**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| KATIE PHANG,<br><br>       Plaintiff,<br><br>    v.<br><br>TODD BLANCHE,<br>in his official capacity as Acting Attorney<br>General of the United States,<br><br>       Defendant. | Civil Action No. 26-1417 (EGS) |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF APPLICATION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................ 5

BACKGROUND ............................................................................................................. 6

    I.     The Epstein Files Transparency Act ............................................................. 6

         A.     Over several decades, Jeffrey Epstein committed an array
               of horrific crimes............................................................................. 6

         B.     Epstein at first largely evaded justice due, in significant part, to a
               favorable deal he struck with then–U.S. Attorney Alexander Acosta. ....... 8

         C.     Investigative reporting in 2018 led to renewed scrutiny of Epstein
               and his network, culminating in new federal charges............................. 10

         D.     Epstein's 2019 death in pretrial detention heightened public interest
               in his and his associates' misdeeds, yet answers remained elusive. ......... 11

         E.     Last year, a wave of public pressure led Congress to impose
               sweeping disclosure mandates on the Attorney General and
               Department of Justice. ................................................................... 11

    II.    DOJ's Productions Under the Act............................................................... 13

         A.     The Department of Justice released some of the Epstein Files but
               provided minimal justification for thousands of withholdings and
               redactions. ................................................................................... 13

         B.     Public scrutiny revealed that the Department had failed to comply
               with the Act in many key respects. ........................................................ 14

    III.   Plaintiff Katie Phang......................................................................... 15

         A.     Phang has reported on the Epstein story in great depth for years............. 15

         B.     Blanche's violations of the Act have interfered with Phang's
               reporting and harmed her business. ...................................................... 16

LEGAL STANDARD...................................................................................................... 17

ARGUMENT ................................................................................................................. 17

    I.     Phang is likely to succeed on the merits of her claims. ...................................... 17

         A.     Phang is likely to establish standing. ....................................................... 17

         B.     Phang is likely to prevail on the merits of her administrative law
               claims. ......................................................................................... 22

    II.    Phang will suffer irreparable harm absent preliminary injunctive relief. ............. 31

    III.   The balance of equities and public interest favor the swift disclosure
       of Epstein materials that Congress has mandated.............................................. 34

CONCLUSION............................................................................................................... 35

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Appalachian Voices v. McCarthy*,
989 F. Supp. 2d 30 (D.D.C. 2013) ........................................................................31

*Attias v. Carefirst, Inc.*,
865 F.3d 620 (D.C. Cir. 2017) ...............................................................................22

*Banner Health v. Price*,
867 F.3d 1323 (D.C. Cir. 2017) .............................................................................17

*Cherokee Nation v. DOI*,
643 F. Supp. 3d 90 (D.D.C. 2022) .........................................................................21

*CREW v. OMB*,
791 F. Supp. 3d 29 (D.D.C. 2025) ..............................................................18, 19, 21

*FEC v. Akins*,
524 U.S. 11 (1998) ................................................................................................18

*Friends of Animals v. Culver*,
610 F. Supp. 3d 157 (D.D.C. 2022) .......................................................................31

*Friends of Animals v. Jewell*,
828 F.3d 989 (D.C. Cir. 2016) ...............................................................................18

*Friends of the Earth v. Laidlaw Envtl. Servs.*,
528 U.S. 167 (2000) ..............................................................................................18

*Hecate Energy LLC v. FERC*,
126 F.4th 660 (D.C. Cir. 2025) .............................................................................22

*Humane Soc'y of the U.S. v. Vilsack*,
797 F.3d 4 (D.C. Cir. 2015) ..................................................................................21

*Judicial Watch, Inc. v. DHS*,
514 F. Supp. 2d 7 (D.D.C. 2007) ..........................................................................31

*Kan. Corp. Comm'n v. FERC*,
881 F.3d 924 (D.C. Cir. 2018) ..............................................................................18

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ..................................................................................34

*LULAC v. Exec. Off. of the President*,
780 F. Supp. 3d 135 (D.D.C. 2025) ..................................................................17, 34

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ..............................................................................................18

*Media Matters for Am. v. Paxton*,
   138 F.4th 563 (D.C. Cir. 2025) ..............................................................................17

*Milner v. Dep't of the Navy*,
   562 U.S. 562 (2011) ...............................................................................................29

*Nken v. Holder*,
   556 U.S. 418 (2009) ...............................................................................................17

*Page v. Comey*,
   137 F.4th 806 (D.C. Cir. 2025) ..............................................................................32

*\*Public Citizen v. Carlin*,
   2 F. Supp. 2d 1 (D.D.C. 1997) ...............................................................................20

*Safari Club Int'l v. Jewell*,
   842 F.3d 1280 (D.C. Cir. 2016) ..............................................................................22

*Sai v. TSA*,
   54 F. Supp. 3d 5 (D.D.C. 2014) .............................................................................31

*\*Seife v. HHS*,
   440 F. Supp. 3d 254 (S.D.N.Y. 2020) ....................................................................20

*United States v. Kubrick*,
   444 U.S. 111 (1979) ...............................................................................................32

*Waterkeeper All. v. EPA*,
   853 F.3d 527 (D.C. Cir. 2017) ................................................................................18

*WildEarth Guardians v. Salazar*,
   859 F. Supp. 2d 83 (D.D.C. 2012) ..........................................................................19

**Statutes**

Epstein Files Transparency Act, Pub. L. No. 119–38 ......................................... *passim*

5 U.S.C. § 706(1) ..............................................................................................22, 28, 30, 31

5 U.S.C. § 706(2) ................................................................................................ *passim*

**Other Authorities**

171 Cong. Rec. (daily ed. Nov. 18, 2025) ..................................................................19

*Accompany*, American Heritage Dictionary (2022),
   https://www.ahdictionary.com/word/search.html?q=accompany ...........................31

DOJ, Justice Manual § 9-13.530 (Special Considerations – Translations) ...................30

Dennis P. Stolle, *et al.*, *Effectively Managing Foreign Language Documents in
   Commercial Litigation: It's All Greek to Me*, Nat'l L. Rev. (June 16, 2016) ..........30

**INTRODUCTION**

The Epstein Files Transparency Act requires the Attorney General to produce, with few exceptions, all files in the Department of Justice's possession related to Jeffrey Epstein, Ghislaine Maxwell, their networks, and their crimes. Defendant Todd Blanche, the Acting Attorney General, has flouted Congress's directives and the Act's unambiguous commands. Among other deficiencies, Blanche has redacted the names of Epstein's friends, associates, and potential co-conspirators, withheld documents implicating his own boss—President Donald J. Trump—in alleged crimes, and invoked exceptions to disclosure that Congress never authorized.

Plaintiff Katie Phang is an independent journalist who has covered Epstein, his network, and his victims for many years. In the past year alone, Phang has published 72 videos about Epstein, Maxwell, and the Epstein Files. Phang relies on materials disclosed under the Act to report many of her stories, so Blanche's flagrant violations of the Act have made it much harder for Phang to do her job. Phang brought this case to obtain a comprehensive remedy for Blanche's unlawful conduct. To that end, Phang intends to ask that the Court appoint a special master to oversee Blanche's overall compliance with the Act. When the Nation's chief law enforcement officer persists in violating the plain letter of the law, ongoing judicial oversight is the only certain cure.

For the moment, however, Phang seeks only to redress the irreparable injuries that she, fellow journalists, and Epstein's victims are suffering because of Blanche's most brazen violations of the Act. Phang requests a narrow preliminary injunction against those violations. First, Blanche must unredact the names of Epstein's associates in eight particularly odious emails. Second, Blanche must unredact the names of potential co-conspirators in two internal Department of Justice documents. Third, Blanche must produce a set of illegally withheld documents from an FBI investigation into allegations about President Donald Trump. Fourth, Blanche must initiate a review and production of foreign-language documents, which he has inexplicably excused the

Department from reviewing at all. And fifth, Blanche must promptly publish in the Federal Register the required log explaining each redaction.

Phang satisfies the requirements to obtain such relief. Blanche's violations of the Act are obvious, and Phang accordingly is likely to prevail on the merits of her claims. Blanche's illegal acts are causing Phang—an investigative journalist covering the Epstein story—informational injuries and direct financial loss, creating Article III standing and threatening irreparable harm absent an injunction. And the balance of equities and public interest favor requiring the Attorney General and Department of Justice to obey the law. The Court should grant the motion.

## BACKGROUND

I.      **The Epstein Files Transparency Act**

A.      **Over several decades, Jeffrey Epstein committed an array of horrific crimes.**

Jeffrey Epstein was a multimillionaire Wall Street financier.[1] He maintained intimate ties with many high-profile political figures, business leaders, academics, and cultural icons, among other notables.[2]

---

[1] *See* Giacomo Tognini & John Hyatt, *How Jeffrey Epstein Got So Rich*, Forbes (updated Jul. 26, 2025), https://www.forbes.com/sites/giacomotognini/2025/07/25/how-jeffrey-epstein-got-so-rich/ [https://archive.is/vcOW3]; David Enrich, *et al.*, *Scams, Schemes, Ruthless Cons: The Untold Story of How Jeffrey Epstein Got Rich*, N.Y. Times (Dec. 16, 2025), https://www.nytimes.com/2025/12/16/magazine/jeffrey-epstein-money-scams-investigation.html [https://archive.is/Loytl].

[2] *See, e.g.*, Luke Broadwater, *A Timeline of What We Know About Trump and Epstein*, N.Y. Times (last updated Nov. 12, 2025), https://www.nytimes.com/2025/07/17/us/politics/timeline-trump-epstein.html [https://archive.is/QXbdW]; Eloise Barry, *After Barclays CEO's Departure, Here Are Some of the Other Business Executives Linked to Jeffrey Epstein*, Time (Nov. 5, 2021), https://time.com/6114433/jeffrey-epstein-business-connections/ [https://archive.is/jsFe5]; Mark Arsenault, *Lawrence Summers Will Resign From Harvard After Epstein Revelations*, N.Y. Times (Feb. 25, 2026), https://www.nytimes.com/2026/02/25/us/larry-summers-resignation-harvard-epstein.html [https://archive.is/BViBS]; Ramon Antonio Vargas, *Chomsky had deeper ties with Epstein than previously known, documents reveal*, The Guardian (Nov. 22, 2025), https://www.theguardian.com/us-news/2025/nov/22/noam-chomsky-jeffrey-epstein-ties-emails [https://archive.is/aighL]; Ginia Bellafante, *Woody Allen Is Not Sorry About His Friendship With*

Epstein was also a prolific sexual predator and trafficker who, across several decades, victimized many women and children.[3] Because Epstein died in pretrial detention in 2019, the full scope of his crimes will never be certain. But the accusations against Epstein include rape and sexual assault, sex trafficking of both adults and minors, kidnapping and false imprisonment, possession of child pornography, soliciting prostitution, conspiracy, and obstruction of justice.[4] Epstein's estate has paid out several hundred million dollars in settlements to hundreds of victims.[5] The Department and FBI have estimated that the total number of Epstein victims exceeds one thousand.[6]

---

*Jeffrey Epstein*, N.Y. Times (Dec. 13, 2025), https://www.nytimes.com/2025/12/13/style/allen-epstein.html [https://archive.is/RMPed].

[3] *See* Bill Chappell, *Jeffrey Epstein files: Tracing the legal cases that led to sex-trafficking charges*, NPR (July 25, 2025), https://www.npr.org/2025/07/25/nx-s1-5478620/jeffrey-epstein-crimes-timeline-legal-case [https://archive.is/khZUZ]; *see generally* Decl. of Samuel T. Ward-Packard ("Ward-Packard Decl.") Ex. A (Sealed Indictment, *United States v. Epstein*, 1:19-cr-490 (S.D.N.Y. July 2, 2019) (Doc. 2)); Ward-Packard Decl. Ex. B at 26–86 (Tr. of Aug. 27, 2019, Hearing at 28–86, *Epstein*, 1:19-cr-490 (S.D.N.Y. Sept. 3, 2019) (Doc. 53) [hereinafter, "Victims Hearing Tr."]).

[4] *See, e.g.*, Victims Hearing Tr., *supra* n.3, at 44 (rape); *id.* at 78 (rape); *id.* at 59 (trafficking); Bridget Read, *A 15 Year-Old Girl Was Allegedly Held Hostage on Epstein's Island*, The Cut (Aug. 9, 2019), https://www.thecut.com/2019/08/jeffrey-epstein-allegedly-held-a-15-year-old-on-his-island.html [https://archive.is/x39xB] (trafficking, kidnapping, false imprisonment); Mike Baker & Matthew Goldstein, *Epstein Files Include 1996 Child Porn Complaint That F.B.I. Ignored*, N.Y. Times (Dec. 19, 2025), https://www.nytimes.com/2025/12/19/us/epstein-fbi-complaint-1996-maria-farmer.html [https://archive.is/4xNPt] (child pornography).

[5] *See* Matthew Goldstein, *Fund for Jeffrey Epstein's Victims Has Paid Out More Than $121 Million*, N.Y. Times (Aug. 9, 2021), https://www.nytimes.com/2021/08/09/business/jeffrey-epstein-victims-fund.html [https://archive.is/KN4pB]; Kaanita Iyer, *Epstein estate reaches settlement of up to $35 million with survivors*, CNN (updated Feb. 20, 2026), https://www.cnn.com/2026/02/20/politics/epstein-estate-settlement-victims [archive.is/lKQ0D].

[6] Memorandum from U.S. DOJ and FBI (July 7, 2025), *available at* https://www.justice.gov/opa/media/1407001/dl.

**B.** **Epstein at first largely evaded justice due, in significant part, to a favorable deal he struck with then–U.S. Attorney Alexander Acosta.**

Epstein's activities first came to the attention of federal law enforcement no later than 1996, when Maria Farmer, an artist Epstein had hired, told the FBI that Epstein had stolen nude images of her minor sisters, threatened her with arson, and asked her to take pictures of girls at swimming pools.[7] But the FBI ignored the report, burying it for nearly three decades, and no charges were ever brought.[8]

In 2001, local Florida police investigated reports that Ghislaine Maxwell—Epstein's longtime confidante and "best friend"[9]—had approached underage girls about working at Epstein's Palm Beach mansion.[10] That investigation turned up evidence of Epstein's inappropriately touching girls or young women, Maxwell's engaging in widespread solicitation of local college students, and possible prostitution.[11] But again, no charges were brought.[12]

In 2005, Epstein again came under scrutiny from law enforcement. Parents of a fourteen-year-old girl told Palm Beach police that their daughter had been molested at Epstein's beachfront home.[13] Police conversations with that victim led to several others—also underaged girls—who in

---

[7] Baker & Goldstein, *supra* n.4

[8] *Id.*

[9] Vicky Ward, *The Talented Mr. Epstein*, Vanity Fair (Mar. 2003), https://www.vanityfair.com/news/2003/03/jeffrey-epstein-200303 [https://archive.is/oGgIQ].

[10] Hannah Phillips, *Epstein investigation began years earlier than previously believed*, Palm Beach Post (Feb. 14, 2026), https://www.palmbeachpost.com/story/news/2026/02/14/girls-reported-epstein-maxwell-to-police-in-2001-years-before-previously-believed/88669757007/ [https://archive.is/tnGQR].

[11] *Id.*

[12] *Id.*

[13] Julie K. Brown, *How a future Trump Cabinet member gave a serial sex abuser the deal of a lifetime*, Miami Herald (last updated Feb. 13, 2026), https://www.miamiherald.com/news/local/crime/article220097825.html [https://archive.is/iAbS1].

turn led to several, and eventually dozens, more victims, in what one detective described as "a sexual pyramid scheme."[14]

In 2006, a Palm Beach grand jury indicted Epstein on charges of felony solicitation of prostitution.[15] But the police investigating the case believed that the Palm Beach County State Attorney's Office was undermining the investigation by failing to charge all of Epstein's conduct.[16] They accordingly referred the matter to the FBI.[17]

The resulting probe "stretched from Florida to New York and New Mexico,"[18] and involved over 100 Jane Doe witnesses.[19] Based on that investigation, prosecutors prepared a 60-count indictment charging Epstein with dozens of counts of sex trafficking, enticement of a minor, and conspiracy.[20] Had Epstein been convicted of even some of the charges, he would have faced decades in prison. The draft indictment also charged a number of co-conspirators.

But that indictment was never filed. Instead, then-U.S. Attorney R. Alexander Acosta offered, and Epstein accepted, a secret non-prosecution agreement.[21] Under its terms, Epstein

---

[14] *Id.*

[15] Ward-Packard Decl. Ex. C (Department of Justice, Office of Professional Responsibility, Executive Summary of Report of Investigation into the U.S. Attorney's Office for the Southern District of Florida's Resolution of Its 2006–2008 Federal Criminal Investigation of Jeffrey Epstein and Its Interactions with Victims during the Investigation at 2 (Nov. 2020) [hereinafter "OPR Investigation"]).

[16] *Id.*

[17] *Id.*

[18] Brown, *supra* n.13.

[19] Julie K. Brown, *Cops worked to put serial sex abuser in prison. Prosecutors worked to cut him a break*, Miami Herald (last updated Feb. 13, 2026), https://www.miamiherald.com/news/local/crime/article214210674.html [https://archive.is/ARJNk].

[20] Ward-Packard Decl. Ex. A.

[21] OPR Investigation, *supra* n.15, at 2.

pleaded guilty to Florida state charges of solicitation of prostitution and procurement of minors for prostitution, and agreed to make a binding recommendation to the state court that he be sentenced to just 18 months in county jail plus 12 months house arrest.[22] In exchange, Acosta never brought federal charges. Victims were not informed of or consulted about the agreement.[23]

Epstein ultimately served just 13 months in a private wing of the Palm Beach County jail.[24] Although sheriff's department rules prohibited granting work-release privileges to sex offenders, Epstein was permitted to spend 12 hours a day, six days a week, at an office in West Palm Beach.[25] And none of the co-conspirators named in the draft indictment were ever charged at all.

### C. Investigative reporting in 2018 led to renewed scrutiny of Epstein and his network, culminating in new federal charges.

In late 2018, the Miami Herald published a series of stories revealing Epstein's decades-long sex trafficking career, his sweetheart plea deal with federal prosecutors, and his remarkable network of rich and powerful friends.[26] This reporting galvanized a new prosecution effort, this time led by the U.S. Attorney's Office for the Southern District of New York. Seven months after the Miami Herald stories came out, Epstein was arrested and indicted on sex trafficking and conspiracy charges.[27]

---

[22] *Id.* at 3.

[23] *Id.*

[24] Brown, *supra* n.13.

[25] *Id.*

[26] *See id.*; Brown, *supra* n. 18; Julie K. Brown, *Even from jail, sex abuser manipulated the system. His victims were kept in the dark*, Miami Herald (last updated Feb. 13, 2026), https://www.miamiherald.com/news/local/crime/article219494920.html [https://archive.is/FKYe8].

[27] Patricia Mazzei & William K. Rashbaum, *Jeffrey Epstein, Financier Long Accused of Molesting Minors, Is Charged*, N.Y. Times (July 6, 2019), https://www.nytimes.com/2019/07/06/nyregion/jeffrey-epstein-arrested-sex-trafficking.html [https://archive.is/wdRaN]; *see also* Ward-Packard Decl. Ex. A.

10

**D.      Epstein's 2019 death in pretrial detention heightened public interest in his and his associates' misdeeds, yet answers remained elusive.**

But a month after his arrest, Epstein died in pretrial custody, in what was ruled a suicide by hanging.[28] With the defendant dead, the indictment against Epstein was dismissed, depriving both victims and the public of the full and final adjudication of his crimes that only a trial could have furnished.

Despite his death—or perhaps because of it—interest in Epstein has remained extraordinarily high. Questions about five aspects of his case in particular have persisted in the public consciousness: the nature and scope of Epstein's never-fully-adjudicated crimes; the identities of Epstein's potential co-conspirators, and whether they have evaded justice; the powerful people and institutions—the "Epstein elite"—that surrounded Epstein and gave him cover; the many prosecutorial and law enforcement missteps that left Epstein at liberty for so long; and the circumstances of Epstein's death.

**E.      Last year, a wave of public pressure led Congress to impose sweeping disclosure mandates on the Attorney General and Department of Justice.**

In recent years, the public's, lawmakers', and journalists' desire to resolve such questions crystalized into demands to "release the Epstein Files"—meaning the millions of Epstein-related documents, photographs, and videos in the FBI's, DOJ's, and federal prosecutors' possession. In late 2025, facing a growing and bipartisan chorus of such demands, Congress enacted the Epstein Files Transparency Act, Pub. L. No. 119–38 (the "Act").

The Act, which passed by unanimous consent through the Senate and by a 427 to 1 vote in the House, has five key features.

---

[28] Ali Watkins, *et al.*, *Inmate 76318-054: The Last Days of Jeffrey Epstein*, N.Y. Times (Aug. 17, 2019), https://www.nytimes.com/2019/08/17/nyregion/epstein-suicide-death.html [https://archive.is/xmWFZ].

First, the Act requires the Attorney General to identify and publicly disclose all files in the Department's, the Bureau's, or any U.S. Attorney's possession that "relate to" one or more of nine subjects: (i) Epstein; (ii) Maxwell; (iii) travel by Epstein or his associates (*e.g.*, flight logs); (iv) individuals associated with Epstein's criminal activities (*e.g.*, known or potential co-conspirators); (v) entities associated with Epstein's criminal activities (*e.g.*, banks, foundations); (vi) outcomes of the various cases against Epstein and his associates (*e.g.*, plea agreements); (vii) DOJ internal decisionmaking regarding Epstein and his associates (*e.g.*, charging memos); (viii) management and destruction of Epstein-related data or evidence (*e.g.*, metadata); and (ix) Epstein's death (*e.g.*, autopsy reports). Act § 2(a)(1)–(9).

Second, the Act allows the Attorney General to "withhold or redact the segregable portions" of otherwise-covered files on any of five grounds: (i) to protect victims' personal and medical information, the disclosure of which would be "clearly unwarranted"; (ii) to avoid disseminating child sexual abuse materials; (iii) to avoid jeopardizing active investigations or prosecutions (but such withholding must be temporary and narrowly tailored); (iv) to avoid disseminating images of death, physical abuse, or injury; or (v) to protect national security (but only where the materials are properly classified under a valid executive order). *Id.* § 2(c)(1)(A)–(E). The Act makes explicit that "embarrassment, reputational harm, or political sensitivity" are not permitted grounds for withholding or redaction. *Id.* § 2(b).

Third, the Act requires the Attorney General to "declassify" classified information otherwise subject to disclosure "to the maximum extent possible," or, where declassification is not possible, to prepare an unclassified summary. *Id.* § 2(c)(3).

Fourth, the Act requires the Attorney General to publish a written justification for each redaction in the Federal Register, as well as for any decision to classify material made after July 1, 2025. *Id.* § 2(c)(2), (4).

Fifth and finally, the Act requires the Attorney General to submit to the House and Senate Judiciary Committees a report listing (i) records released and withheld; (ii) a summary of redactions, including legal basis; and (iii) a list of all "government officials and politically exposed persons named or referenced in the released materials." *Id.* § 3. This report must be issued within 15 days of the release of the covered materials. *Id.* This requirement for a report is separate from the requirement to publish a redaction log justifying each individual redaction.

The Act required the Attorney General to comply with its disclosure mandate within 30 days of enactment, corresponding to a deadline of December 19, 2025.

## II.    DOJ's Productions Under the Act

### A.    The Department of Justice released some of the Epstein Files but provided minimal justification for thousands of withholdings and redactions.

On December 19, 2025, the deadline to complete production, then–Deputy Attorney General Blanche issued a letter to Congress asserting that the Department was "producing hundreds of thousands of pages." Declaration of Samuel T. Ward-Packard ("Ward-Packard Decl."), Ex. D at 1. In reality, the Department released only a few thousand files on that date.

Blanche's December 19 letter also outlined the Department's "Review Protocol." *Id.* at 1–2. Among other things, the letter asserted that material had been redacted or withheld pursuant only to (i) the five exemptions set out in section 2(c)(1) of the act or (ii) "various privileges . . . based in common law." *Id.* The letter indicated that a "privilege log" would be "produced in due course" without committing to any specific deadline. *Id.*

The Department made further productions on December 20, 22, and 23, 2025, and January 30, 2026. None of those productions was accompanied by a privilege log.

On January 30, the Department issued a second letter signed by Blanche indicating that the January 30 production "mark[ed] the Department's compliance with its production obligations under the Act." Ward-Packard Decl. Ex. E at 1. Blanche's letter asserted that the Department had identified "more than 6 million pages" as "potentially responsive" and had released "nearly 3.5 million pages" after a multi-round review process. *Id.* at 1–2. Blanche also claimed that "200,000 pages [had] been redacted or withheld based on various privileges," and promised that a "formal report with a summary of redactions made" would be submitted to Congress within 15 days. *Id.* at 4. And Blanche disclosed that "foreign-language document[s]" had not been reviewed or produced at all—apparently, first-level responsiveness review was deemed "not practicable." *Id.* at 5.

On February 14, the Department issued a third letter signed by Blanche, which it characterized as the "report" to Congress required under Act section 3. Ward-Packard Decl. Ex. F at 1. Its promised "summary" of redactions was exceptionally brief—the report just identified in a few paragraphs the redaction bases employed, without explaining or justifying any individual redaction. *Id.* at 2–3. The report did not indicate whether or when the redaction log required under Act section 2(c)(2) would be forthcoming.

## B.    Public scrutiny revealed that the Department had failed to comply with the Act in many key respects.

The Department's productions failed to comply with many of the Act's provisions. Several of those deficiencies are at issue in the instant motion. The specific failures at issue here include the illegal redactions of Epstein associates' names, the illegal redactions of alleged co-conspirator names, the improper withholding of materials that mention Donald Trump, the failure to review

14

any foreign-language materials at all, and the failure thus far to publish a redaction log. Those five deficiencies are analyzed in more detail below. *See infra* Argument § I.B.1.–5.

The Department also made many more mistakes that are not directly challenged here. Among other things, the Department failed redact at least 43 victims' names[29] and produced dozens of initially unredacted photographs of nude women and girls,[30] and as a result had to take down thousands of previously produced files.[31] Counsel for victims described the productions as "the single most egregious violation of victim privacy in one day in United States history."[32]

In response to extensive reporting about these and other deficiencies, the Department's Office of the Inspector General announced on April 23 that it would audit the Department's compliance with the Act.[33]

### III.   Plaintiff Katie Phang

#### A.      Phang has reported on the Epstein story in great depth for years.

Plaintiff Katie Phang is an attorney and independent journalist based in Miami, Florida. Decl. of Katie Phang ("Phang Decl.") ¶ 2. She previously hosted a show—*The Katie Phang*

---

[29] Khadeeja Safdar & Brian Whitton, *Epstein Files Release Exposes Names of at Least 43 Victims, WSJ Review Finds*, Wall St. J. (last updated Feb. 1, 2026), https://www.wsj.com/us-news/law/epstein-files-release-exposes-names-of-at-least-43-victims-wsj-review-finds-ba4ff95e [https://archive.is/Wq9Va].

[30] Mike Baker & Julie Tate, *The Government Published Dozens of Nude Photos in the Epstein Files*, N.Y. Times (Feb. 1, 2026), https://www.nytimes.com/2026/02/01/us/nude-photos-epstein-files.html [https://archive.is/Q3wte].

[31] Jessica Rawnsley, *Thousands of Epstein documents taken down after victims identified*, BBC     (Feb.     4,     2026),     https://www.bbc.com/news/articles/cn0k65pnxjxo [https://archive.is/tBpYW].

[32] *Id.*

[33] Dep't of Justice Office of the Inspector General, DOJ OIG Announces Initiation of Audit (Apr. 23, 2026), https://oig.justice.gov/news/doj-oig-announces-initiation-audit.

*Show*—on MSNBC, and now reports on legal news via an array of platforms, including YouTube and Substack. *Id.* ¶¶ 6–7.

A South Florida native, Phang has extensively covered the crimes of Jeffrey Epstein, Ghislaine Maxwell, and others in the Epstein elite. *Id.* ¶ 8. In just the past year, she has published 72 videos about Epstein, Maxwell, or the Epstein Files. *Id.* ¶ 9. Phang has also interviewed people connected to the Epstein tragedy, including at least two survivors of Epstein's abuse. *Id.* ¶ 10. To date, Phang's Epstein episodes have recorded 9.7 million views and have earned Phang tens of thousands of dollars in revenue. *Id.* ¶ 11; *see also id.* ¶¶ 37–40. To conduct her reporting, Phang has personally reviewed many of the documents produced under the Act. *Id.* ¶ 12.

**B.    Blanche's violations of the Act have interfered with Phang's reporting and harmed her business.**

Blanche's violations of the Act have interfered with Phang's ability to perform her job as an investigative reporter. *Id.* ¶ 13. With key documents redacted in whole or in part, and the bases for those redactions left wholly unexplained, Phang cannot comprehensively understand or report on the meaning of the materials that have been produced. *See, e.g.*, *id.* ¶ 15–17. With other documents retracted or never produced at all, Phang cannot understand or report on the full scope of the government's investigation. *See, e.g.*, *id.* ¶¶ 22–31. This has led Phang not to report many stories she otherwise would have produced videos about. As relevant here, Blanche's violations of the Act have prevented Phang from publishing videos reporting on (i) the identities of email senders and recipients whose names Blanche redacted, (ii) the identities of alleged co-conspirators whose names Blanche redacted, (iii) certain allegations about President Trump, (iv) Epstein's extensive overseas network, and (v) the Department's overall compliance with the Act. Phang Decl. ¶¶ 14–34.

By constraining Phang's ability to report comprehensively on these stories, Blanche has also caused Phang direct financial losses. Phang Decl. ¶¶ 35–46. Of course, those financial harms matter far less than the informational harms and harms to victims Blanche's unlawful conduct has inflicted. But they are further evidence of the broad and ongoing damage caused by Blanche's failure to comply with the Act.

## LEGAL STANDARD

To obtain a preliminary injunction, "a party must establish that [she] is likely to succeed on the merits, that [she] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [her] favor, and that an injunction is in the public interest." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 573 (D.C. Cir. 2025) (citation omitted). "'When the Government is the opposing party' . . . the balance-of-equities and public-interest factors 'merge,' and courts address those factors together." *LULAC v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 169 (D.D.C. 2025) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009) (citation modified).

## ARGUMENT

**I.     Phang is likely to succeed on the merits of her claims.**

Phang satisfies the first criterion for a preliminary injunction because she is likely to establish Article III standing, show that Blanche has violated the Act, and prevail on the merits of her claims.

**A.     Phang is likely to establish standing.**

Phang is likely to establish that she has Article III standing. "To establish Article III standing, the plaintiff must have 'suffered an injury in fact' that 'is fairly traceable to the challenged action of the defendant' and it must be 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Banner Health v. Price*, 867 F.3d 1323, 1333–34 (D.C.

Cir. 2017) (quoting *Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180–81 (2000)). "An injury in fact is an 'invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'" *Kan. Corp. Comm'n v. FERC*, 881 F.3d 924, 929 (D.C. Cir. 2018) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

Blanche's violations of the Act have inflicted two related injuries in fact on Phang. First, Blanche's withholding of materials he is bound by law to disclose has inflicted informational and professional harms on Phang in her capacity as a journalist covering the Epstein Files. Second, and relatedly, Blanche's withholding of such materials has inflicted financial harms on Phang, who would otherwise be able to derive revenue by publishing videos and articles about the withheld files. Each of these injuries is cognizable in federal court; each is fairly traceable to Blanche's lawless disregard for the Act; and each will be redressed by a favorable decision of this Court. Accordingly, Phang is likely to establish standing.

### 1. Phang has suffered cognizable informational injuries.

Blanche, through his failure to comply fully with the Act, has inflicted informational injuries on Phang. A plaintiff "suffers an 'injury in fact' when agency action cuts [her] off from 'information which must be publicly disclosed pursuant to a statute.'" *Waterkeeper All. v. EPA*, 853 F.3d 527, 533 (D.C. Cir. 2017) (quoting *FEC v. Akins*, 524 U.S. 11, 21 (1998)). Courts in this circuit employ a two-element test to determine whether such an "informational injury" is "sufficiently concrete and particularized" to ground standing. *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016). Under that test, the "plaintiff must show that '(1) [she] has been deprived of information that, on [her] interpretation, a statute requires the government or a third party to disclose to [her], and (2) [she] suffers, by being denied access to that information, the type

18

of harm Congress sought to prevent by requiring disclosure.'" *CREW v. OMB*, 791 F. Supp. 3d 29, 45 (D.D.C. 2025) (quoting *Friends of Animals*, 828 F.3d at 992).

Phang satisfies both elements of this test. Under the first element, deprivation of a required disclosure, courts adopt the "plaintiff's reading" of the statute mandating disclosure. *WildEarth Guardians v. Salazar*, 859 F. Supp. 2d 83, 92 (D.D.C. 2012). Here, Phang reads the statute to require a host of disclosures that have not occurred. *Infra* § I.B. And Phang is part of the class to which that disclosure is owed: The Act requires the Department to make covered files "publicly available in a searchable and downloadable format," Act § 2(a), a clear indication that disclosure is owed to the "public at large." *CREW*, 791 F. Supp. 3d at 46. Nothing more is needed to satisfy the first element of the D.C. Circuit's informational-injury test—as this Court has explained, "individualized entitlement to disclosure is not required." *Id.*

As to the second element, the harm, the lack of disclosure to Phang has caused the "harm[s] Congress sought to prevent by requiring disclosure." *CREW*, 791 F. Supp. 3d at 45. Congress enacted the Act to provide "complete truth" for survivors, 171 Cong. Rec. H4726 (daily ed. Nov. 18, 2025) (statement of Rep. Raskin), and to achieve "the maximum possible level of transparency when it comes to the heinous crimes of Jeffrey Epstein," *id.* at H4727 (statement of Rep. Kiley); *cf. CREW*, 791 F. Supp. 3d at 47 (considering legislative history to determine harms relevant to informational injury).[34]

---

[34] *See also, e.g.*, 171 Cong. Rec. H4722 (daily ed. Nov. 18, 2025) (statement of Rep. Thomas Massie) (explaining that the Act's purpose was to provide "transparency for America."); *id.* at S8193 (statement of Sen. Chuck Schumer) ("This isn't about Democrat versus Republicans or about Congress versus the President. This is about giving the American people the transparency they have been crying for."); *id.* at S8191 (Nov. 18, 2025) (statement of Sen. Jeff Merkley) ("The victims and the American people demand not just justice but transparency.").

If those goals are to be realized, journalists must serve as intermediaries. Most victims and members of the public lack the time or capacity to sort through and make sense of millions of disparate, often opaque, and extensively redacted records. Journalists, by contrast, have those skills, and through their reporting are able to mediate the contents of the Epstein Files for the general public—indeed, they have already done so, despite the defects in Blanche's productions to date.

Phang is particularly well situated to serve as such an intermediary. She is a South Florida native and legal journalist who has covered Epstein's crimes for years, across dozens of stories and videos, including through interviews with survivors. Phang Decl. ¶¶ 8–10. Accordingly, denying Phang—as well as her fellow journalists and the rest of the public—access to materials that by law must be disclosed will tend to deprive Epstein's victims of "complete truth," and to frustrate Congress's goal of achieving "the maximum possible level of transparency." Phang would have standing to bring this case merely as an interested member of the public. Her position as a leading journalistic voice covering the Epstein story puts the issue beyond credible dispute.

Courts repeatedly have held, under other disclosure statutes, that journalists like Phang suffer cognizable informational injury when disclosure is frustrated. For instance, in *Seife v. HHS*, an investigative journalist sued to challenge an agency rule that would have exempted developers of older drugs from disclosing information which was otherwise required by statute to be disclosed. 440 F. Supp. 3d 254, 268, 272–73 (S.D.N.Y. 2020). The court held that the journalist had standing because the agency had "stymied" his "research into [a certain drug's] safety and effectiveness"— the very goals Congress aimed to further by mandating disclosure. *Id.* Similarly, in *Public Citizen v. Carlin*, this district held that a "research, author, and journalist" suffered cognizable informational injury from a regulation authorizing disposal of electronic records that he relied on

for research. 2 F. Supp. 2d 1, 5–6 (D.D.C. 1997), *rev'd on other grounds*, 184 F.3d 900 (D.C. Cir. 1999). These cases confirm that Phang has suffered a cognizable informational injury.

### 2.    Phang has suffered cognizable economic injuries.

Blanche also has inflicted economic injuries on Phang by failing to disclose materials in violation of the Act. An "actual economic loss" is "a classic form of concrete and particularized harm" that suffices by itself to ground Article III standing. *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 9 (D.C. Cir. 2015).

Here, Phang's declaration establishes that Blanche's actions have caused her—and are continuing to cause her—such an "actual economic loss." As an independent journalist who publishes on YouTube, Phang is able to track the impressions and revenue derived from each episode. Phang Decl. ¶ 37. Phang's Epstein reporting reliably draws very substantial traffic. For instance, one recent video has recorded over 190,000 views, earning Phang hundreds of dollars in revenue. *Id.* ¶ 38. Phang's Epstein-related episodes routinely perform that well or better. *Id.* ¶¶ 39–40.

Blanche's illegal actions have denied Phang access to certain Epstein Files, meaning that she is unable to publish additional videos about stories that she would otherwise pursue. *Id.* ¶ 41. Phang has accordingly lost out on thousands of dollars in revenue, a loss that continues to grow each day. *Id.* ¶ 42. This textbook economic injury provides a separate and independent basis for Phang's standing. *See CREW*, 791 F. Supp. 3d at 51 (treating an economic injury resulting from denial of disclosure as a freestanding basis for standing).

### 3.    Phang's injuries are traceable to Blanche's actions and would be redressed by a favorable judgment.

Both of Phang's cognizable injuries are fairly traceable to Blanche's violations of the Act. Courts apply a but-for test to this aspect of standing: "if some part of the alleged injury would not

have occurred, or will not occur, but for the challenged action, then the injury is fairly traceable to the challenged action." *Cherokee Nation v. DOI*, 643 F. Supp. 3d 90, 106 (D.D.C. 2022); *see also, e.g.*, *Attias v. Carefirst, Inc.*, 865 F.3d 620, 629 (D.C. Cir. 2017). Blanche's conduct is a but-for cause of both of Phang's injuries. Phang would not be deprived of the withheld materials if Blanche had complied with his statutory obligation to release them. And had those materials been disclosed, Phang could have reported on them.

By the same logic, resolution of this case in Phang's favor would redress her injuries. If the Court orders Blanche to comply with the Act, Phang will no longer be improperly deprived of the withheld materials, and will be able to grow her viewership and derive revenue by reporting on them. This more than suffices to satisfy the redressability requirement. *See Hecate Energy LLC v. FERC*, 126 F.4th 660, 666 (D.C. Cir. 2025).

### B.      Phang is likely to prevail on the merits of her administrative law claims.

Phang is likely to establish that Blanche has violated the Act, and, accordingly, is likely to prevail on her administrative law claims. Under the Administrative Procedure Act (APA), a reviewing court (i) "shall . . . compel agency action unlawfully held or unreasonably delayed;" and (ii) "shall . . . hold unlawful and set aside" final "agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," as well as final agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(1), (2)(A), (C).

Blanche's production of materials under the Act is a final agency action because Blanche stated that the January 30 production "mark[ed] the Department's compliance with its production obligations under the Act." Ward-Packard Decl. Ex. E at 1; *see, e.g.*, *Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1289 (D.C. Cir. 2016) (defining final agency actions). Phang is likely to establish that the production violated the Epstein Act in five concrete ways relevant to the instant motion.

22

She is also likely to establish that each of those deficiencies violates one or more provisions of the APA.

### 1.    Blanche has violated the Act by improperly redacting sender and recipient names in emails.

Blanche has violated the Act by redacting names in emails that are not subject to redaction. The Act requires Blanche to redact victims' personal information and, in limited circumstances, other identifying information. *See* Act § 2(c)(1). The Act otherwise mandates disclosure of all names in the files, *see id.* § 2(a), and expressly prohibits any redaction "on the basis of embarrassment, reputational harm, or political sensitivity," *id.* § 2(b)(1). Blanche has violated these provisions with respect to at least eight email exchanges:

- In EFTA00749245,[35] an April 24, 2009, email exchange in which Epstein writes, "where are you? are you ok I loved the torture video," the recipient responds "I am in china I will be in the US 2nd week of may," and Epstein replies, "Hope to see you," Blanche has redacted the recipient's name. Phang Decl. Ex. A.

- In EFTA01187999, a January 17, 2013, email reading "New Brazilian just arrived, sexy and cute, 19yo," and attaching five images, Blanche has redacted both the sender's and the recipient's names. Phang Decl. Ex. B.

- In EFTA01930501, a March 11, 2014, email to Epstein reading "Thank you for a fun night… Your littlest girl was a little naughty," Blanche has redacted the sender's name. Phang Decl. Ex. C.

---

[35] This brief identifies Epstein Files documents produced to date using the EFTA Bates number in the lower right corner of the first page of the document. All cited Epstein Files documents may be viewed on the DOJ Epstein Library webpage, https://www.justice.gov/epstein, and are also attached as exhibits to either the Phang or the Ward-Packard declaration.

- In EFTA01928255, an April 21, 2014, email to Epstein reading "I can't take it anymore!!!!!!! I just saw the most beautiful little girl on Madison with long soft blonde hair," Blanche has redacted the sender's name. Phang Decl. Ex. D.

- In EFTA00628112, a February 2, 2015, email to Epstein that includes the line "the key are the 14 to 15 year old girls—i am a sexual pervert because i say they are now of a reproductive age?", Blanche has redacted the sender's name. Phang Decl. Ex. E.[36]

- In EFTA02648868, a May 23, 2017, email to Epstein reading "I met [REDACTED] today. She is like Lolita from Nabokov , femme miniature :) So now I should send you her type of candidates only  ? [*sic*]", Blanche has redacted the sender's name. Phang Decl. Ex. F.

---

[36] This redaction is especially troubling because contemporaneous public-record reporting strongly hints at the identity of the sender. The EFTA00628112 email refers to a "Reuters piece" that has already been published, then asserts that "in a day or two the Guardian will come out with a lengthier piece in which they tried to trap me and succeeded in good part." Phang Decl. Ex. E.

In early February 2015, the Guardian syndicated a Reuters article in which it was reported that evolutionary biologist Robert Trivers had defended Epstein by saying, "By the time they're 14 or 15, they're like grown women were 60 years ago, so I don't see these acts as so heinous." *Jeffrey Epstein: charities turning backs on financier accused in sex case*, The Guardian (Feb. 1, 2015), https://www.theguardian.com/us-news/2015/feb/01/jeffrey-epstein-charities-refuse-money-financier-sex-case [https://archive.is/fSxN9]. No other figure is reported to have made similar remarks during that period.  And Trivers appears many times in other Epstein Files (with his name unredacted). For instance, EFTA00822574 is a long email exchange between Trivers and Epstein about meeting up for, in Trivers' words, "some quality time." Ward-Packard Decl. Ex. G. In those other emails, Trivers employs the same stylistic quirks as the author of EFTA00628112— for instance, failing to capitalize the first-person pronoun "I." *Id.*

Trivers thus appears to be the author of the email in question. That would mean Blanche has redacted Trivers' name in one particularly embarrassing email, yet left his name unredacted in many other less objectionable files. The Act expressly prohibits Blanche from doing that. Act § 2(b)(1).

- In EFTA02504630, a March 19, 2018, email to Epstein reading "I found at least 3 very good young poor but we was so tired. I will cover up this week. Meet this one, not the beauty queen but we both likes her a lot," Blanche has redacted the sender's name. Phang Decl. Ex. G.

- In EFTA01022356, a September 21, 2018 email exchange in which the sender writes, "My favorite from Lithuania, [REDACTED], 19. Will meet when I am there," and Epstein responds "full name instagram?," Blanche has redacted the sender's name. Phang Decl. Ex. H.

At best, the persons whose names are redacted in these emails are implicated in embarrassing, misogynistic chumminess with a convicted sex offender. Several of the emails suggest far worse—implying complicity in prostitution, sex trafficking, and even torture.

The Act is explicit that names may not be redacted "on the basis of embarrassment, reputational harm, or political sensitivity." The Act's principal basis for redaction—for victim PII, Act § 2(c)(1)(A)—is not a plausible basis for redacting these emails given their contents. And the only other exception that conceivably might apply—temporary redaction to protect an ongoing investigation or prosecution, *id.* § 2(c)(1)(C)—could not be the basis for these redactions because Blanche has stated that nothing released in the Epstein Files would allow DOJ "to prosecute somebody."[37]

In short, Blanche is violating the Act by redacting the names in question. These redactions are thus "not in accordance with law" and "in excess of statutory . . . authority," 5 U.S.C. § 706

---

[37] Cheyanne M. Daniels, *Photos released in Epstein dump not enough evidence to prosecute, Blanche says*, Politico (Feb. 1, 2026), https://www.politico.com/news/2026/02/01/epstein-files-todd-blanche-photos-00759045 [https://archive.is/G7djq].

(2)(A), (C). Further, Blanche's redacting of some embarrassing materials but not others is "arbitrary [and] capricious." 5 U.S.C. § 706(2)(A). Phang is thus likely to prevail on her APA claims with respect to the redacted emails.

> **2.**      **Blanche has violated the Act by improperly redacting the names of unindicted potential co-conspirators.**

Blanche has violated the same provisions governing redactions with respect to at least two internal DOJ documents produced in the files. In EFTA01703108, the draft indictment that was not filed because of the Acosta non-prosecution agreement, Blanche has redacted the names of four potential co-defendants. Phang Decl. Ex. I. And in EFTA00038227, an October 8, 2019, DOJ briefing email, Blanche has again redacted four of five names listed under the heading "Co-conspirators." Phang Decl. Ex. J. Only Ghislaine Maxwell's name is not redacted. Confirming that the redaction is of potential co-conspirators' names, not victims' names, the same document separately indicates that "[a]pproximately 80 victims have been identified, with 100s unidentified." *Id.* Blanche has also redacted the identities of the email's sender and recipients, who are presumably DOJ personnel. *Id.*

The Act does not exempt the names of unindicted potential co-conspirators from disclosure. *See* Act § 2(c)(1). To the contrary, the public outrage that animated Congress to pass the Act sprang from the many unanswered questions about Epstein's potential co-conspirators. And again, Blanche may not invoke the section 2(c)(1)(C) exemption for ongoing federal proceedings because he says that no further prosecutions are possible. *Supra* n.39.

Accordingly, Phang is likely to establish a violation of the Act with respect to these redactions. It follows that the redactions are "not in accordance with law" and "in excess of statutory . . . authority," 5 U.S.C. § 706 (2)(A), (C), and that Phang is likely to prevail on her APA claims.

**3.    Blanche has violated the Act by improperly withholding materials implicating Donald Trump.**

Blanche has violated the Act by withholding materials implicating President Trump in alleged crimes. In particular, Blanche has withheld notes from FBI interviews with a victim who has alleged that in the 1980s, when she was about 13 years old, Epstein introduced her to Trump, who in turn assaulted her.

The Epstein Files establish that the materials in question exist. In particular, EFTA00095758 is part of a list of "Non-Testifying Witness Material" provided to Maxwell's legal team in *United States v. Maxwell*, No. 20-cr-330 (S.D.N.Y. 2020). *See* Phang Decl. Ex. K. Among other things, it lists materials relating to a witness who was assigned case number 3501.045:

| 3501.045 | Date | Description | Attorney | Produced to Defense |
|---|---|---|---|---|
| 3501.045-001 | 2019.07.24 | Interview 302 | | 2021.04.12 |
| 3501.045-002 | 2019.07.24 | Interview Notes | | 2021.04.12 |
| 3501.045-003 | 2019.08.07 | Interview 302 | | 2021.04.12 |
| 3501.045-004 | 2019.08.07 | Interview Notes | | 2021.04.12 |
| 3501.045-005 | 2019.08.20 | Interview 302 | | 2021.04.12 |
| 3501.045-006 | 2019.08.20 | Interview Notes | | 2021.04.12 |
| 3501.045-007 | 2019.10.16 | Interview 302 | | 2021.04.12 |
| 3501.045-008 | | Photograph | | 2021.04.12 |
| 3501.045-009 | | Photograph | | 2021.04.12 |
| 3501.045-010 | | Photograph | | 2021.04.12 |
| 3501.045-011 | 2019.07.31 | FBI intake report | | 2021.07.23 |
| 3501.045-012 | 2019.10.29 | FBI intake report | | 2021.07.23 |
| 3501.045-013 | 2019.07.10 | FBI report | | 2021.10.11 |
| 3501.045-014 | 2019.07.10 | Law enforcement report | | 2021.10.11 |
| 3501.045-015 | 2019.07.19 | License records | Colleen Mullen | 2021.10.11 |

*Id.*

The list indicates that in 2019, the FBI interviewed the 3501.045 witness four times—on July 24, August 7, August 20, and October 16. The resulting FD-302 reports, corresponding to entries 001, 003, 005, and 007 in the 3501 list, have been produced, albeit with heavy redactions, and only after sustained public and congressional pressure.[38] Those reports—EFTA01245620,

---

[38] *See* Mike Baker & Michael Gold, *Epstein Files Are Missing Records About Woman Who Made Claim Against Trump*, N.Y. Times (Feb. 25, 2026), https://www.nytimes.com/2026/02/25/us/politics/trump-epstein-files.html [https://archive.is/IiM3z] (initial reporting indicating that the August 7, August 20, and October 16 FD-302 reports were missing as of February 26, 2026); Oversight Democrats, Statement after DOJ Released Previously Withheld Epstein Files Accusing President Trump of Sexual Abuse (Mar. 6,

EFTA02858481, EFTA02858491, and EFTA02858495—include allegations that Trump sexually and then physically assaulted the witness when she was a minor. *See* Phang Decl. Exs. L, M, N, & O.

By contrast, the underlying interview notes (entries 002, 004, and 006 in the 3501 list) have not been produced as part of the Epstein library. Yet the 3501 list confirms those underlying notes still exist, because it indicates that they were produced to Maxwell's defense team in April 2021. Again, the Act does not permit Blanche to withhold materials "on the basis of embarrassment, reputational harm, or political sensitivity," *id.* § 2(b)(1)—even when the subject of the embarrassment would be President Trump.

Phang is likely to establish that the materials in question (i) exist and (ii) are subject to disclosure (with appropriate redactions) under the Act. It follows that Phang is likely to prevail on her claims that Blanche has violated the APA. He has "unlawfully withheld" the required agency action of producing the materials in question, 5 U.S.C. § 706(1), has otherwise exceeded his "statutory . . . authority," *id.* § 706(2)(C), and has produced some materials but not others in a manner that is "arbitrary, capricious . . . or otherwise not in accordance with law," *id.* § 706(2)(A).

### 4. Blanche has violated the Act by declining to review any foreign-language materials.

Blanche has violated the Act's disclosure mandate by instructing the Department not to review or produce any materials in languages other than English. Specifically, Blanche stated in the January 30 letter that:

> The Department's collection of documents included pages in various foreign languages. Because it was not practicable for a first-level reviewer to determine the

---

2026), https://oversightdemocrats.house.gov/news/press-releases/oversight-democrats-statement-after-doj-released-previously-withheld-epstein-files-accusing-president-trump-of-sexual-abuse-continues-white-house-cover-up [https://archive.is/REYrs] (press release from members of Congress noting production of those materials, but not others, on March 6, 2026).

responsiveness of a foreign language document, those pages have not been produced.

Ward-Packard Decl. Ex. E at 5.

Had Congress wished to exempt foreign-language materials from review and production, the Act would say that. It does not, so production of such materials is required. A provision that exempts materials from disclosure should be given "the narrower reach Congress intended" through "the simple device of confining the provision's meaning to its words." *Milner v. Dep't of the Navy*, 562 U.S. 562, 572 (2011) (internal citation and quotation marks omitted). Blanche may not grant himself an extra-statutory exemption where Congress has spoken through an unambiguous law—particularly not where that law already contains a comprehensive list of permitted exemptions.

Moreover, Congress had good reason not to exempt foreign-language materials from the Act. Epstein's sex-trafficking operation was international in scope,[39] Epstein himself often travelled abroad for extended periods,[40] and Epstein had close relationships with many high-profile foreigners, including apex political leaders.[41] The full Epstein story cannot be told without disclosure of foreign-language documents in the Epstein Files.

---

[39] *See, e.g.*, Chi Chi Izundu, *et al.*, *Epstein housed abuse victims in London flats, BBC reveals*, BBC (Apr. 24, 2026), https://www.bbc.com/news/articles/cn08j2g9ze9o [https://archive.is/kaXx9]; Olivier Sorgho, *Polish prosecutors investigate alleged human trafficking by Epstein-linked group*, Notes from Poland (Mar. 12, 2026), https://notesfrompoland.com/2026/03/12/polish-prosecutors-investigate-alleged-human-trafficking-by-epstein-linked-group/ [https://archive.is/gtucF].

[40] *See, e.g.*, James Hill & Thomas Volscho, *Records show Jeffrey Epstein's requests for multiple passports, travels to Africa and Middle East*, ABC News (Jan. 15, 2024), https://abcnews.com/US/records-show-jeffrey-epsteins-requests-multiple-passports-travels/story?id=106327253 [https://archive.is/TcrpX].

[41] *See, e.g.*, Isabel Kershner, Epstein's Ties to Former Israeli Leader Shake Up Election Campaign, N.Y. Times (July 16, 2019), https://www.nytimes.com/2019/07/16/world/middleeast/epstein-israel-barak-ehud.html [https://archive.is/0bgwA]; Daniel Ruetenik, *Inside Jeffrey Epstein's relationship with Saudi*

Blanche's "not practicable" excuse falls flat. Review of foreign-language materials is a routine feature of contemporary litigation. *See, e.g.*, Dennis P. Stolle, *et al.*, *Effectively Managing Foreign Language Documents in Commercial Litigation: It's All Greek to Me*, Nat'l L. Rev. (June 16, 2016). Many tools exist to facilitate such review. And the Department routinely employs those translation tools in immigration, criminal (*e.g.* anti-cartel), and counterterrorism matters. *See, e.g.*, DOJ, Justice Manual § 9-13.530 (Special Considerations – Translations). It is perfectly capable of applying those same tools to the Epstein Files.

In sum, Phang is likely to establish that Blanche has violated the Act by instructing the Department not to review or produce any foreign-language materials. And Phang is likely to establish that Blanche's assertion of a non-statutory exemption for such materials is cognizable under the APA both as "unlawfully withheld" agency action, 5 U.S.C. § 706(1) and as action "in excess of statutory . . . authority," *id.* § 706(2)(C).

> **5.    Blanche has violated the Act by failing to publish the required redaction log.**

Blanche has violated the Act by failing to publish the redaction log that should have been published in the Federal Register at the same time as any redacted files were produced. The Act requires that "[a]ll redactions must be accompanied by a written justification published in the Federal Register and submitted to Congress." Act § 2(c)(2). "Accompany" means "to exist or occur *at the same time*." *Accompany*, American Heritage Dictionary (2022), https://www.ahdictionary.com/word/search.html?q=accompany (emphasis added). Blanche was thus required to publish a redaction log at the same time as he produced each set of files. He failed

---

*Arabia*, CBS News (Nov. 18, 2025), https://www.cbsnews.com/news/jeffrey-epstein-saudi-arabia/ [https://archive.is/rDBmY].

to do so, and has yet to publish any justification for any redaction in the months since productions concluded.

Accordingly, Phang is likely to establish that Blanche has violated Act § 2(c)(2), and has "unlawfully withheld or unreasonably delayed" mandatory agency action in violation of the APA, 5 U.S.C. § 706(1).

## II.     Phang will suffer irreparable harm absent preliminary injunctive relief.

Phang will suffer irreparable harm absent a preliminary injunction ordering Blanche to cure the five deficiencies set forth above. An improperly delayed disclosure may be "sufficient to establish irreparable harm if the information sought is 'time-sensitive.'" *Sai v. TSA*, 54 F. Supp. 3d 5, 10 (D.D.C. 2014) (quoting *Judicial Watch, Inc. v. DHS*, 514 F. Supp. 2d, 7, 10 (D.D.C. 2007)). For several reasons, the information Phang seeks in the instant motion meets that standard.

*First*, Congress has said the information in question is time-sensitive. It commanded Blanche to comply with the Act "[n]ot later than 30 days after" the date of the Act's enactment. Act § 2(a). As this district has recognized, "[a] statute may create a non-discretionary duty by setting forth a date certain by which an agency must comply with an obligation." *Appalachian Voices v. McCarthy*, 989 F. Supp. 2d 30, 54 (D.D.C. 2013). And when Congress writes such a statute, even though the deadline imposed "may be impracticable, or even impossible, an agency's failure to comply . . . is necessarily unlawful." *Friends of Animals v. Culver*, 610 F. Supp. 3d 157, 169 (D.D.C. 2022).

In this respect, the Act is distinct from FOIA and most other federal disclosure laws, which do not prescribe a date-certain deadline for release of covered materials. Here, Congress has effectively declared the entire Act "time-sensitive" as a matter of law. The Court should give force to that choice by requiring Blanche to cure the most open-and-shut violations of the Act—those at

31

issue here—immediately. To do otherwise would be to permit Blanche's continuing violation not only of the Act's substantive provisions, but also of Congress's mandate of urgency.

*Second*, in any case, each disclosure Phang seeks to compel here is time-sensitive in fact. Start with the improperly redacted co-conspirator names. *See supra* § I.B.1.–2. Those names are time-sensitive for the victims whose stories Phang aims to tell through her reporting. Where judicial redress may still be possible, delay in disclosing identities of potential co-conspirators will damage prosecutors' and plaintiffs' attorneys' capacity to make and win cases. The law recognizes that "the search for truth may be seriously impaired by the loss of evidence, ... fading memories, disappearance of documents, or otherwise." *Page v. Comey*, 137 F.4th 806, 813 (D.C. Cir. 2025) (quoting *United States v. Kubrick*, 444 U.S. 111, 117 (1979)). Those concerns are acute here—in many cases, the Epstein Files reveal details of crimes committed several decades ago.[42]

Similar harms will arise from delay in production of the foreign-language documents Blanche has declined to review. *See supra* § I.B.4. Those documents are likely to be a fruitful source of information about the identities of those complicit in Epstein's crimes. Epstein's trafficking operation and personal network were international in scope. And unlike the English-language materials, the foreign-language materials have not—according to Blanche himself—undergone even a first-level relevancy review. Blanche thus has no basis to claim that those files are not likely to ground future civil or criminal liability.

---

[42] Even where the principal redress available to victims will be public embarrassment of Epstein's confederates, delay will cause public attention to atrophy and allow perpetrators to evade accountability. The likely Robert Trivers email discussed above, *supra* n.36, illustrates the point. The disclosure that Trivers not only defended Epstein to the press but then bragged about it to Epstein himself is, needless to say, quite embarrassing for Trivers. Had Blanche complied with his obligation to disclose that email with Trivers' name unredacted by the deadline Congress set, Trivers would have suffered that embarrassment personally. But Trivers died on March 12, 2026— after the disclosure should have occurred, but before it did.

32

The Trump-related materials Phang seeks, *see supra* § I.B.3, are time-sensitive, among other reasons, because of the ongoing midterm elections. Many candidates have highlighted the Epstein Files as part of their campaigns. Kentucky Representative Thomas Massie, for instance, made the administration's handling of the Epstein Files a central plank of his recent primary campaign.[43] Massie argued to voters that he "led the charge to expose a bunch of rich and powerful and politically connected men in the Epstein files."[44] But the files at issue in this motion were not available before the primary election, which deprived voters of the opportunity to consider them when assessing Massie's candidacy. Georgia Senator Jon Ossoff has likewise referred to an "Epstein class," calling out by name some of the elites who appear in the files.[45] And Representative Nancy Mace, who is seeking the Republican nomination for South Carolina governor, has focused in particular on the Department's broad redactions, arguing that they have deprived "the American people" of "information about co-conspirators."[46]

In this context, allegations that Trump and others in his orbit participated in Epstein's crimes are highly salient. So, too, is pertinent new information, whether it supports or debunks such allegations. But that salience will fade swiftly after the midterms.

---

[43] *See* Alex Roarty, *Thomas Massie Is Testing Whether a Trump Nemesis Can Win a Republican Primary*, Notus (Feb. 26, 2026), https://www.notus.org/2026-election/thomas-massie-trump-primary-gallrein [https://archive.is/xY3kf].

[44] *Id.*

[45] Zachary B. Wolf, *Democrats wade into 'Epstein class' warfare*, CNN (Feb. 9, 2026), https://www.cnn.com/2026/02/09/politics/epstein-files-ossoff-clinton-trump-lutnick-analysis [https://archive.is/rI4A3].

[46] Steve Inskeep, *Rep. Nancy Mace says she wants Americans to know the truth about the Epstein files*, NPR (Feb. 12, 2026), https://www.npr.org/2026/02/12/nx-s1-5710044/rep-nancy-mace-says-she-wants-americans-to-know-the-truth-about-the-epstein-files [https://archive.is/isbcI].

The missing redaction log is time-sensitive as a structural matter—without it, Phang, Congress, and the courts have no systematic way to evaluate the productions that have occurred to date. Blanche has committed many obvious violations of the Act. The redaction log will likely reveal many more. But until it is produced, neither Phang, nor Congress, nor this Court will be able to assess Blanche's compliance in full.

*Third*, the information Phang seeks is time-sensitive to Phang's business interests. As an independent journalist, Phang derives income from each video and story she publishes. Phang Decl. ¶ 36. To maximize revenue, Phang must report about topics that are timely and newsworthy. *Id.* ¶ 44. At present, public interest in the Epstein Files is extraordinarily high but—as with any story, and particularly any story during an election year—that interest will diminish over time. *Id.* ¶ 45. If the congressionally mandated disclosures are delayed even further, Phang will not be able to recoup a significant portion of the resulting lost revenue. *Id.* ¶ 46.

Of course, those financial harms to Phang matter less than the informational harms and harms to victims Blanche's unlawful conduct has inflicted. But they nonetheless provide a separate and independent basis to find irreparable harm and grant a preliminary injunction.

III.    **The balance of equities and public interest favor the swift disclosure of Epstein materials that Congress has mandated.**

The balance of equities and public interest merge here, *LULAC*, 780 F. Supp. 3d at 169, and tilt sharply in favor of granting the requested injunction. "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Insofar as the Court agrees that Phang is likely to succeed on the merits, a preliminary injunction will necessarily be in the public interest.

An injunction will also serve the public interest in a broader sense. In the words of its author, the Epstein Files Transparency Act mandates a "reckoning for America."[47] For decades, Jeffrey Epstein preyed on women and children. For decades, rich, powerful men and the institutions they commanded facilitated Epstein's crimes. And for decades, the Department of Justice failed to stop them. Now the acting Attorney General is hindering accountability and violating the law. He should be enjoined from doing so as a first step toward the reckoning the Act demands.

## CONCLUSION

The Court should grant the motion for a preliminary injunction and enter an order requiring Blanche to:

(i) show cause why the redactions of sender and recipient names in the emails bearing Bates numbers EFTA00749245, EFTA01187999, EFTA01930501, ETFA01928255, EFTA00628112, EFTA02648868, EFTA02504630, and EFTA01022356 should not be removed;

(ii) show cause why the redactions of potential co-conspirator names in the DOJ documents bearing Bates numbers EFTA01703108 and EFTA00038227 should not be removed;

(iii) show cause why the underlying FBI interview notes that formed the basis for the FD-302 interview reports bearing Bates numbers EFTA01245620, EFTA02858481,

---

[47] Joseph Gideon, *'I believe this is going to be a reckoning': Ro Khanna, the man behind the Epstein files act, on building bipartisan wins*, The Guardian (Dec. 28, 2025), https://www.theguardian.com/us-news/2025/dec/28/ro-khanna-epstein-files-act-bipartisan [https://archive.is/xHm8I].

EFTA02858491, and EFTA02858495 should not be produced (with appropriate redactions to protect victims' information);

(iv)    immediately initiate review and production of foreign-language materials that may be subject to production under the Epstein Files Transparency Act; and

(v)    immediately publish in the Federal Register the redaction log required under Epstein Files Transparency Act § 2(C)(2), and update it concurrently with each future release of redacted materials.

Dated: May 28, 2026                    Respectfully submitted,

                                       /s/ Samuel T. Ward-Packard

                                       **PUBLIC INTEGRITY PROJECT**
                                       Brendan Ballou
                                       D.C. Bar No. 241592
                                       Samuel T. Ward-Packard
                                       D.C. Bar No. 90005484
                                       brendan@publicintegrityproject.org
                                       sam@publicintegrityproject.org
                                       (917) 684-3900 (BB)
                                       (262) 949-0973 (SWP)

                                       *Attorneys for Plaintiff Katie Phang*

**CERTIFICATE OF SERVICE**

I hereby certify that this document will be served on the Defendant in accordance with

Federal Rule of Civil Procedure 5.

/s/ Samuel T. Ward-Packard
Samuel T. Ward-Packard

37