**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

KATIE PHANG,

       Plaintiff,

   v.

TODD BLANCHE,
in his official capacity as Acting Attorney
General of the United States,

       Defendant.

</td><td>

Civil Action No. 26-1417 (EGS)

</td></tr>
</table>

**DECLARATION OF SAMUEL T. WARD-PACKARD IN SUPPORT OF
PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION**

I, Samuel T. Ward-Packard, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2. I am one of the attorneys representing Plaintiff Katie Phang in the above-captioned action.

3. Attached as Exhibit A is a true and correct copy of Sealed Indictment, *United States v. Epstein*, No. 1:19-cr-490 (S.D.N.Y. July 2, 2019) (Doc. 2).

4. Attached as Exhibit B is a true and correct copy of Transcript of Aug. 27, 2019, Hearing, *United States v. Epstein*, No. 1:19-cr-490 (S.D.N.Y. Sept. 3, 2019) (Doc. 53).

5. Attached as Exhibit C is a true and correct copy of Department of Justice, Office of Professional Responsibility, Executive Summary of Report of Investigation into the U.S. Attorney's Office for the Southern District of Florida's Resolution of Its 2006–2008 Federal

1

Criminal Investigation of Jeffrey Epstein and Its Interactions with Victims during the Investigation (Nov. 2020).

6.    Attached as Exhibit D is a true and correct copy of a Dec. 19, 2025, Letter from Deputy Attorney General Todd Blanche to Members of Congress.

7.    Attached as Exhibit E is a true and correct copy of a Jan. 30, 2026, Letter from Deputy Attorney General Todd Blanche.

8.    Attached as Exhibit F is a true and correct copy of a Feb. 14, 2026, Letter from Deputy Attorney General Todd Blanche to the House and Senate Judiciary Committees.

9.    Attached as Exhibit G is a true and correct copy of EFTA00822573.

10.    I declare under penalty of perjury that the foregoing is true and correct.


Executed this 28th day of May, 2026.

/s/ Samuel T. Ward-Packard
Samuel T. Ward-Packard

## INDEX OF EXHIBITS

| Exhibit | Document |
|---------|----------|
| A | Sealed Indictment, *United States v. Epstein*, No. 1:19-cr-490 (S.D.N.Y. July 2, 2019) (Doc. 2) |
| B | Transcript of Aug. 27, 2019, Hearing, *United States v. Epstein*, No. 1:19-cr-490 (S.D.N.Y. Sept. 3, 2019) (Doc. 53) |
| C | Department of Justice, Office of Professional Responsibility, Executive Summary of Report of Investigation into the U.S. Attorney's Office for the Southern District of Florida's Resolution of Its 2006–2008 Federal Criminal Investigation of Jeffrey Epstein and Its Interactions with Victims during the Investigation (Nov. 2020) |
| D | Dec. 19, 2025, Letter from Deputy Attorney General Todd Blanche to Members of Congress |
| E | Jan. 30, 2026, Letter from Deputy Attorney General Todd Blanche |
| F | Feb. 14, 2026, Letter from Deputy Attorney General Todd Blanche to the House and Senate Judiciary Committees |
| G | EFTA00822573 |

# Exhibit A

ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

    - v. -

JEFFREY EPSTEIN,

    Defendant.

- - - - - - - - - - - - - - - - x

SEALED
INDICTMENT

19 Cr.

**19 CRIM 490**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/4/14

### COUNT ONE
### (Sex Trafficking Conspiracy)

The Grand Jury charges:

### OVERVIEW

1.  As set forth herein, over the course of many years, JEFFREY EPSTEIN, the defendant, sexually exploited and abused dozens of minor girls at his homes in Manhattan, New York, and Palm Beach, Florida, among other locations.

2.  In particular, from at least in or about 2002, up to and including at least in or about 2005, JEFFREY EPSTEIN, the defendant, enticed and recruited, and caused to be enticed and recruited, minor girls to visit his mansion in Manhattan, New York (the "New York Residence") and his estate in Palm Beach, Florida (the "Palm Beach Residence") to engage in sex acts with him, after which he would give the victims hundreds of dollars in cash. Moreover, and in order to maintain and increase his supply of victims, EPSTEIN also paid certain of his victims to recruit additional girls to be similarly abused by EPSTEIN. In

this way, EPSTEIN created a vast network of underage victims for him to sexually exploit in locations including New York and Palm Beach.

3. The victims described herein were as young as 14 years old at the time they were abused by JEFFREY EPSTEIN, the defendant, and were, for various reasons, often particularly vulnerable to exploitation. EPSTEIN intentionally sought out minors and knew that many of his victims were in fact under the age of 18, including because, in some instances, minor victims expressly told him their age.

4. In creating and maintaining this network of minor victims in multiple states to sexually abuse and exploit, JEFFREY EPSTEIN, the defendant, worked and conspired with others, including employees and associates who facilitated his conduct by, among other things, contacting victims and scheduling their sexual encounters with EPSTEIN at the New York Residence and at the Palm Beach Residence.

## FACTUAL BACKGROUND

5. During all time periods charged in this Indictment, JEFFREY EPSTEIN, the defendant, was a financier with multiple residences in the continental United States, including the New York Residence and the Palm Beach Residence.

6. Beginning in at least 2002, JEFFREY EPSTEIN, the defendant, enticed and recruited, and caused to be enticed and

2

recruited, dozens of minor girls to engage in sex acts with him, after which EPSTEIN paid the victims hundreds of dollars in cash, at the New York Residence and the Palm Beach Residence.

7. In both New York and Florida, JEFFREY EPSTEIN, the defendant, perpetuated this abuse in similar ways. Victims were initially recruited to provide "massages" to EPSTEIN, which would be performed nude or partially nude, would become increasingly sexual in nature, and would typically include one or more sex acts. EPSTEIN paid his victims hundreds of dollars in cash for each encounter. Moreover, EPSTEIN actively encouraged certain of his victims to recruit additional girls to be similarly sexually abused. EPSTEIN incentivized his victims to become recruiters by paying these victim-recruiters hundreds of dollars for each girl that they brought to EPSTEIN. In so doing, EPSTEIN maintained a steady supply of new victims to exploit.

### The New York Residence

8. At all times relevant to this Indictment, JEFFREY EPSTEIN, the defendant, possessed and controlled a multi-story private residence on the Upper East Side of Manhattan, New York, *i.e.*, the New York Residence. Between at least in or about 2002 and in or about 2005, EPSTEIN abused numerous minor victims at the New York Residence by causing these victims to be recruited to engage in paid sex acts with him.

3

9.     When a victim arrived at the New York Residence, she typically would be escorted to a room with a massage table, where she would perform a massage on JEFFREY EPSTEIN, the defendant.  The victims, who were as young as 14 years of age, were told by EPSTEIN or other individuals to partially or fully undress before beginning the "massage."  During the encounter, EPSTEIN would escalate the nature and scope of physical contact with his victim to include, among other things, sex acts such as groping and direct and indirect contact with the victim's genitals.  EPSTEIN typically would also masturbate during these sexualized encounters, ask victims to touch him while he masturbated, and touch victims' genitals with his hands or with sex toys.

10.    In connection with each sexual encounter, JEFFREY EPSTEIN, the defendant, or one of his employees or associates, paid the victim in cash.  Victims typically were paid hundreds of dollars in cash for each encounter.

11.    JEFFREY EPSTEIN, the defendant, knew that many of his New York victims were underage, including because certain victims told him their age.  Further, once these minor victims were recruited, many were abused by EPSTEIN on multiple subsequent occasions at the New York Residence.  EPSTEIN sometimes personally contacted victims to schedule appointments at the New York Residence.  In other instances, EPSTEIN directed

4

employees and associates, including a New York-based employee ("Employee-1"), to communicate with victims via phone to arrange for these victims to return to the New York Residence for additional sexual encounters with EPSTEIN.

12. Additionally, and to further facilitate his ability to abuse minor girls in New York, JEFFREY EPSTEIN, the defendant, asked and enticed certain of his victims to recruit additional girls to perform "massages" and similarly engage in sex acts with EPSTEIN. When a victim would recruit another girl for EPSTEIN, he paid both the victim-recruiter and the new victim hundreds of dollars in cash. Through these victim-recruiters, EPSTEIN gained access to and was able to abuse dozens of additional minor girls.

13. In particular, certain recruiters brought dozens of additional minor girls to the New York Residence to give massages to and engage in sex acts with JEFFREY EPSTEIN, the defendant. EPSTEIN encouraged victims to recruit additional girls by offering to pay these victim-recruiters for every additional girl they brought to EPSTEIN. When a victim-recruiter accompanied a new minor victim to the New York Residence, both the victim-recruiter and the new minor victim were paid hundreds of dollars by EPSTEIN for each encounter. In addition, certain victim-recruiters routinely scheduled these

encounters through Employee-1, who sometimes asked the recruiters to bring a specific minor girl for EPSTEIN.

### The Palm Beach Residence

14. In addition to recruiting and abusing minor girls in New York, JEFFREY EPSTEIN, the defendant, created a similar network of minor girls to victimize in Palm Beach, Florida, where EPSTEIN owned, possessed and controlled another large residence, *i.e.*, the Palm Beach Residence. EPSTEIN frequently traveled from New York to Palm Beach by private jet, before which an employee or associate would ensure that minor victims were available for encounters upon his arrival in Florida.

15. At the Palm Beach Residence, JEFFREY EPSTEIN, the defendant, engaged in a similar course of abusive conduct. When a victim initially arrived at the Palm Beach Residence, she would be escorted to a room, sometimes by an employee of EPSTEIN's, including, at times, two assistants ("Employee-2" and "Employee-3") who, as described herein, were also responsible for scheduling sexual encounters with minor victims. Once inside, the victim would provide a nude or semi-nude massage for EPSTEIN, who would himself typically be naked. During these encounters, EPSTEIN would escalate the nature and scope of the physical contact to include sex acts such as groping and direct and indirect contact with the victim's genitals. EPSTEIN would also typically masturbate during these encounters, ask victims

6

to touch him while he masturbated, and touch victims' genitals with his hands or with sex toys.

16. In connection with each sexual encounter, JEFFREY EPSTEIN, the defendant, or one of his employees or associates, paid the victim in cash. Victims typically were paid hundreds of dollars for each encounter.

17. JEFFREY EPSTEIN, the defendant, knew that certain of his victims were underage, including because certain victims told him their age. In addition, as with New York-based victims, many Florida victims, once recruited, were abused by JEFFREY EPSTEIN, the defendant, on multiple additional occasions.

18. JEFFREY EPSTEIN, the defendant, who during the relevant time period was frequently in New York, would arrange for Employee-2 or other employees to contact victims by phone in advance of EPSTEIN's travel to Florida to ensure appointments were scheduled for when he arrived. In particular, in certain instances, Employee-2 placed phone calls to minor victims in Florida to schedule encounters at the Palm Beach Residence. At the time of certain of those phone calls, EPSTEIN and Employee-2 were in New York, New York. Additionally, certain of the individuals victimized at the Palm Beach Residence were contacted by phone by Employee-3 to schedule these encounters.

19. Moreover, as in New York, to ensure a steady stream of minor victims, JEFFREY EPSTEIN, the defendant, asked and enticed certain victims in Florida to recruit other girls to engage in sex acts. EPSTEIN paid hundreds of dollars to victim-recruiters for each additional girl they brought to the Palm Beach Residence.

## STATUTORY ALLEGATIONS

20. From at least in or about 2002, up to and including in or about 2005, in the Southern District of New York and elsewhere, JEFFREY EPSTEIN, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, sex trafficking of minors, in violation of Title 18, United States Code, Section 1591(a) and (b).

21. It was a part and object of the conspiracy that JEFFREY EPSTEIN, the defendant, and others known and unknown, would and did, in and affecting interstate and foreign commerce, recruit, entice, harbor, transport, provide, and obtain, by any means a person, and to benefit, financially and by receiving anything of value, from participation in a venture which has engaged in any such act, knowing that the person had not attained the age of 18 years and would be caused to engage in a

8

commercial sex act, in violation of Title 18, United States Code, Sections 1591(a) and (b)(2).

## Overt Acts

22.    In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.    In or about 2004, JEFFREY EPSTEIN, the defendant, enticed and recruited multiple minor victims, including minor victims identified herein as Minor Victim-1, Minor Victim-2, and Minor Victim-3, to engage in sex acts with EPSTEIN at his residences in Manhattan, New York, and Palm Beach, Florida, after which he provided them with hundreds of dollars in cash for each encounter.

b.    In or about 2002, Minor Victim-1 was recruited to engage in sex acts with EPSTEIN and was repeatedly sexually abused by EPSTEIN at the New York Residence over a period of years and was paid hundreds of dollars for each encounter.    EPSTEIN also encouraged and enticed Minor Victim-1 to recruit other girls to engage in paid sex acts, which she did.    EPSTEIN asked Minor Victim-1 how old she was, and Minor Victim-1 answered truthfully.

c.    In or about 2004, Employee-1, located in the Southern District of New York, and on behalf of EPSTEIN, placed

9

a telephone call to Minor Victim-1 in order to schedule an appointment for Minor Victim-1 to engage in paid sex acts with EPSTEIN.

d. In or about 2004, Minor Victim-2 was recruited to engage in sex acts with EPSTEIN and was repeatedly sexually abused by EPSTEIN at the Palm Beach Residence over a period of years and was paid hundreds of dollars after each encounter. EPSTEIN also encouraged and enticed Minor Victim-2 to recruit other girls to engage in paid sex acts, which she did.

e. In or about 2005, Employee-2, located in the Southern District of New York, and on behalf of EPSTEIN, placed a telephone call to Minor Victim-2 in order to schedule an appointment for Minor Victim-2 to engage in paid sex acts with EPSTEIN.

f. In or about 2005, Minor Victim-3 was recruited to engage in sex acts with EPSTEIN and was repeatedly sexually abused by EPSTEIN at the Palm Beach Residence over a period of years and was paid hundreds of dollars for each encounter. EPSTEIN also encouraged and enticed Minor Victim-3 to recruit other girls to engage in paid sex acts, which she did. EPSTEIN asked Minor Victim-3 how old she was, and Minor Victim-3 answered truthfully.

10

g.   In or about 2005, Employee-2, located in the Southern District of New York, and on behalf of EPSTEIN, placed a telephone call to Minor Victim-3 in Florida in order to schedule an appointment for Minor Victim-3 to engage in paid sex acts with EPSTEIN.

h.   In or about 2004, Employee-3 placed a telephone call to Minor Victim-3 in order to schedule an appointment for Minor Victim-3 to engage in paid sex acts with EPSTEIN.

(Title 18, United States Code, Section 371.)

## COUNT TWO
### (Sex Trafficking)

The Grand Jury further charges:

23.   The allegations contained in paragraphs 1 through 19 and 22 of this Indictment are repeated and realleged as if fully set forth within.

24.   From at least in or about 2002, up to and including in or about 2005, in the Southern District of New York, JEFFREY EPSTEIN, the defendant, willfully and knowingly, in and affecting interstate and foreign commerce, did recruit, entice, harbor, transport, provide, and obtain by any means a person, knowing that the person had not attained the age of 18 years and would be caused to engage in a commercial sex act, and did aid and abet the same, to wit, EPSTEIN recruited, enticed, harbored, transported, provided, and obtained numerous

11

individuals·who were less than 18 years old, including but not limited to Minor Victim-1, as described above, and who were then caused to engage in at least one commercial sex act in Manhattan, New York.

(Title 18, United States Code, Sections 1591(a), (b)(2), and 2.)

### **FORFEITURE ALLEGATIONS**

25. As a result of committing the offense alleged in Count Two of this Indictment, JEFFREY EPSTEIN, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 1594(c)(1), any property, real and personal, that was used or intended to be used to commit or to facilitate the commission of the offense alleged in Count Two, and any property, real or personal, constituting or derived from any proceeds obtained, directly or indirectly, as a result of the offense alleged in Count Two, or any property traceable to such property, and the following specific property:

a. The lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 9 East 71st Street, New York, New York, with block number 1386 and lot number 10, owned by Maple, Inc.

12

## Substitute Asset Provision

26.   If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third person;

(c) has been placed beyond the jurisdiction of the Court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p) and 28 U.S.C. § 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Section 1594; Title 21, United States Code, Section 853(p); and Title 28, United States Code, Section 2461.)

FOREPERSON

GEOFFREY S. BERMAN
United States Attorney

13

Form No. USA-33s-274 (Ed. 9-25-58)

---

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA**

**v.**

**JEFFREY EPSTEIN,**

**Defendant.**

---

**INDICTMENT**

(18 U.S.C. §§ 371, 1591(a), (b)(2), and 2)

GEOFFREY S. BERMAN
United States Attorney

Foreperson

---

14

# Exhibit B

J8RsEPS1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

      v.                           19 CR 490 (RMB)

JEFFREY EPSTEIN,

            Defendant.

------------------------------x

                                New York, N.Y.
                                August 27, 2019
                                10:30 a.m.

Before:

              HON. RICHARD M. BERMAN,

                         District Judge

                   APPEARANCES

GEOFFREY S. BERMAN
    United States Attorney for the
    Southern District of New York
BY:  MAURENE R. COMEY
    ALISON MOE
    Assistant United States Attorneys

MARTIN G. WEINBERG, PC
    Attorney for Defendant
BY:  MARTIN G. WEINBERG

STEPTOE & JOHNSON, LLP
    Attorneys for Defendant
BY:  REID WEINGARTEN
    MICHAEL MILLER

J8RsEPS1

(Case called)

THE COURT:  Good morning, everybody.  Please be seated.

So just some housekeeping.  We have a podium here for both attorneys and others who may be speaking, and so we would like you, attorneys and others who are speaking, to come up to the podium.  This room is a little cavernous.  We thought the podium over there would be more comfortable.

For starters, and for this you don't have to go up to the podium, if you could just indicate your names.  This table in front to my left, your right, are defense counsel, and that table to my right, your left, are government attorneys.

If we could just ask the attorneys to introduce themselves.

MS. COMEY:  Good morning, your Honor.  Maureen Comey and Alison Moe for the government.  Joining us at counsel table are Special Agent Amanda Young of the FBI and Detective Paul Byrne of the NYPD.

MR. WEINGARTEN:  Good morning, your Honor.

Reid Weingarten.

MR. WEINBERG:  Martin Weinberg.

Good morning, your Honor.

THE COURT:  Good morning.

MR. MILLER:  Good morning, your Honor.

Michael Miller from Steptoe & Johnson on behalf of the

defendant.

THE COURT: Great.

Again, good morning to all of you. This hearing that we're having today considers the government's motion to dismiss the indictment in this case.

I must add that it also serves as the opportunity for me to thank all of you, the attorneys and the victims who are here today, among others, for your very hard work and dedication in this case.

We also have here today the U.S. Attorney for the Southern District of New York, Geoffrey Berman, who has also been very helpful and indispensable in this matter.

The news on August 10, 2019, that Jeffrey Epstein had been found dead in his cell at the Metropolitan Correctional Center, at the MCC, was certainly shocking. Most of you, and myself for that matter, were anticipating that the next steps in this case would be defense motion practice, including a motion to dismiss, followed by a trial on the merits before a jury, if the motions were not successful, and through which the accusers and the accused would come face to face, allowing everyone to get their day in court. Mr. Epstein's death obviously means that a trial in which he is a defendant cannot take place. It is a rather stunning turn of events.

The government's motion to dismiss the indictment because of Jeffrey Epstein's death on August 10, 2019, is

relatively straightforward.  In my view, a public hearing clearly is nevertheless the preferred vehicle for its resolution.

Incidentally, while I'm on this subject, I got some help today from the New York Law Journal from two professors who write that a hearing is -- let me tell you exactly what they said.  They say, in part, that this is an odd moment for transparency in a criminal case.  I think that is an odd sentence to hear about, transparency in a criminal case.

They go on to say that normally, if a prosecutor seeks to dismiss an indictment for such an obviously worthy reason, the court would simply grant the request.  As to that statement, I respectfully say it is incorrect as a matter of law.

They go on to say the judge would not schedule a hearing and he definitely would not allow the victims to speak. If he did hold a hearing, whatever informational interests the victims may have would be served by affording them a chance to attend the hearing, not by giving them a speaking role.

I read it.  It was incredulous.  I'm still incredulous.  I don't quite understand at all.  There is a suggestion in the article that the reason they are making these suggestions has to do with minimization of drama in this case. In the Jeffrey Epstein case, there has not been much a minimization of drama, and what little drama might happen

J8RsEPS1

today, I don't think it would be very significant.

On a somewhat more serious note, don't quote me on this, but it is my understanding that one of the authors of that article is himself counsel in one of the Epstein-related cases. I was surprised to learn that very recently. I'm certain it is true. I was also surprised that that aspect was not disclosed in the Law Journal.

But in any event, I think you know where I'm heading. I respectfully disagree with the Law Journal piece. I was saying that the government's motion is relatively straightforward, and in my view, a public hearing is clearly, nevertheless, the preferred vehicle for its resolution. I'm still convinced of that.

A few may differ on this, but public hearings are exactly what judges do. Hearings promote transparency and they provide the court with insights and information which the court may not otherwise be aware of.

The victims have been included in the proceeding today both because of their relevant experiences and because they should always be involved before rather than after the fact.

Indictment 19 CR 490 charges Jeffrey Epstein with sex trafficking and with conspiracy to commit sex trafficking. The U.S. Attorney, on August 19, 2019, requested that the court approve the government's proposed order of *nolle prosequi*. I think that's a rough justice. That means *nolle prosequi*,

discontinuance by the prosecutor of all or of a part of the case that he or she has commenced.

The government in its motion concludes that Epstein's death abates these proceedings. In accordance with Federal Rule of Criminal Procedure 57(b), I determined to hold a public hearing and I notified the victims that they would be given the opportunity to be heard before any final action on the motion. That is the purpose also of today's proceeding. I would do that every time.

Also, recognized that Epstein, Mr. Epstein died before any judgment of conviction against him had been obtained, and that the government's proposed order appears, in form and substance, to be appropriate.

Federal Rule of Criminal Procedure 48(a) codifies the *nolle prosequi* process. It is entitled dismissal, and it states in relevant part that the government may, with leave of the court, dismiss an indictment, information, or complaint, and that leave of the court proviso, you should know, was added as an amendment to the original draft of Rule 48, which had originally provided for automatic dismissal upon the motion of the government.

This proviso, in my judgment, is clearly directed toward an independent judicial assessment of the public interest in dismissing the indictment. Thus, even whereas, in this case, the standard of court review is deferential, the

court must still make its own independent determination.  A conclusory statement from the government that dismissal is appropriate does not satisfy the court's obligations.

It is also, in my view, required that the court consider the views of the victims in the case at the hearing and before deciding whether to grant the motion.  This is being done here both as a matter of law and as a measure of respect that we have for the victims' difficult decisions to come forward in this matter.

In a case called United States v. Heaton, H-e-a-t-o-n-, the government filed a Rule 48 motion for leave to dismiss a charge against a defendant who allegedly committed a sexual offense against a young victim.  Although I should point out, very importantly, that that defendant was still alive, which distinguishes it from our case.

Nevertheless, I think it is irrelevant because in evaluating the Rule 48 motion, then district Judge Paul G. Cassell -- who is now a law professor at the University of Utah and is regarded to be a noted expert in victims' rights -- concluded that under the Crime Victims' Rights Act, victims have broad rights that extend to a court's decision whether to grant a government motion to dismiss under Rule 48.

I completely share that viewpoint in these circumstances, even though the facts of our case, as I said, are somewhat different from those in Heaton.  I believe it is

J8RsEPS1

the court's responsibility, and manifestly within its purview, to ensure that the victims in this case are treated fairly and with dignity.

The fundamental substantive principle which applies in considering the government's motion is termed the rule of abatement. This principle originated in the English common law. It was adopted by most U.S. federal courts, but more recently, it has faced some appropriate criticism. The rule of abatement is best explained in the Second Circuit case of U.S. v. Wright.

In that Wright case, two defendants had pled guilty to embezzlement and tax evasion. Both defendants appealed, but one of the defendants died while his appeal was pending in the Second Circuit. The Court of Appeals rule that under the rule of abatement, the judgment of conviction against the deceased defendant was required to be vacated and the indictment was to be dismissed. The Wright court held that when a convicted defendant dies while his direct appeal as of right is pending, his death abates not only the appeal, but also proceedings had during the course of the prosecution.

The Second Circuit incidentally has also held that when a criminal conviction abates upon the death of a defendant, any restitution ordered as a result of that conviction must also abate, and it is also ruled the same with respect to associated forfeiture orders.

J8RsEPS1

This latter application of the rule of abatement regarding forfeiture has not been universally accepted among federal courts, but it certainly is the law in this circuit. Some of you may be interested to know that some United States courts, state courts, have criticized the rule of abatement, particularly in the face of growing recognition of victims' rights in the criminal justice system, including the Crime Victims' Rights Act.

It has been written and contended in the Brooklyn Law Review -- I can give you the cite later -- that when courts abate criminal convictions, they reimpose a burden on victims that legislatures intended to alleviate through these victim rights statutes. The state Supreme Court has even concluded that the expansion and codification of victims' rights provides the changed conditions needed for overruling the rule of abatement. It has also been stated that Alaska's statute and its constitution now require the criminal justice system to accommodate the rights of crime victims. Further, that the abatement of criminal convictions has important implications for these rights.

But coming back to our case, which is what you are concerned about and I am as well, it is appropriate to conclude that if the rule of abatement applies to a convicted defendant as in the Wright case, it should also apply *a fortiori* in the Epstein case, which was still in the pretrial phase when

J8RsEPS1

Mr. Epstein died, when there had been no conviction.

So that's just some background I wanted to share with you. At this point in time, I would like to turn to the government prosecutors to hear from them in support of their Rule 48 application to dismiss the Epstein indictment.

MS. COMEY: Thank you, your Honor.

Would you like me to address the court from the podium?

THE COURT: If you wouldn't mind.

MS. COMEY: Thank you, your Honor.

I believe your Honor has accurately summarized the state of the law, as set forth in our papers, in light of the clear Second Circuit law, that upon the death of a defendant before a final entry of a judgment of conviction, all proceedings must be abated.

In light of that clear law, the government is legally obligated to seek dismissal of the pending indictment against Jeffrey Epstein, and we respectfully submit, likewise, that the entry of the proposed order is similarly required by law.

A few notes to make about that, though, your Honor. To be very clear, dismissal of this indictment as to Jeffrey Epstein in no way prohibits or inhibits the government's ongoing investigation into other potential coconspirators, nor does it prevent the bringing of a new case in the future or the prosecution of new defendants.

J8RsEPS1

It also does nothing to prevent the government from continuing to explore the possibility of seeking civil forfeiture of any assets that were used to facilitate the crimes charged in this indictment. Indeed, as has been stated publicly, investigations into those matters have been ongoing, remain ongoing, and will continue following dismissal of the indictment here.

I would also like to note that, as the government has previously mentioned, this dismissal in no way lessens the government's resolve to stand up for the victims in this case, both those who have come forward and those who have yet to do so. We agree with your Honor's sentiment that those victims should be respected, and we appreciate your Honor's recognition of that.

One housekeeping matter that I did want to reference for your Honor. The protective order in this case requires destruction or return of any and all discovery material upon conclusion of the case. We have been in communication with defense counsel, who have confirmed that they have returned all physical copies that they have of discovery that the government has produced to date, and they are in the process of deleting any copies that they may have made. So the parties are in compliance with the protective order.

Finally, I just wanted to say a word about the victims in this case, and particularly those who are here in court

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J8RsEPS1

today. I'll note that in light of the court's order indicating that the victims and their counsel would be permitted to be heard in court here today, the government has endeavored to provide notice to all known victims of today's proceeding. We did so either directly where a victim was not represented by counsel or through counsel where a victim is represented by an attorney.

The government does not know exactly how many victims or their attorneys are here today and we do not know how many of them or their counsel would like to speak. To the extent any individuals do wish to speak, we do not know the substance of what they would like to say. We have left that entirely up to the individual decisions of the victims and their attorneys.

I will note, though, that throughout this case, the government has endeavored and done our utmost to fulfill our obligations under the Crimes Victims' Rights Act. We have done so by trying to keep as many victims as we are aware of up to date about the ongoing case and about any developments in the case.

We will continue to provide services and offer services to any of the victims in this case, even after the indictment is dismissed. Both the U.S. Attorney's office and the FBI have been in touch with all known victims or have attempted to be in touch with all known victims, either again directly where victims are not represented by counsel or

J8RsEPS1

through counsel where they have attorneys.  We have expressed to them that services are available for those who wish to take advantage of them.

Unless the court has any questions for me, the government will otherwise rest on its papers.

THE COURT:  I just have one question.

The protective order, is that self-executing or do I need to do something?

MS. COMEY:  It is self-executing, your Honor.

THE COURT:  Thanks very much, Ms. Comey.

MS. COMEY:  Thank you, your Honor.

THE COURT:  Yes.

I'll turn to counsel for the defense at this time. Mr. Weingarten, I'm happy to hear from you.

MR. WEINGARTEN:  Thank you.

Your Honor, I think it is an understatement of the year to say the world looks and feels differently today than it did the last time I was before you.  For us, the elephant in the room is what happened to our client.  I would like to tell you how we see the world and where we are on that subject.

We start with the Attorney General's statements, public statements, that there were very serious improprieties in the jail.  We obviously read the press.  We see that the warden has been taken out.  We see that the guards on duty at the time have been put on leave.  We understand guards are

J8RsEPS1

refusing to cooperate with the investigation. We have heard allegations that people at the time who had responsibility for protecting our client falsified information. We understand that there were orders out there that Jeffrey Epstein was never to be left alone and that the orders were ignored by many of the employees of the prison.

In a word, yikes. In addition, obviously we followed the medical examiner's report, or we haven't followed the report, we haven't seen it, but heard conclusions, initially not enough evidence to come to a conclusion, wanted to see more. We assumed she was talking about the videotapes, but then came to the conclusion that it was suicide.

We report to the court that --

THE COURT: Suicide by hanging --

MR. WEINGARTEN: Yes.

THE COURT: -- was her conclusion?

MR. WEINGARTEN: Yes.

And we report to the court that we had a doctor there at the time, and we also have been in receipt of a tremendous amount of medical and scientific evidence volunteered to us opining that the injuries suffered, as reported, were far more consistent with assault than with suicide, and we are happy to supply the court with all the information that we have.

Now, in addition, as the court noted, we were underway with our pretrial motions, and as the court obviously

J8RsEPS1

understands, the NPA and the role of the NPA was going to be critically important. And I would simply like to report that we went pretty far along.

We interviewed all of the relevant lawyers on the defense side who participated in the NPA, and we were satisfied that we had a very strong argument that every one of those lawyers believed with an objective basis that the deal was global. That is, at the time --

THE COURT: I'm sorry, that?

MR. WEINGARTEN: The deal of the NPA was global. That is, more specifically, at the time, the Florida prosecutors and agents knew of conduct in New York, and that no competent defense counsel negotiating in good faith with the prosecutors would have ever agreed to a deal back then that allowed New York prosecutors to indict for precisely the same conduct in the future, which, of course, is what happened.

In addition, we have come up with very powerful evidence, we believe, that Florida prosecutors, who participated in the deal, steered the victims and the alleged victims to New York on more than one occasion because they did not want to suffer the sleights of attacks against them. So we have advanced the ball on this very subject and we are prepared to completely report to the court as to where we are and what we've done.

Another point. We obviously had contact with our

J8RsEPS1

client at or around the time of his death, and obviously the attorney-client privilege survives death and we are not going to forfeit the privilege, but we will report to the court, with as much specificity as the court may want, that at or around the time of his death, we did not see a despairing, despondent suicidal person.  Details to follow, if the court wishes.

The 800-pound gorilla, for us, of course, are the video surveillance tapes.  Obviously we assume there is a tape that leads directly to the door where Jeffrey Epstein was housed.  If that tape reports for 12 hours before his death that no one went in and out of that room, then the suggestion that there was something other than a suicide seems preposterous.

But there is no such evidence that has surfaced to date.  Just the opposite.  We have heard, and we actually read in the press, that the tapes were either corrupted or not functioning.  Talk about a yikes.  If, in fact, the system was broken for six months before Jeffrey Epstein was housed, I mean, that would be stunning incompetence.  If it was allowed to continue to be inoperative when Jeffrey Epstein was housed, it would be incompetence times ten.  But what if the tapes only broke down or were inoperative or were corrupted on the day he was killed or the day he died?  Then we're in a completely different situation.

So where does this lead?  I think where it leads,

J8RsEPS1

Judge, is there are incredibly important questions that remain open. The public interest in this matter is obvious from this courtroom. There are conspiracy theories galore. We are all for finding the truth. We believe this court has an indispensable role to play.

Whether or not this indictment is dismissed, I think this court has the inherent authority to find out what happened on its watch. Obviously, when the court detained Jeffrey Epstein, the court did not anticipate that weeks later he would be dead in his cell. I think given the inherent authority of the court, the court should make inquiry.

This could come in many forms. Obviously the court made inquiry as to what happened in the first incident. When there was an allegation of an attempted suicide, the court made inquiry. The court obviously was interested.

I recall your language. You talked about that being one of the several open questions indicating an interest on the court for the others as well. Obviously, the ultimate question is what happened to the client.

THE COURT: You're talking about the July 23, 2019 incident?

MR. WEINGARTEN: Yes.

The court obviously could hold hearings. The court could assign a lawyer to help the court. I think this is an area where there is intense public interest. We have complete

J8RsEPS1

confidence in the prosecutors in the Southern District and the FBI to do a competent investigation. But these are allegations against serious components of the United States Department of Justice. Sometimes the appearance of justice is just as important as justice itself.

I think the court supervising, or at least keeping an interest in this proceeding, is incredibly important for the public to have confidence in the ultimate findings, and certainly for us to have confidence in the ultimate findings.

One more issue, Judge. The conditions of the jail, in a word, they were dreadful. Not just for Jeffrey Epstein, but for many of the prisoners over there. This is a prison within the shadows of this courthouse. The situation is rife with vermin. The abuse and the conditions in that prison, in a word, are a disgrace and everybody knows it.

A person with authority told us, someone with knowledge, that the prisoners in Guantanamo -- and he spoke with personal knowledge -- are treated better than the prisoners right across the way. The feds certainly know how to run a disciplined, clean prison. I've been in 20 of them. They know how to do it just fine. And the question is, why in the world does it not happen down the road? I think that is a perfectly legitimate subject for the court to make inquiry.

In a word, we want the court to help us find out what happened. The court has a role to play. It is the institution

J8RsEPS1

that most people have confidence in in these very troubled times.

So whether or not you dismiss the indictment, to us, is beside the point. We want you to stay on the case, we want you to conduct an investigation, and we want to know what happened here.

Thank you, your Honor.

THE COURT: Just so it is clear, so your view on the motion directly on its merits of the *nolle prosequi* order and application by the U.S. Attorney, do you have a view on that?

MR. WEINGARTEN: I think if the court felt that the case had to stay alive for the court to continue, we would oppose it. I think --

THE COURT: I'm sorry, if what?

MR. WEINGARTEN: If the issue, if you took the position for you to conduct the investigation or lead the investigation or participate in the investigation, then we want, the role we want you to play, if the indictment has to be alive, we would oppose the motion.

I don't think you need to do that. I think you can dismiss the indictment.

THE COURT: So you're suggesting that you support the government's motion, just viewed in the context of --

MR. WEINGARTEN: Yes, of course.

THE COURT: Great.

J8RsEPS1

MR. WEINBERG: Judge, if I can just supplement?

THE COURT: Absolutely.

MR. WEINBERG: Thank you, sir.

Thank you, as an out-of-town lawyer for the privilege to appear in front of you, your Honor.

THE COURT: It's my pleasure.

MR. WEINBERG: First, as to the conditions, we think your Honor trusted the government, the Bureau of Prisons, to keep our client safe and keep him in civilized conditions. The government will again ask, as to other defendants, that they be detained at the MCC, some subset of them will end up in the SHU unit.

It is a horrific. I've called it medieval. There's vermin on the floor. There is wet from the plumbing. There is no sunlight. There is limited exercise. It is simply conditions that no pretrial detainee -- and I would go farther as a criminal defense lawyer -- no United States defendant should be subjected to.

Certain judges have taken views of the conditions. We would urge your Honor, the government talks about and we talk about transparency, to see what kind of conditions there exist within 50 or 100 yards of one of the great United States district courts.

Second, in terms, we have a profound problem with the conclusions of the medical examiner. There are for three

J8RsEPS1

reasons, your Honor.

One is the timing of Mr. Epstein's demise. It was on August 10. On August 12, a bail pending appeal motion was being filed in the Second Circuit. On August 12 or 13, the United States Attorneys were going to respond to our request for the preservation and production of documents that would have facilitated and furthered our efforts to demonstrate communications between the Southern District of Florida, the Northern District of Georgia, which was standing in the shoes of the Southern District of Florida main justice and the Southern District.

In other words, we were beginning the process discharging our responsibilities. There had been no new evidence that Mr. Epstein had committed any offense against a minor after 2005. The subject matter of the New York prosecution was squarely within the heartland of the Florida NPA. We had a significant motion to dismiss. This was not a futile, you know, defeatist attitude.

Third, we had all the discovery motions that your Honor had scheduled. So the timing for a pretrial detainee to commit suicide on August 10, when his bail pending appeal motion is being filed on August 12, strikes us as implausible.

Second, we had an independent doctor who was present at the autopsy which occurred on August 11. On August 11, the city medical examiner's findings were inconclusive. We are

J8RsEPS1

told by a very experienced forensic pathologist that the broken bones in Mr. Epstein's neck, in his larynx, are more consistent with external pressure, with strangulation, with homicide, if you will, than with suicide. It doesn't exclude suicide, but the pure medical forensic evidence creates profound issues about what happened to him.

Also the time of death. Our medical examiner's opinion is it occurred at least 45 minutes and probably hours before 6:30 a.m. on August 10, when he was first found, if you will, according to the reports. Yet he was moved, something that is not ordinary in these circumstances.

I would also --

THE COURT: Excuse me. He was moved?

MR. WEINBERG: Instead of having the cell in the condition it was found, if he had been dead for 45 minutes or two hours or four hours, there were efforts to move him and, therefore, make it more difficult to reconstruct whether or not he died of suicide or some other cause.

I spoke to Stacey Richmond, who is a responsible member of this court who represents the family of Mr. Epstein. She spoke to the medical examiner on the Friday after Mr. Epstein's death and asked why, if the conclusion was made late in the afternoon on Friday that week. She specifically asked about what extrinsic nonmedical evidence caused the medical examiner to go from uncertain to suicide, and she was

J8RsEPS1

told that the medical examiner had seen nine minutes of one video which was on a stairwell between floors at the MCC. She was told that the principal video that would have showed the whole hall was corrupted. It was in DC with the FBI to see if they can reconstruct it.

And I asked the same questions that my co-counsel did, you know, was the dysfunction of the critical pivotal video, in the most secure prison east of Florence, out in Colorado known to the MCC before August 10, or was this corruption occurring on August 10, which would again cause us to be skeptical of the servitude of the medical examiner's conclusions that this was suicide rather than some other cause.

So with my co-counsel, we ask your Honor, it is not a question of trust or not trust. They ask you to detain people and you trust the Bureau of Prisons. And it is within your inherit authority, your Honor, to find out what happened to our client.

We are angry about the conditions he was held in. And we're also angry, quite frankly, your Honor, that the only source of information that we get as to what happened to him is through the media rather than through the United States Attorney's office. We've made requests informal. We have made Touhy requests. We've been told there is a pending investigation.

But we trust your Honor and the judiciary, and with

J8RsEPS1

all due respect, we believe there is an inherent and central role, a pivotal role in your Honor to find out what happened to a defendant in a case before the court, whether or not the court grants the *nolle pros* today or whether it holds it pending an investigation into Mr. Epstein's death.

We're not here without significant doubts regarding the conclusion of suicide. We are not here to say what happened. We don't know what happened. But we deeply want to know what happened to our client.

Thank you, sir.

THE COURT: And you, as Mr. Weingarten, have the same view of the *nolle prosequi* motion?

MR. WEINBERG: Yes, your Honor.

THE COURT: OK.

MS. COMEY: Your Honor, may I respond to some of those points?

THE COURT: Sure.

MS. COMEY: Thank you, your Honor.

Just briefly. With the exception of the noting that the defense does not have an objection to the government's motion, virtually everything else that defense counsel just argued, respectfully is completely irrelevant to the purposes of today's proceeding and to the motion that is pending before your Honor.

As an initial matter, the question --

THE COURT:  Well, it may be.  Well, I don't know.  You say irrelevant.

It is a public hearing, and I think it is fair game for defense counsel to raise its concerns.

MS. COMEY:  Certainly, your Honor.  But it is irrelevant to whether or not the motion should be granted.

THE COURT:  Right.  I get that.

MS. COMEY:  I would also note that the question of Mr. Epstein's death is the subject of an ongoing and active investigation, as has been publicly noted, by a separate team of Assistant United States Attorneys from the Southern District of New York, separate from the team who is handling this prosecution, as well as a separate team of FBI agents.

There is an ongoing and active grand jury investigation into the circumstances surrounding Mr. Epstein's death.  It is the function of a grand jury and of the Federal Bureau of Investigation to investigate crimes in the federal court system.  It is not the purview, respectfully, of the court to conduct an investigation into uncharged matters.

So respectfully, we disagree with defense counsel's suggestion that the court has some authority to conduct an independent investigation.  To the extent any other defendants who are detained in the MCC have concerns about the conditions or believe that the conditions are relevant to a future or current bail determination, it is for those defendants and

J8RsEPS1

their counsel to raise those arguments and for the judges hearing those arguments to evaluate those claims. It is not relevant to today's proceedings.

Thank you, your Honor.

THE COURT: In those other cases, Ms. Comey, judges do have authority to investigate, but don't here?

MS. COMEY: Not to investigate, your Honor, but to hear arguments about the conditions of confinement in the MCC as they may relate to any bail determination. I believe that was the argument that was made.

The bigger picture here, your Honor, is that the focus of today's proceeding, as we understand it, is to allow the victims who have gathered here today to be heard and to comment upon the case and to comment upon the motion that is pending, and to bring this case to a close.

THE COURT: Got it.

MR. WEINGARTEN: May I?

THE COURT: Sure.

MR. WEINGARTEN: We obviously saw this as, perhaps, the last opportunity to be before you, and we wanted to take advantage of the opportunity to say our peace and thank you for allowing us.

There is precedent here. Ted Stevens, the Senator from Alaska case in Washington, DC, Judge Emmet Sullivan ordered an independent investigation by a private lawyer when

J8RsEPS1

he was deeply troubled by the alleged Brady violations.  I represented the prosecutors in that case, so I'm very, very familiar with it.

It is analogous.  It is a situation where there was tremendous controversy over what happened in the case and whether or not the prosecutors went off the reservation.  Judge Sullivan -- and there were three or four independent -- not independent, DOJ inquiries into the very same matter.  But Judge Sullivan wanted his own opportunity to make a judgment with his own independent investigation.

THE COURT:  OK.

MR. WEINBERG:  If I could just add one precedent, your Honor.

The Chief judge in the District of Massachusetts or the Chief Judge at the time, Judge Wolf, in a case called U.S. v. Fleming, when the conditions at Walpole, which is a state prison where federal prisoners were being held -- we don't have a federal MCC in Boston -- went to the prison, stayed in the prison to determine whether or not the complaints about the conditions were authentic.

I think your Honor has the inherent authority to go to the ninth floor and see how the MCC houses pretrial detainees.

Thank you.

THE COURT:  Are you saying that whether or not the motion is granted that is pending before us?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J8RsEPS1

MR. WEINBERG:  Yes, your Honor.

I think, like when appeals are taken, bail issues remain before the district court.  Jurisdiction is not completely divested.  Your Honor issued a pretrial detention order and your Honor has the power, the inherent authority, they are not going to refuse to allow you to go look at the ninth floor.  They are going to count on you to make decisions in the future.

I just trust that the executive branch is not going to prevent the judicial branch from looking into the death of Jeffrey Epstein or the conditions in the SHU unit at the MCC, sir.

THE COURT:  Great.  Thank you.

MS. COMEY:  May I, your Honor?

Just very briefly, your Honor.  I would note that upon the dismissal of the indictment, which I believe the parties agree is appropriate in this case, there would be no case. There would be no jurisdiction for the court to conduct any sort of inquiry, even if the court had such authority.

THE COURT:  Right.

OK.  I think we've heard enough.

It is at this point in the hearing that I would like to call upon victims' counsel, plural, for any remarks they may have and they may wish to make.  Also, to introduce their clients, those of them who wish to be heard.

J8RsEPS1

It would be helpful if, in doing that, if counsel -- Mr. Edwards and I see and I see Mr. Boise as well -- I know they are counsel to several, at least several of the victims. It would be helpful if whoever is speaking, both Mr. Edwards and Mr. Boise, would indicate to the court whether or not they have discussed the pending motion with their clients, that is to say and the rule of abatement, etc., etc. with them prior to today's hearing.

Are we going to hear from Mr. Edwards first, is that right?

MR. EDWARDS:  Thank you, your Honor.

THE COURT:  You bet.

It would be helpful, Mr. Edwards, if you would state and spell your name for the court reporter.

If you are going to introduce someone else, which I trust that you are, if you could state and spell their name as well.

MR. EDWARDS:  Yes, your Honor.

May it please the court.  Brad Edwards, B-r-a-d E-d-w-a-r-d-s, with the law firm of Edwards Pottinger.

I have in the courtroom today 15 victims that I represent and have represented over the years.  There are at least 20 more who didn't make this hearing today for a multitude of reasons, some out of fear of public exposure, others because the way in which this case ended will never

bring full justice, and they decided it was best for them not to talk today.

Some of my clients are going to address the court that are here today. Others are not. Some are going to use their names, and have in the past, and others wish to remain anonymous. And I have instructed each of them to inform the court reporter that they will be proceeding as Jane Doe so that the court reporter can take them down.

THE COURT: For those who wish to remain anonymous?

MR. EDWARDS: Exactly, your Honor.

THE COURT: And that is satisfactory, as far as I am concerned.

MR. EDWARDS: Before we do that, I would like to address a couple of the things that have occurred this morning.

First of all, whether relevant or not, I personally, and on behalf of my clients, do appreciate the presentation that Mr. Weingarten made and Mr. Marty Weinberg made.

I have tremendous respect for Mr. Weinberg. I've worked with him through this and related cases for years, and I understand the reason why they made the presentation that they made.

There is two things of interest to our clients in that respect. One is, because of the tragic ending, that none of my clients wanted, nor did I, nor did anyone else, if there is some civil rights violation and there is some civil remedy for

J8RsEPS1

Mr. Epstein that goes to the estate, certainly the victims are interested in that as they might help to repair the damage done.

Second, Mr. Epstein's untimely death, the timing is curious to us. But more so, it makes it absolutely impossible for the victims to ever get the day in court that they wanted in court and to get full justice. That now can never happen. I know that Mr. Epstein's attorneys say he wanted it, and they know, we did too. And there are a lot of people here today that are very sad by the way that this ended for both Mr. Epstein and the fact that full justice was robbed from them, once again.

The second issue I wanted to address was the Law Review or the Law Journal article that your Honor referenced, which is troubling because the opinion seems to say that transparency is not appropriate in the criminal system and is not appropriate at this point in time.

That's tough to swallow, especially in this case, given the long history of this case. Personally, it is tough to swallow, and on behalf of my clients, I can say that is very concerning. Transparency is the only way that the justice system works. We know this because there was a similar investigation of Mr. Epstein many years ago, from 2005 to 2008.

My personal involvement in this case was because a young female came into my office named Courtney Wild, and she

J8RsEPS1

came to me not asking to file a lawsuit against Jeffrey Epstein, but simply asking for the government to talk to her. She was cooperating in an FBI investigation and wanted the government to speak with her, and I thought that was going to be an easy task.

It was only a few months later that we learned that this investigation that was represented to my client in written form, that it would be a long investigation, and to be patient. Basically, to hang tight. It was resolved by way of a secret deal that never allowed any of the more than 30 victims who had been identified of Mr. Epstein's abuse in Florida to ever participate in a single hearing. There was a hearing. They were never notified.

I then went on to represent many of them in civil cases and also in extensive pro bono work. And I can tell your Honor that while Jeffrey Epstein's abuse of them hurt them and harmed them for many years, the feelings they had was aggravated exponentially by the facts that they had no rights in the criminal justice system, by the fact that they were treated as if they didn't matter. They were not allowed their rights under the Crime Victims' Rights Act to meaningfully confer with prosecutors, to be treated with fairness, to be treated with dignity. That is what this is supposed to be about, and to have notice of hearings.

So I do want to thank your Honor, and especially the

J8RsEPS1

prosecutors who have worked this investigation and this case, which is very different in experience for all of my clients and the other Epstein victims in this case, because they were allowed to be a part of the process. While some of them elected not to be here today, that opportunity should always be allowed for them.

In 2008, we filed that case under the Crime Victims' Rights Act because our clients' rights were violated, and as your Honor knows, a federal judge has ruled in our clients' favor that their rights were violated. So this hearing today means a lot to them. The fact that they may never get their chance to speak in court, they may never get complete closure, and all of us have to wonder, if their rights had been afforded them the first time, would any of us be here right now. Or wouldn't it more likely be the case that everyone, including Jeffrey Epstein, would have turned out better for it?

Today, I have not only represented, but met and become very close with many of these victims. Many of these survivors. They are very strong people. They are people who have persevered through a lot of adversity. It's been a roller coaster of emotions that has led us to where we are today. And while they have all been cast over the years because of the secrecy of the first investigation, in the shadow as victims, you can't put them all in one bucket and say one size fits all. They are each individual people who were harmed differently and

J8RsEPS1

distinctly through not only the abuse, but the system.

And on behalf of all of them, I would like to thank your Honor for the fairness with which they've been treated, and the United States Attorney's office for the way in which you have handled this investigation, and especially how you have treated the victims in this case.

Like I said, I have many who want to speak. Some that can't. This is a very difficult day for them. But we appreciate the opportunity and the invitation.

The first client that I have that is going to address your Honor is the one who walked into my office in 2008 asking just to be heard, Courtney Wild.

THE COURT: Hold on one second. Did you all want to be seated?

You don't need to be standing. Whatever is more comfortable until you're ready to give some comments. It's up to you.

Ms. Wild, if you could spell your name for the court reporters, please.

MS. WILD: Courtney, C-o-u-r-t-n-e-y, last name Wild, W-i-l-d.

(Continued on next page)

MS. WILD:  My name is Courtney Wild, and I'm a victim of Jeffrey Epstein.  Jeffrey Epstein sexually abused me for years, robbing me of my innocence and mental health.  Jeffrey Epstein has done nothing but manipulate our justice system, where he has never been held accountable for his actions, even to this day.

Jeffrey Epstein robbed myself and all the other victims of our day in court to confront him one by one, and for that he is a coward.

I want to thank the U.S. Attorney's for seeking justice that has been long over due, and most importantly, given us, the victims, our day in court to speak our peace and find some sort of closure.  I feel very angry and sad that justice has never been served in this case.  Thank you.

THE COURT:  Thanks very much.

MR. EDWARDS:  I believe my next client who is going to speak is probably going to speak as Jane Doe.

JANE DOE NO. 1:  Yes, Jane Doe.

THE COURT:  We'll say Jane Doe No. 1, just for the record.

JANE DOE NO. 1:  Okay.  Thank you for allowing us to speak today.  I've shifted what I want to say in hearing what's already been said, and just about the question of Jeffrey's death.  I don't know what the relevance is to this hearing, but I do know that it is profoundly relevant to my

J8RPEPS2

life, as a victim. I don't like that word, but I still feel like I am learning the ways that he's impacted me as a complex situation, but he was also a major part of my life. As destructive as that relationship was and as much of a villain as we have created him to be -- based on facts we've created him to be a villain -- he's a complex villain and actually all of that is irrelevant. Anybody deserves -- an investigation is the right thing to do. Like, we do need to know how he died.

It felt like a whole new trauma all over again, and I don't know why, you know, because I -- I'm trying to defend myself against him at this point in my life, but it still does not feel good. It didn't feel good to wake up that morning and find out that he had allegedly committed suicide. Okay. But I also wanted to say to the press, I'm reading -- I read my story in the paper. I read so many other girls' stories that are so similar to my own, and everything that's been focused on is not the most important part of it.

There was -- the problem with focusing on these, the facts of the situation, that were out of the ordinary and like because he was such a grand person, and it was just a unique situation. I know that that's the more interesting side of the story, but I don't want to be used as entertainment. And the problem, the fundamental problem of the whole situation is the element of exploitation and coercion, and these are things that so many girls can relate to.

And even though this Jeffrey Epstein brought it to a grand scale, on some level, a lot of girls could relate to the trauma that we are talking about, and even though this whole situation sucks, I would like to think that it may be possibly a catalyst for change because, obviously, as we're seeing with the "Me Too" movement, change needs to happen and it's -- what I'm seeing in the papers is not a common story, but it's so much more common than you realize.  That's all.  Thank you.

THE COURT:  Thank you very much.

MR. EDWARDS:  I believe that the next client is going to also be a Jane Doe; so I think for the purposes of the record it will be Jane Doe 2.

THE COURT:  Yes.

JANE DOE NO. 2:  Good morning, your Honor.

THE COURT:  Good morning.  How are you?

JANE DOE NO. 2:  Doing okay.  I hadn't prepared any words to speak today, but there is something that was on my mind this morning when I got here.  It's been on my mind in reading through the press and through the people that I've spoken to about it, friends, family.  It's something that's bothered me because I think it has a lot of blame in it, as well, a little bit of what my friend, who was up here, was speaking about.

I think that a lot of people asked why we spent so much time, why we stayed.  It's an experience that's really

J8RPEPS2

hard to explain to people who haven't gone through it. I think there's a writer, Thomas Nagel, who wrote an essay called "What is it like to be a bat?" And I think that he touches on it pretty strongly and if you haven't experienced something, it's very hard to fully understand why someone makes the decisions they do and what the circumstances were.

I don't want to speak for all of the victims. I think each of us has a different story and different circumstances for why we stayed in it, but for me, I think he was really strategic in how he approached each of us. Things happened slowly over time. We didn't -- it almost was like, putting it like that analogy of a frog being in a pan of water and slowly turning the flame up. You didn't realize it was happening, and it just -- I don't think anyone can fully understand the experience, but I just -- the blame feels very strong.

There's a lot of support as well, but I just want people to try and understand that we aren't bad people. We weren't trying to -- it wasn't a situation where we were trying to extort money from someone. A lot of us were in very vulnerable situations and in extreme poverty, circumstances where we didn't have anyone on our side, to speak on our behalf, and that's really scary.

You start to blame yourself because, at first, you don't tell anyone what's happening, and it becomes your deep, dark secret that you tried to keep from everyone. And I didn't

J8RPEPS2

even know I was a victim until I spoke with my lawyers. I had no idea. I had so much self-hatred and doubt and just guilt for everything. I still do. I still don't feel like I deserve to say I'm a victim, and I think that's a big problem with our society right now, that people are still blaming victims, and I think that does need to change.

I hope that today people understand that each of us has a story, has a past, has a family and just give us a chance to -- you know, that's basically all I just wanted to say.

THE COURT: Thank you so much.

JANE DOE NO. 2: Thank you so much.

THE COURT: Okay.

MR. EDWARDS: Okay. I think that the next person who is going to speak is also going to be speaking as Jane Doe; so for the purpose of the record, Jane Doe No. 3.

JANE DOE NO. 3: Thank you for allowing us to speak today. I came to New York City 15 years ago to pursue modeling from a small town. I signed on with an agency and was excited to pursue my passion and my dream. Several months later, I met a female who told me about Mr. Epstein. She portrayed him as an amazing man who genuinely cared for people and that he was going to be able to help me in a modeling career.

I was excited to meet him, after hearing her talk about him. He sounded like an amazing person. An introduction was made at his New York home, and it is there that I was

J8RPEPS2

sexually assaulted. I left his home, after he threw me, basically put money on the table, and I was ashamed. I was embarrassed. This was not the way I was brought up, and I couldn't believe this had happened to me.

I left and my world kind of spiraled after that. I stopped going on modeling castings. I gained weight. I became depressed. I stopped going out with my friends, and only five months after I had been in New York City to pursue my dream, I left. I left the modeling industry, and I left New York City, and I totally switched my career paths.

I buried this deep within me, and all of the new occurrences that have come up in the media is what brought it back up for me. And I feel sickened and saddened that it took so many years, and God knows how many victims, for this to finally come out, but I'm thankful it did. And I'm just angry that he's not alive anymore to have to pay the price for his actions. So I thank you for your time.

THE COURT: You're very welcome.

MR. EDWARDS: Your Honor, Jane Doe No. 4, I believe, is going to speak now.

JANE DOE NO. 4: Good morning, your Honor.

THE COURT: Good morning.

JANE DOE NO. 4: I just have something very short to say. I met Jeffrey Epstein at a very vulnerable place in my life, and whatever the outcome is with everything, I just

Case 21-1049, Document 53, Filed 05/23/25, Page 160 of 345

wanted to express that we, the victims, we will always carry irreparable damage and pain throughout our lives after this. It's something that's never going to go away.

You know, whoever we marry in our life, whatever future we have in our life, it's always going to be something that's always there for us. And I'm very nervous right now. And Jeffrey Epstein, he took away the chance I had at having the future I had envisioned for myself as a young girl, and I think many of us here today will never fully heal from that pain and the heartache that we'll continue carrying with us.

So I just wanted to say that. It's something that it's irreparable. I can't even really use a better word to describe that. So thank you for hearing us today.

THE COURT: You're very welcome.

MR. EDWARDS: Your Honor, Jane Doe No. 5 would like to speak.

JANE DOE NO. 5: This is a letter that I wrote; so it's going to be: Dear Jeffrey, I think you are a mentally disturbed human being. You used your power to make me believe at a young age that I could have my dreams of being a model. You paid for your freedom. You violated my rights. You should have to pay for them, just as anyone else. You got a plea deal that no one else would have been able to get. You used your money to get out of paying the price for your actions.

Also, as a victim, I never got to see what the

J8RPEPS2

agreement was or why the special treatment got approved. I think you should have been in jail for several years in population and live like everyone else that is mentally disturbed like you. You paid for yourself to get special treatment while you were in jail. I don't even think you spent a day in a jail as a normal human being.

You had investigators come to my house and also went to my friend's house to question them. I will never be able to over -- I will never be able to get over the overwhelming emotions and embarrassment I experienced from that trauma. I needed therapy several times a week and had high stress and anxiety levels.

You paid your way to make the public think that the girls had nothing in life going on for them. You wanted to try and blame that we were lower class and that was the problem with the girls. I was from a middle class family and did well in school. I lived the American girl dream -- or the American girl life. I went on family vacations around the world, grew up in a good city, and my parents are still married to this day. Basically, everything you said that we didn't have in our life, I did.

It all came down to I was told I was making $200 in an hour. Being young, that was a lot of money, and I didn't know any better. Sadly, you were the one with an illness that you should have to go and see a doctor and also have a mentor group

for the sickness you have.  I will continue with writing my book about that secret life, with all the newspaper articles of the case, my high school agenda book of official dates.  I'm basing that proof that I deposited cash after leaving Jeffrey's.  I still have all of the information, articles that I collected over the years.

You mentally and physically traumatized me.  I went to therapy, and it was the best thing I did for myself.  If anyone only learns one thing from this case, I hope is that money should not let you buy your way free.  A crime is a crime and a victim is a victim.  Thank you.

THE COURT:  Thank you.  Thank you very much.

MR. EDWARDS:  Your Honor, my next client is Chauntae Davies, C-h-a-u-n-t-a-e, Davies, D-a-v-i-e-s.

MS. DAVIES:  I met Jeffrey Epstein through my first massage teacher, a man who took me in as his apprentice to teach me a practice I wanted to learn while in desperate search to find a cure for a debilitating neurological disorder that I have, which manifests into violent vomiting attacks, largely triggered by stress.  It's called Cyclic Vomiting Syndrome.

I was recruited by Ghislaine Maxwell.  Upon my first meeting of her, I wouldn't know I had been recruited until many years later, when I would read it in a headline.  Ghislaine and Jeffrey took me in.  They sent me to school.  They gave me a job.  They flew me around the world, introduced me to a world I

J8RPEPS2

had only dreamt of and made me feel as though I had become a part of their family, another thing I was desperately searching for.

But on my third or fourth time meeting them, they brought me to Jeffrey's island for the first time, and on the first night there, Sarah Kellen came tapping on my door late at night to inform me Jeffrey was ready for another massage. My instincts told me this didn't feel right, but I got up and followed her to a villa I hadn't yet seen. Jeffrey and Ghislaine's villa.

I began my massage, trying not to let him smell my fear and obvious discomfort, but before I knew what was happening, he grabbed onto my wrist and tugged me towards the bed. I tried to pull away, but he was unbuttoning my shorts and pulling my body onto his already naked body faster than I could think. I was searching for words but all I could say was meek, "No, please stop," but that just seemed to excite him more.

He continued to rape me, and when he was finished, he hopped off and went to the shower. I pulled my shorts up, and I ran as fast as I could back to my own villa, my feet bloodied from the rocks. I cried myself to sleep that night.

I spent two weeks vomiting, almost to death, in a Los Angeles hospital after that first encounter. Jeffrey's abuse would continue for the next three years, and I allowed it

J8RPEPS2

to continue because I had been taken advantage of my entire life and had been conditioned to just accept it.

It took me a long time to come forward, too long maybe, and all it took to bring -- and all that it took to bring this man to justice has been robbed by his death. Every day, every week I've spent in the hospital since, I've suffered and he has won. Every job offer that's been offered to me and then retracted because of my connection to this case, I have suffered and he has won. Every public humiliation I have endured, I have suffered and he has won. Every relationship that I've had to end because of the abuse that I have endured by the hands of this man, I have suffered and he has won.

Every woman sitting in this room today, and all of the women who have yet come forward and who have not yet to come forward and whose lives have been affected by Jeffrey Epstein's sick abuse of young girls, we have all suffered, and he is still winning in death.

I refuse to let this man win in death. I couldn't fight back when Jeffrey Epstein sexually abused me because I hadn't yet found my voice. Well, I have found my voice now, and while Jeffrey may no longer be here to hear it, I will not stop fighting, and I will not be silenced anymore. I needed him to hear the pain he's caused, what I've gone through because of him. I wrote a 350-page book of all the pain that I have endured at the hands of this man that I really needed him

J8RPEPS2

to hear.  His death has robbed me of that justice.

Please don't rob us of justice again.  Thank you.

THE COURT:  Thank you.

MR. EDWARDS:  Your Honor, I think I have one more client that is going to speak today, Anouska De Georgiou.

THE COURT:  Would you spell that?

MS. DE GEORGIOU:  Good morning, your Honor.

THE COURT:  Good morning.

MS. DE GEORGIOU:  My name is spelled A-n-o-u-s-k-a, D-e, space, G-e-o-r-g-i-o-u.

Thank you, your Honor, for giving us the opportunity to be heard this morning.

THE COURT:  Sure.

MS. DE GEORGIOU:  When I was introduced to Jeffrey Epstein, I was young and full of hope and the foolishness of a teenager.  I was idealistic, and I saw the good in people. Jeffrey Epstein manipulated me, coerced me and sexually abused me.

Something I think is very important to communicate is that loss of innocence, trust and joy is not recoverable.  The abuse, spanning several years, was devaluing beyond measure and affected my ability to form and maintain healthy relationships, both in my work and my personal life.  He could not begin to fathom what he took from us, and I say "us" because I am every girl he did this to, and they're all me.  And today we stand

J8RPEPS2

together, those that are present and those that aren't.

I was a victim, and it has taken me many, many years to stand here and say, yes, it was me. I was a victim, but I will not remain a victim and be silent for one more day. Although I think it's tragic when anybody dies before their time, I'm extremely relieved that Jeffrey Epstein will not be in a position to hurt anymore children or anymore women, and I'm glad to be part of a group of women who are now bonded forever in the trauma that we endured at the hands of this man. Thank you.

THE COURT: Thank you.

MR. EDWARDS: Your Honor, we had one client who was not able to be here but sent a message through a letter. Her name is Michelle Licata, M-i-c-h-e-l-l-e; last name, L-i-c-a-t-a. And Brittany Henderson, of my office, is going to read her letter as instructed.

THE COURT: Sure.

MS. HENDERSON: Thank you, your Honor.

THE COURT: Yup.

MS. HENDERSON: What happened to me occurred many years ago when I was in high school, but it still effects my life. I was told then that Jeffrey Epstein was going to be held accountable, but he was not. In fact, the government worked out a secret deal and didn't tell me about it. The case ended without me knowing what was going on, without him being

held responsible, without any explanation and without a chance for my voice to be heard.  I was treated like I did not matter.

Many years later, he was arrested again.  These investigators and attorneys representing the United States have been completely different.  I am still mad, concerned and confused about how he committed suicide and escaped responsibility again, but I know it is not the fault of the judge or the government attorneys.

I was allowed to be a part of the process this time. My attorney was able to tell me what was going on at every stage because they kept him informed.  Thank you for inviting me.  It means more to me than you can ever know.  I was not able to be here this time, but I know that I was allowed to be and I had the chance to attend this hearing, which is helping me in my healing process.  The fact that I mattered this time and the other victims mattered is what counts.  For that, I am grateful.

THE COURT:  Thank you.

MR. EDWARDS:  Your Honor, finally, in 2008 when I filed the case under the Crime Victims Rights Act, it wasn't me alone.  I did it with Paul Cassell and Jay Howell.

Paul Cassell is here today, and I think your Honor even cited to a piece of -- an opinion of his from when he was on the bench, and he has some remarks to make.

Once again, your Honor, I really do believe that this

is a model for how victims should be treated in a criminal process, and we really do appreciate it. Thank you.

THE COURT: Thank you.

MR. CASSELL: I'll be very brief because I know there are others that want to speak here. I'm Paul Cassell, C-a-s-s-e-l-l, previously served as a federal judge at the District of Utah, currently a law professor, where I teach crime victims rights at the University of Utah, College of Law.

I just wanted to take one minute to address some suggestion that there would be no need for a hearing this morning. I think, having heard already from these powerful victims and recognizing how important giving those statements will be in the trajectory of their lives, makes clear that your Honor has followed exactly the right path. Legally, there is one precedent, which is *U.S. v. Heaton*, a case that you cited that I wrote about a decade ago, and as explained in that opinion, victims have important interests in the criminal justice system that can only be recognized if they're given their day in court.

With all due respect to other law professors that have recently written an article, I think transparency is one of the overriding objectives in our criminal justice system, and the one substantive action that I would urge your Honor to take today is to publish your remarks as a published opinion. The Heaton case is, to my knowledge, the only reported decision on

J8RPEPS2

this particular issue, even though it's more than a decade old and, yet, we can see today that these problems recur in many other cases. Your remarks today, I think, should be published so that they can serve as a guide for other judges around the country.

I would encourage you to add into your remarks a reference to the Crime Victims Rights Act. The Crime Victims Right Act promises victims the right to be treated with fairness, dignity and respect, and the process that we see unfolding this morning is a clear example of how victims can be treated with fairness, dignity and respect.

So I know that your Honor is wondering what is the appropriate action here. Unfortunately, it seems like there are no other legal options, but there was a legal option for you to decide to exercise, which was to allow these victims to come forward. And if there's been one positive thing that has come out of the tragedies, the abuse, the other events of this case, it's been your decision to allow these victims to be heard this morning, and I encourage you to publish your decision and to encourage other judges to follow what is clearly a model for crime victims rights and is clearly an example that should be followed in other cases down the road.

THE COURT: Thank you very much. I appreciate your being here. I had no idea that you would be here when I wrote the remarks, but it was clear from the literature that you are

J8RPEPS2

the leading expert formerly of the District Court of Utah, I believe, and it's a pleasure to have you here today.

MR. CASSELL:  Thank you, your Honor.

THE COURT:  Thanks.

Mr. Boies?

MR. BOIES:  Thank you, your Honor.  David Boies of Boies Schiller Flexner.  We have with us today five of the victims that we represent.  There are a number of additional victims who either were unable to attend or are still unwilling to come forward publicly.  This has been an enormously traumatic aspect of their lives, something that, as you've already heard and will hear more today, is something that they can never entirely escape from.

I want to, as prior counsel have, commend both the Court and counsel for the Department of Justice for the consideration and respect and attention that they have paid to the victims.  We believe that that is not only right, as a matter of human dignity, but we think that is exactly what the law requires and intends.

I will be more blunt than the Court has been, or Professor Cassell has been about Professor Green's article. That is an article that cites no authority, and I believe there is no authority for his proposition.  I entirely respect his right to advocate on behalf of his client Alan Dershowitz, who has retained him in connection with litigation that we've

brought against Mr. Dershowitz, but I would have expected that the Law Journal or Professor Green himself would have disclosed that connection, which I think is a conflict.

But regardless of the appropriateness of his disclosure, or lack of disclosure, I think that his article opposing allowing the victims to have a voice in this proceeding is inconsistent not only with the policy that underlies the Crime Victim Rights Act and the very statute that Mr. Epstein is being prosecuted under, but it ignores the actual language of those statutes, and many other statutes, in which Congress has made clear that the purpose of the criminal law is no longer simply to punish the individual defendant, but it is to find some way of trying to mitigate the damage that has been done to the victims through restitution and economic mitigation, but also through the ability to confront and to have the court system and the justice system and the prosecutors treat these victims as they are victims, as they are human beings, and they are entitled to the respect that our society needs to give every human being.  So I think that this is not only commendable, but I think it is what the law requires.

In response to the question the Court asked, I have discussed this hearing with my clients.  I have told them that, under the applicable law, the government has no alternative but to move to dismiss this case, and I believe under the

J8RPEPS2

applicable law in this circuit, the Court has no alternative but to grant that motion.

I think the current law is outdated, as the Court suggested in some of its remarks. I think there will come a time when either an Appellate court or the Congress will make clear that, just as it's possible to continue civil cases against someone after they have deceased, it is possible, at least for purposes of things like restitution, to continue criminal cases, but we are not there now. And, fortunately, in this case, there are other ways and perhaps even more efficient ways to vindicate the interests of the victims here.

We greatly appreciate the remarks of the representative of the Department of Justice today, and we, too, on behalf of the victims, are not going to stop when we walk out of this courtroom. We are going to continue to seek vindication against Mr. Epstein's estate and, in some senses, perhaps even more important, against the people who worked with him and enabled him.

As you have already heard, and will hear more, Mr. Epstein did not act alone. He could not have done what he did, on the scope and the scale of what he did, for as many years as he did it without the activities and support and the co-conspirator activity of a number of other key individuals, and those individuals also need to bear their share of responsibility, and those people need to have a reckoning as

J8RPEPS2

well.

My partner Sig McCawley, who's been working with me for more than five years on this case, is going to, with the Court's permission, introduce five of our clients who will speak briefly to your Court. Thank you very much.

THE COURT: Thank you very much, Mr. Boies. Pleasure to have you here.

MS. McCAWLEY: Thank you, your Honor, the first victim that would like to speak today is Theresa J. Helm.

THE COURT: Can we have the spelling of your name?

MS. McCAWLEY: Sure. Sigrid, S-i-g-r-i-d, and the last name is M-c-C-a-w-l-e-y, and I'm a partner at Boies Schiller Flexner.

THE COURT: Thank you.

MS. HELM: Good morning.

THE COURT: Good morning.

MS. HELM: Thank you, prosecutors and Judge, and the Court. My name is Theresa Helm. I note today I do feel respected and listened to; so I appreciate that, and I have to say that I commend the boldness of the New York prosecutors for pursuing a man that has, you know -- and others, that have clearly taken a lot from a lot of people.

17 years ago I knew him only as "Jeffrey." I was recruited and brought from California to New York, and that

J8RPEPS2

experience for the last 17 years has been a dark corner in my story, in my life, in my life story and that has been definitely made worse by my own self-shame and that -- and anger for normalizing all of the red flags. I feel like we are conditioned to do that, and that's something that needs to change.

So I'm here today, you know, I'm coming forward because it is time to bring light to that darkness, and it's time to replace that darkness with light. And I am a survivor of this, and I do aim to progress further from being a survivor, you know. I feel I've worked hard, quite hard, to get to where I'm at now, and I'm definitely at a place in my life where I will no longer cover up. I'll no longer cover up what needs to be brought to light.

Jeffrey is no longer here, and the women that helped him are, Ghislaine Maxwell. My experience is with Ghislaine Maxwell and Sarah Kellen, and they definitely need to be held accountable for helping him, helping themselves, helping one another carry on this huge, almost like a system. So they need to be held accountable, all of them, and I would like to see that, certainly on behalf of myself and for everyone here. Thank you.

THE COURT: Thanks so much.

MS. McCAWLEY: Our next client, who is going to speak this morning, is Virginia Roberts Giuffre.

J8RPEPS2

MS. GIUFFRE:  Good morning, your Honor.

THE COURT:  Good morning.  How are you?

MS. GIUFFRE:  Okay.  Thank you.  My name is Virginia Roberts Giuffre, that's V-i-r-g-i-n-i-a, Roberts, R-o-b-e-r-t-s, Giuffre, G-i-u, double F, for Fred, -r-e.

I am a victim of Jeffrey Epstein and Ghislaine Maxwell in the dark and cruel and criminal acts they committed against me and hundreds of other girls and young women for years and years and years, unstopped.

Thank you for allowing me to address the Court and speak the truth.  I commend the prosecutors from the Southern District of New York for the ongoing investigation and its pursuit of justice for us victims.  It has given me hope, and I will not let go of that hope.

When I was recruited by Ghislaine Maxwell at Mar-a-Lago, just before I was 17, I thought I was given a big break, and I'd be able to reset my life and become an actual real massage therapist.  My hopes were quickly dashed, and my dreams were stolen.  Jeffrey Epstein is no longer alive, but this is not about how he died.  This is about how he lived.

He will not have his day in court, but the reckoning of accountability has begun, supported by the voices of these brave and beautiful women in this courtroom today.  The reckoning must not end.  It must continue.  He did not act alone and we, the victims, know that.  We trust the government

J8RPEPS2

is listening and that the others will be brought to justice. Thank you, your Honor.

THE COURT: Thank you very much.

MS. McCAWLEY: The next client of ours that will be speaking this morning is Sarah Ransome.

MS. RANSOME: Thank you, your Honor. My name is Sarah Ransome, R-a-n-s-o-m-e. I'm a victim of Jeffrey Epstein and Ghislaine Maxwell's international sex trafficking ring.

I would like to thank the Court for the dignity and the respect you are showing me here today, as well as the other victims. I would also like to acknowledge and extend my gratitude to the prosecutors from the Southern District of New York for pursuing justice on behalf of the victims. Please, please finish what you have started. I struggled to find the words to adequately say how important your work is to us.

For a very long time Jeffrey Epstein gamed the system at every level, and when he realized he couldn't do that any longer, he showed the world what a depraved and cowardly human being he is by taking his own life. But we, the victims, are still here, prepared to tell the truth, and we all know he did not act alone. We are survivors, and the pursuit of justice should not abate. Thank you, your Honor.

THE COURT: You're very welcome.

MS. McCAWLEY: Our next client who is going to be

J8RPEPS2

speaking this morning is Annie Farmer.

MS. FARMER:  Good morning, your Honor.

THE COURT:  Good morning.

MS. FARMER:  Annie, A-n-n-i-e, Farmer, F-a-r-m-e-r.

I had the opportunity to speak at Jeffrey Epstein's bail hearing, and I really appreciate that you heard me and listened to me that day.  I am so sorry that others will not have the opportunity to stand before him the way that I did.  But I'm here today to speak on behalf of my sister, Maria Farmer, who could not be here.

Jeffrey Epstein, Ghislaine Maxwell not only assaulted her, but as we're hearing from so many of these brave women here today, they stole her dreams and her livelihood.  She risked her safety in 1996, so many years ago, to report them, to no avail, and it is heartbreaking to her and to me that all this destruction has been wrought since that time.

We were deeply disappointed and disturbed by Epstein's death and the fact that that was allowed to happen while he was in the government's custody, and I'm encouraged to hear that there will be a full investigation as to how that was allowed to happen.

But it is extremely important, as others are saying, that he did not act alone and that the other people that were a part of what he did are held accountable and that that investigation continues.

J8RPEPS2

I believe that we have a real problem in this country with perpetrators of sexual abuse and sexual assault being held accountable. There are so many roadblocks to victims being heard, to cases being investigated thoroughly, and then to those cases being prosecuted. And so I think this is a really important signal to send a message to victims out there that people will take you seriously, people will follow through, and that even those in power, as we have unfortunately seen, that has not been often are able to escape that, that even those in power will be held accountable. Thank you.

THE COURT: Thanks so much.

MS. McCAWLEY: Our next client, who's going to address the Court is Marijke Chartouni. She says it much more beautifully than I do; so I'll let her say it.

MS. CHARTOUNI: My first name is spelled, M-a-r-i-j-k-e; last name is C-h-a-r-t-o-u-n-i.

My name is Marijke Chartouni, and I am a victim of Jeffrey Epstein and the sophisticated sex trafficking operation he ran, where he allegedly was to be a financier.

I was 20 and previously modeled and was living in the West Village. I met a young woman named Rena through a mutual friend. We were friends for a few months. She was an amazing artist and liked to party. One day she called me and asked if I was interested in meeting a friend of hers. She told me he wanted to meet me and really liked blonds, and I thought he was

J8RPEPS2

our age and liked to do the same things we did at that age; so I agreed.

On a sunny, crisp day, we took the train together to the Upper East Side. She then began to talk a little bit about him on our way to his house. I was at his house. I was sexually assaulted by both Rena and Jeffrey Epstein in his mansion. It left me feeling both disgusted and betrayed.

As we walked home to the subway afterwards, she continued to tell me about the man who had just abused me with her participation. She seemed exhilarated from the horrific experience. I was shocked and in a daze. This is a few things that she had told me. She told me he went to Cooper Union. He was a mathematical genius. That he had favorite girls that he would take to Chanel for 15-minute, all-you-can-buy shopping trips. She told me his right-hand person had connection to the arts and the fashion world, and she could help me.

This is not my complete story. I'll stop here. I'm in a good, stable place in my life, and I had decided to come forward to be a voice to the victims who may not be able to tell their story, or at least not yet. I feel like I am a survivor.

Thank you, Judge Berman, for inviting victims to speak today before you. We hope the government is listening very closely to the words we are saying.

THE COURT: Thank you very much.

J8RPEPS2

MR. BOIES:  Your Honor, just very briefly.

THE COURT:  Sure.

MR. BOIES:  I would like to express to the Court how proud I am of all of these women who have come forward.  It's taken an enormous amount of strength and courage for them to do so.  Thank you.

THE COURT:  Thanks, Mr. Boies.  Hold on one second.

(Pause)

MS. LERNER:  Thank you, your Honor.  My name is Kimberly Lerner, of Lerner and Lerner, and your Honor, with your permission, I would like my client, Jennifer Aroz, to stand next to me.

THE COURT:  Sure.

MS. LERNER:  Would that be okay?

THE COURT:  Absolutely.

MS. LERNER:  Your Honor, I would like to begin by saying that I am in awe of all of these beautiful women.  I just want to let you know, on behalf of Jennifer and myself, we admire you, we respect you, and we applaud you, and you are brave survivors.  And Jennifer's heart is with all of you, and we thank you so much for coming forward.

Jennifer, when she went public, she thought she was one of the only ones, and to see all of these faces is, I know, amazing for her.

Jeffrey Epstein was a predator, a pedophile and a sick

individual. However, he was also a thief. He stole Jennifer's childhood dreams, her innocence and her self-confidence. She was 14 years old. What he could not buy, he forcibly took. Why? Because he surrounded himself with a network of powerful people who not only looked the other way, but also actively facilitated and participated in his sexual abuse of children.

Jeffrey Epstein thought he was above the law, and essentially he was until now. The system let Jennifer and the other victims down, but it does not have to end here. We ask the U.S. Attorney's Office and the FBI to bring all of Epstein's enablers and co-conspirators to justice.

It has taken Jennifer 18 years to find her voice, and again, Jeffrey Epstein has tried to silence her. While she will never have her chance to face him in court, he no longer has any power over her. Today, this brave survivor will be heard.

MS. AROZ: Thank you for allowing me to be able to have my chance in court today, to be able to tell you what this horrific man did to my life. You can't even imagine how much it affected my childhood, all the way through my adult life. He robbed me of my dreams. He robbed me of my chance to pursue a career I always adored. He stole my chance at really feeling love because I was so scared to trust anyone for so many years that I had such severe anxiety. I didn't want to leave my house let alone my bed.

The fact that he felt entitled to take away my innocence, the fact that he felt that he could do whatever he wanted, regardless of the laws, hurts me so very much. It took me years to tell anyone what Epstein did to me because I was so ashamed and embarrassed at what people would say or think of me until I found out there were other victims, girls just like me. I knew I could no longer keep my silence no matter how ruthless and powerful Epstein was, and still is even after his death.

The fact I will never have a chance to face my predator in court eats away at my soul. Even in death, Epstein is trying to hurt me. I had hoped to at last get an apology, but this evil man had no remorse or caring for what he did to anyone. I felt let down by the people who were supposed to watch him in prison. They let this man kill himself and kill the chance of justice for so many others in the process, taking away our ability to speak.

Out of all the damages and side effects that Epstein caused by his heartless and selfish acts, it's very hard to put my feelings and emotions into words, trying to let his horrendous actions go and attempting to forgive him, has been so difficult for me. Yet, as hard as it's been to come so publicly forward, I refuse to let Epstein take me as a victim anymore.

I am a survivor. The many that stand before me here today that have shared the horrific experiences with this

deplorable human being, because even though this weak, evil coward tried to steal all of our childhoods, tried to steal all of our innocence and tried to steal all of our means of justice, he will never steal our inner strength, and he will never, ever, ever steal our voice. Thank you so much.

THE COURT: You're welcome.

MS. GIBBS: Good morning, your Honor. Teri Gibbs, T-e-r-i, G-i-b-b-s. For the record, I am a California attorney. I'm not admitted to the New York State bar. I am here to make a statement on behalf of New York attorney, Lisa Bloom. I work for her firm, The Bloom Firm.

Lisa Bloom represents four of Jeffrey Epstein's victims, Jane Doe 6, for the record, Jane Doe 7 and Jane Doe 8. I am so proud of all of you victims who are here today and are able to voice yourselves today. I will not and cannot comment on the criminal case, or Ms. Bloom's communications with her clients.

Ms. Bloom would like to share three of her client's statements for the record. Here are the statements. Statement of Jane Doe 6.

To the Honorable Richard M. Berman. Jeffrey Epstein stole my innocence. He gave me a life sentence of guilt and shame. I do not consider myself a victim. I see myself a survivor. The abuse that I endured cannot continue. Let's stop this before it happens to other young women. Jane Doe.

Statement of Jane Doe 7.  To the Honorable Richard M. Berman.  I used to be relatively carefree, inquisitive, hopeful and excited about life, but my life changed because of Jeffrey Epstein.  My perspective on life became very dark when I was unknowingly recruited by one of his agents.  Jeffrey Epstein ruined me.  His recruiter ruined me.  The far-reaching consequences of that day ruined my family's lives.

I've chosen to remain anonymous in order to protect my family from unwanted media attention.

I was just trying to figure out my path in life when I encountered Jeffrey Epstein in his New York City mansion.  I cannot even begin to summarize the many detriments this experience of sexual assault has had on my life.  Immediately following the incident, I was unable to function and be around other people.  My parents had to rescue me and bring me home, where I became a recluse for years.

I was changed forever and buried my assault deep down, where the darkness couldn't hurt me anymore, but of course, it has always been here, lingering and affecting me unconsciously.  At the time, I was mired in shame, guilt and humiliation.  I had somehow tricked myself into thinking that I had allowed the assault to happen, that I did it to myself, that I don't deserve to be alive or to be loved.  I believed that I was a disgusting, shameful person who does not deserve to ever be happy.  These are the thoughts I've lived with on a daily

J8RPEPS2

basis.

Furthermore, because I couldn't tell anyone, out of fear of judgment, blame or retaliation, keeping this secret completely hindered my ability to uncover why these issues existed for me, which could have led to a path of healing over the years.

It is time for those of power to do the right thing. It is time for compassion toward our fellow human beings to reign over money, power and greed. We need to protect our most vulnerable to allow them a chance at a normal life, and nothing should come in the way of that. I believe that for future generations, including my own children, this case will set a precedent that victims must no longer suffer in silence on our own or be shamed for coming forward to seek protection.

This case should demonstrate to those who want to harm others that there will be a reckoning, and they will pay dearly for the harm they inflict on innocent people. Judge Berman, I thank you for from the bottom of my heart for this forum and opportunity.

To all of those survivors who came before me, I commend your bravery. There is no way I could have done this without you.

Thank you to the public following this story, for your outrage and desire for answers, which will hopefully move this case forward so that victims can stop having to relive their

J8RPEPS2

experiences every day and move on to begin to heal.

God bless the victims, their families, the investigators and public servants working so diligently to find those answers and to right all these wrongs.  Jane Doe 7.

(Continued on next page)

THE COURT:  Thanks very much.

MS. GIBBS:  One more.  Statement of Jane Doe 8.

In the past few weeks, I have had to reflect on my interaction with Jeffrey Epstein and realized that, though I have yet to put it all behind me, I am still a victim.  I say this because I have to come to terms with it in an effort to truly get past the abuse I suffered at the hands of Epstein.

Pursuing criminal penalties against him and having an opportunity to address the egregious crimes he committed against me and other young woman would have helped my recovery process.  This all came to an abrupt halt when he took his own life.  This point of disclosure is lost.

I cannot say that I am pleased he committed suicide, but I am at peace knowing he will not be able to hurt anyone else.  However, a sad truth remains.  I, along with other people, will never have an answer as to why.  I will never have an apology for the wrongdoing.  And most importantly, Epstein will not be justly sentenced for his crimes.  Now I sit in my home questioning the well-being of those girls like myself.  In choosing death, Epstein denied everyone justice.

Any efforts made to protect Epstein's name and legacy send a message to the victims that he wins and that he is untouchable.  I understand his case may be dismissed or closed, but this makes me feel as though I, and anyone else who fell pry to his hands, simply do not matter.

I ask that you very seriously consider the final decision, because it will undoubtedly affect all other facets of this case, including any future charges brought against the recruiters or third parties to his crimes.  I do not want the narrative to be, Those poor girls.  I want to send a message to anyone who would consider engaging in similar acts to think twice beforehand.  I want some sort of closure for those of us who relive those horrible moments where we were assaulted, abused, and taken advantage of by Epstein.

You have the opportunity to help us seek that closure. I appreciate your time and consideration and ask for your continued support in dealing with this case to illustrate that we, Epstein's victims, do matter.

Sincerely, Jane Doe 8.

On behalf of Lisa Bloom and The Bloom Firm, thank you, your Honor.

THE COURT:  Thank you, Ms. Gibbs.

Did we have any other victim's counsel or victims?

Ms. Allred.

MS. ALLRED:  Good morning, your Honor.

THE COURT:  Good morning.  How are you?

MS. ALLRED:  Fine.  Thank you.

Allred, Maroko & Goldberg by Gloria Allred, G-l-o-r-i-a A-l-l-r-e-d.

Your Honor, thank you so much for this opportunity to

J8RsEPS3

afford the victims their voice, because many of them have never spoken before.  They never spoke in Florida.  They never spoke anywhere.  They never told their mother.  They never told their father.  They never told their family members.  This is an opportunity for them to be heard.  We thank you for that.

Your Honor, for 43 years my firm has been the leading women's rights private law firm in the United States.  We have helped thousands of victims.  And I, as an officer of the court, and as a believer in the system, have tried to encourage the victims to have confidence in the system that should provide them access to justice that should help them to assert and vindicate their rights in a court of law.  It has been increasingly difficult in this case for me to say to my clients that they should have confidence in the system of justice given what has occurred in this case, People v. Jeffrey Epstein.

Having said that, I am encouraged by the fact that this court, essentially, in an unprecedented situation where the defendant is deceased, is still affording these victims an opportunity to be heard.  So we thank you for that.  It is some encouragement.

Your Honor, you also asked do our clients wish to be heard in reference to some of the issues that have been raised this morning, including what should happen into this case. Your Honor, there has been a suggestion that the court should investigate the circumstances of the death of Mr. Epstein.  I'm

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J8RsEPS3

not going to repeat the arguments made by counsel, but I would say that if there is jurisdiction, and I know that is a legal issue which has been previously argued, that certainly it would increase the confidence of my clients. Not just my clients, but victims all over, and some are, by the way, located in other parts of the world, to have the court oversee the investigation.

We are encouraged by the sensitivity of the attorneys for the United States Attorney's office for the Southern District of New York and the investigation that is going on with the separate team. However, and, of course, the defense is also conducting its own investigation. But I do think the greatest confidence would be if the court in some way would be able to oversee an investigation because the court is a neutral party. And although the court certainly has a stake in finding out what happened to defendants who are in the custody of the federal system and who should be there to face the prosecutors and the charges against them, but now are not because clearly the system has failed.

And the United States Attorney has admitted that, and even before he admitted that, everybody knows the system failed. Failed the victims, failed the court, failed everyone.

In any event, your Honor, having seen so many thousands of victims of gender violence, sex harassment, sexual assault, I've dealt with child sex trafficking, child

molesters, I mean, this is a unique case because there are so many victims and so many failures of the system. At this point, what we would really ask for is not just words, but words have been helpful, but deeds, and that is very important.

In addition, I would like to say, throughout this case is the running theme of the betrayal of trust. Betrayal of trust by Jeffrey Epstein. Betrayal of trust by the system. And betrayal of trust to the victims who had a right to justice. And the Crime Victims' Act should not just be words, it should have meaning and it should be enforced.

In essence, we are asking, although you may need to, of course, grant this motion to dismiss, I think because the court has shown sensitivity to victims and victims' needs, if there is a way to at least keep the record open so that victims who have not been able to be physically present in the courtroom today and who have not been able to submit to the court any letters, victim impact, and who have not been able to secure attorneys or speak to attorneys yet -- so, for example, I'll still hearing from victims who I have not been able to meet with yet because they just recently are now contacting me -- so if they could submit, at least for the record, their victim impact statements, that, I think, would be a very important assistance to them. So that would be, at least they would know that what they are sharing is on the record.

So, in summary, I would say that they are looking

J8RsEPS3

forward to the very serious investigation by the United States Attorney of who may have conspired in this case, and that is very hopeful, and we're hoping that everyone who may have a role to this criminal prosecution will submit that evidence.

This is about power. This is about many victims having lived in fear -- fear of the rich, the powerful, the famous, fear that the system will not afford them justice. So fear of not coming forward. And fear, of course, is a weapon that the rich, powerful, famous, and sexual predators used to silence the victims. But that is gone for a lot of victims because they refuse to suffer in silence.

Finally, it does take courage to speak truth to power. We thank this honorable court for giving these victims a voice. We thank them, even after the death of the defendant, for showing respect for the victims, allowing them dignity, allowing them a voice. We do want truth, we do want justice, we do want accountability, and we do want those conspirators to face the justice system.

Your Honor, right now we have two of our clients who would like to address the court.

THE COURT: Sure.

MS. ALLRED: Then I have a couple of statements on victims who do not wish to address the court.

As they come up, we'll give them the opportunity to say either their name or Jane Doe.

J8RsEPS3

By the way, thank you, your Honor, for allowing some of these victims to be called Jane Doe. What number the court affords to them, we'll accept whatever that is.

Thank you.

THE COURT: We're up to nine.

MS. ALLRED: Thank you.

MS. DAVIES: Hello. My name is Teala Davies. That is T-e-a-l-a D-a-v-i-e-s.

I was going to start this statement by saying that I was a victim of Jeffrey Epstein. But that's not the case. I'm still a victim of Jeffrey Epstein. I'm still a victim because the fear of not being heard stopped me from telling my story for so many years. This lingering fear almost stopped me from attending this monumental movement of strength and power.

I'm still a victim because I am fearful for my daughters and everyone's daughters. I'm fearful for their future in this world, where there are predators in power, a world where people can avoid justice if their pockets run deep enough.

I'm still a victim because the 17-year-old Teala was manipulated into thinking she had found someone who cared, someone who wanted to help. Jeffrey knew I had nowhere to go. He knew I was vulnerable, and he took advantage of that poor girl, who will never be the same.

I cannot eat at the thought that Jeffrey Epstein -- I

J8RsEPS3

cannot eat at the thought of Jeffrey Epstein not serving the time he needed to realize the pain and suffering he caused so many vulnerable young girls. He thought he was untouchable, and honestly, so did I. I thought he was the most powerful person I would ever meet.

But the end is here and here I stand becoming more powerful than he will ever be. Thank you.

THE COURT: Thank you.

JANE DOE: Jane Doe.

Um, in 2004, when I was 15 years old, I flew on Jeffrey Epstein's plane to Zorro Ranch, where I was sexual molested by him for many hours. What I remember most vividly was him explaining to me how beneficial the experience was for me and how much he was helping me to grow. Yikes.

I remember feeling so small and powerless, especially after he positioned me by laying me on his floor so that I was confronted by all the framed photographs on his dresser of him smiling with wealthy celebrities and politicians.

After he finished with me, he told me to describe in detail how good my first sexual experience felt. That was the first of many lies I was forced to carry for him, the weight of which proliferated my trauma. I felt powerless not merely because one man wanted to strip me of my innocence, but because I was the victim of a system that just enfranchises human beings, making them vulnerable to pedophilic exploitation.

As unjust as what happened to me was, I believe that experience to be a symptom of insidious and pathological violence that extreme wealth yields, a violence which ultimately stays hidden through channels of extreme power that serve it.

I first identified with this feeling the night after I was molested by Epstein, when another girl and I took out two of his ATVs and raised them across the mesa. I crashed mine and expressed my concern to the other girl of getting in trouble, which she replied to me, Don't worry, no one gets in trouble for anything here.

Even as a child, I understood, in a sad and precocious way, what I hoped we have the ability of changing now. Even though Epstein is dead, there is still justice to be brought for the crimes we felt powerless against concealing for him and the system that supported him for all these years.

Thank you.

THE COURT: You're very welcome.

MS. ALLRED: Thank you.

Your Honor, may it please the court. I would like to read a statement for Jane Doe, my client, who is present in court, but requested that I read it.

We only have one opportunity at childhood. One opportunity to develop. One opportunity to find direction for our lives. Jeffrey Epstein robbed and denied me at each

J8RsEPS3

opportunity he had.

I came from a small Texas town, not far from the New Mexico border. My mother died when I was 11, after suffering from cancer for many years. My father was devastated, as were my siblings and I. My father was saddled with debt. My only hope for college was to get a scholarship.

When I was 15, I was a blossoming freshman in high school and was trying to carry on my mother's dream. She wanted me to master the violin. After school, I would often go to a mall in a nearby city. A lady approached me and saw I had a violin case with me and asked if I was any good. We talked about the violin, my family, and why I had clothes that looked like hand-me-downs.

The lady told me she works for a very rich man who had a home close by and that he would pay to hear me play. I was told that if I could get away, she could arrange for transportation to and from his place and have me back before anyone knew I was gone. After some hesitation, I agreed. This decision was the beginning of the end of my childhood.

The man who only identified himself as J or Jeff had asked if I would give him a massage, and over four visits, eventually progressed to forced oral copulation. The money he gave me further placed my young soul into a perverse sense of hell.

I was so utterly disgusted with myself and what he did

to me that I stopped going to see him.  I had documented the events with a Texas rape crisis center about the man I know now as Jeffrey Epstein.

Epstein targeted and took advantage of me, a young girl, whose mother had recently died a horrific death and whose family structure had deteriorated.  His actions placed me, a young girl, into a downward spiral to the point where I purchased a gun and drove myself to an isolated place to end my suffering.

A voice that could only have been from my mother told me, quote, I am not the victim, I am the victor, and I dare not pull the trigger." I returned the gun days later.

Epstein is a coward.  He lived his life leaching off the souls of inspiring, young girls due to the fact that he could never know how it feels inspired to live.  Like a leach, once Epstein had his fill, he would unlatch and seek out another victim.

The only sense of justice I had hoped to see was Epstein being sentenced.  However, Epstein died as he lived, taking the easy way out without any responsibility.

Your Honor, the next statement is also a statement of a Jane Doe.  May it please the court.

I was a 16-year-old virgin when Jeffrey Epstein first raped me.  I was naive and gullable.  He was a pillar of finance and a giant in the world that I was an insignificant

J8RsEPS3

part of.  I was so impressed that this great man would even talk to me and impart any of his wisdom on me.  I gladly jumped at the chance to meet him again, when he told me how impressed he was with my personal story and maturity for my age.

When I was in his presence, he made an effort to call celebrities and influential people on speakerphone, like Academy Award-winning actresses and super models, who always answered his calls.  Sadly, I was impressed.

He was friends with former and future heads of states and every other fixture in the New York social scene and beyond.  He knew important people in my own world that I looked up to and revered, but he spoke about them like they were sweet distractions far beneath his stature.  He could easily reach down from his position and influence the people directly involved with my daily life and future prosperity.  I was the perfect victim.

My whole life was extremely turbulent.  But one of my mother's greatest wishes was that all her children would graduate from respectable universities.  He promised me that he would write me a letter of recommendation for Harvard if I got the grades and scores needed for admission.  His word was worth a lot, he assured me, as he was in the midst of funding and leading Harvard's studies on the human brain, and the president was his friend.

The fact that all of you already know these next

J8RsEPS3

details, which I'll share, should ignite fire instead of induce the complacency they did in the past, when heard repeatedly over the years, but yes, an innocent massage turned sexual almost immediately.

"Here, come. Come help me with a kink in my shoulder while we finish our discussion." A large vibrator and a couple of hundred dollars, disgust and dirty secret, more praise and imparted wisdom from a godlike figure, a deliberate diabolical depression of grooming and submission for his pleasure and release. Even if I resisted, I was no match for him. I felt powerless, ashamed, and embarrassed. I wanted to vomit remembering these moments.

What I learned in those depraved sessions, staring up at the dome ceiling in his private massage room, tore a violent hole through any normal sexual awakening. I'm haunted forever, having learned everything there is to know about sex through a vile criminal. Every time a new molestation would bring a new lesson, the progressive and constant unwinding. I was nothing more than a teenage prostitute. I was his slave.

I had never even kissed a boy before I met him, and never throughout the horrific abuse did Jeffrey Epstein kiss me even once. When he stole my virginity, he washed my entire body compulsively in the shower and then told me, "If you're not a virgin, I will kill you." And then I wasn't a virgin anymore.

J8RsEPS3

He forcefully penetrated me.  I was numb.  There was pain, but his use of the vibrator and his fingers in previous sessions with me had left a black hole-like void between my legs.  I protested, but he forced my face into the bed to stifle my cries.  That was my first time.

I got a few hundred dollars, as usual, as he led me out of his mansion with assurances that I was on the right path guided by him.  I lied to myself and tried to believe him.  I became a hollow shell.  If I missed an appointment, he threatened me and let me know who was in charge. "Do you know how important my time is?  I'll bury you.  I owe this -- I won't say the word -- F'ing town."  He would hang up.

I would stand there frozen in the street, terrified that his assistant would call to reschedule.  I made sure to stay in line and not disobey him.  I was in complete denial. Being paid after every scheduled meeting felt routine and disgusting.  He was the master of the universe and the world bent to his will.

He would eventually brag to his assistants about my ability to please him sexually right in front of me, leaving me feeling grotesque and worthless.  Everything in my outside life was falling apart.  I distanced myself from friends and grew further away from my family.  I felt less human after each ordeal.  My psyche broke down completely and wouldn't let me continue.

One day I walked out of his residence and passed a girl similar to myself. When I turned around, she was entering Jeffrey's residence. He no longer even tried to schedule his appointments with other girls in secrecy from me. Maybe he never did. I was too stupid to see.

My world shattered. I had been so naive. I had an epiphany in a calvary of desperation. I realized I was just one of many young girls he had in rotation come to perform for him for money. I went into a deep depression and never lifted completely. I wanted to inflict pain on myself. I was humiliated, angry, and suicidal. I locked myself away from everything. I cut myself off forever from the world I had known.

I endured the daily agony of knowing my life would never be the same. I could never go back to New York City and the wonderful life I had taken for granted before I met this demon named Jeffrey Epstein.

This creature had manipulated and outwitted the whole system, including some of the most intelligent scientists, political people, prosecutors, and power players. How easy was it to manipulate a 16-year-old virgin who never had a boyfriend and came from a background of hardship with no parental guidance or support.

I went to therapy and was given antidepressants for severe anxiety and depression. My only solace, years later,

J8RsEPS3

was my desire to succeed on my own terms.  I emersed myself into my studies and was accepted to every college I applied to, graduating from a top university.  To this day, there is still an ache in my being that I did not apply to Harvard in fear of his influence there.

They say you never forget your first.  I'm in a never-ending nightmare trying to do just that.  I'm forever suffering because everything reminds me of that horror.  This new wave of worldwide publicity only worsens my despair.

It was only many years later that I was finally intimate with a man again, and those moments were marred by my actions as a child with Jeffrey Epstein.  Even now is impossible to separate his treachery from any care of a good man.

For one brief moment there was elation when he was recently arrested.  I would finally get my chance to see him again face to face and show him what I had become, that I had succeeded on my own, that I was worth something in spite of his abuse, and that I had surmounted the monumental obstacles he laid before me throughout my entire life since falling prey to him.

I had hoped humanity would prevail, but it seems to me that he outsmarted everyone so far, and his ghost is still laughing at us.  I appeal to all of those just and true that his evil legacy and his death not stand in the way of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J8RsEPS3

resolution and justice for all of his underaged victims.

Thank you, your Honor.

And then just one last one, and this is much shorter.

Statement of Jane Doe, also my client.

I was a model in another country when I came to the United States. I was told by a booker that I needed to meet with a man named Jeffrey Epstein, who was the owner of Victoria's Secret. The booker told me that Mr. Epstein could help me get into Victoria Secret's world.

It was my childhood dream to be a Victoria's Secret model. So I went one day in the afternoon and I met Mr. Epstein in his office in his mansion in New York. A woman introduced herself and suggested to me that I should be extremely nice to Mr. Epstein, because if he liked me, he would probably have photographers shooting photos of me right away.

The told me to go upstairs and directed me to Jeffrey Epstein's office. Mr. Epstein had a white robe on and we chatted very briefly. I had my portfolio of photos, but he didn't even look at it. Suddenly, he took his robe off and got close to me. I got up to leave, but the door was locked.

I didn't know what was going on. It was my first official meeting to be cast in the United States. I was a young girl and confused. He got very close to me, and I had a skirt on. He started to touch my genitals. I refused him. Then he went to the massage table and showed me the vibrator.

J8RsEPS3

I took it and threw it at him.

At that point, I ran to the door again and figured out how to get out of there. A girl outside asked me where I was going and she said to be careful. She said that Mr. Epstein knew a lot of powerful people, including Bill Clinton, and that if I didn't do what Mr. Epstein wanted, I would not be able to have any job in the industry.

I was so scared. I couldn't wait to get out of there, and I left. I took the train home. I had spent all of my savings getting Victoria's Secret lingerie to prepare for what I thought would be my audition. But instead, it seemed like a casting call for prostitution. I felt like I was in hell.

Thank you, your Honor.

Thank you.

THE COURT: Thank you, Ms. Allred.

Was there anybody else, any victim's counsel or any of the other victims who have not been heard and wish to be heard?

Well, OK then. All I have to say, really, is thank you, all of you, for your participation in today's remarkable hearing. I think everybody has benefited greatly from your input, and especially from the testimony of victims here today and who have had the courage to come forward.

We have also benefited throughout these proceedings, however brief altogether, from the attorneys' legal advocacy and their written and oral submissions. I'm grateful to them

J8RsEPS3

as well, both for the government and the defense and those representing the victims.

Finally, we're also grateful to the press for their very diligent coverage of seemingly every detail of this case.

That concludes our work for today and we stand adjourned.

Thanks.

(Adjourned)

# Exhibit C

# DEPARTMENT OF JUSTICE



# OFFICE OF PROFESSIONAL RESPONSIBILITY

# EXECUTIVE SUMMARY OF REPORT

Investigation into the
U.S. Attorney's Office for the Southern District of Florida's
Resolution of Its 2006–2008 Federal Criminal Investigation of
Jeffrey Epstein and Its Interactions with Victims during the Investigation

November 2020

# EXECUTIVE SUMMARY

The Department of Justice (Department) Office of Professional Responsibility (OPR) investigated allegations that in 2007-2008, prosecutors in the U.S. Attorney's Office for the Southern District of Florida (USAO) improperly resolved a federal investigation into the criminal conduct of Jeffrey Epstein by negotiating and executing a federal non-prosecution agreement (NPA). The NPA was intended to end a federal investigation into allegations that Epstein engaged in illegal sexual activity with girls.[1] OPR also investigated whether USAO prosecutors committed professional misconduct by failing to consult with victims of Epstein's crimes before the NPA was signed or by misleading victims regarding the status of the federal investigation after the signing.

## I.      OVERVIEW OF FACTUAL BACKGROUND

The Palm Beach (Florida) Police Department (PBPD) began investigating Jeffrey Epstein in 2005, after the parents of a 14-year-old girl complained that Epstein had paid her for a massage. Epstein was a multi-millionaire financier with residences in Palm Beach, New York City, and other United States and foreign locations. The investigation led to the discovery that Epstein used personal assistants to recruit girls to provide massages to him, and in many instances, those massages led to sexual activity. After the PBPD brought the case to the State Attorney's Office, a Palm Beach County grand jury indicted Epstein, on July 19, 2006, for felony solicitation of prostitution in violation of Florida Statute § 796.07. However, because the PBPD Chief and the lead Detective were dissatisfied with the State Attorney's handling of the case and believed that the state grand jury's charge did not address the totality of Epstein's conduct, they referred the matter to the Federal Bureau of Investigation (FBI) in West Palm Beach for a possible federal investigation.

The FBI brought the matter to an Assistant U.S. Attorney (AUSA), who opened a file with her supervisor's approval and with the knowledge of then U.S. Attorney R. Alexander Acosta. She worked with two FBI case agents to develop a federal case against Epstein and, in the course of the investigation, they discovered additional victims. In May 2007, the AUSA submitted to her supervisors a draft 60-count indictment outlining charges against Epstein. She also provided a lengthy memorandum summarizing the evidence she had assembled in support of the charges and addressing the legal issues related to the proposed charges.

For several weeks following submission of the prosecution memorandum and proposed indictment, the AUSA's supervisors reviewed the case to determine how to proceed. At a July 31, 2007 meeting with Epstein's attorneys, the USAO offered to end its investigation if Epstein pled guilty to state charges, agreed to serve a minimum of two years' incarceration, registered as a sexual offender, and agreed to a mechanism through which victims could obtain monetary damages. The USAO subsequently engaged in additional meetings and communications with Epstein's team of attorneys, ultimately negotiating the terms of a state-based resolution of the federal investigation, which culminated in the signing of the NPA on September 24, 2007. The

---

[1]      As used in this Report, including in quoted documents and statements, the word "girls" refers to females who were under the age of 18 at the time of the alleged conduct.   Under Florida law, a minor is a person under the age of 18.

NPA required Epstein to plead guilty in state court to the then-pending state indictment against him and to an additional criminal information charging him with a state offense that would require him to register as a sexual offender—specifically, procurement of minors to engage in prostitution, in violation of Florida Statute § 796.03. The NPA required Epstein to make a binding recommendation that the state court sentence him to serve 18 months in the county jail followed by 12 months of community control (home detention or "house arrest"). The NPA also included provisions designed to facilitate the victims' recovery of monetary damages from Epstein. In exchange, the USAO agreed to end its investigation of Epstein and to forgo federal prosecution in the Southern District of Florida of him, four named co-conspirators, and "any potential co-conspirators." Victims were not informed of, or consulted about, a potential state resolution or the NPA prior to its signing.

The signing of the NPA did not immediately lead to Epstein's guilty plea and incarceration, however. For the next nine months, Epstein deployed his extensive team of prominent attorneys to try to change the terms that his team had negotiated and he had approved, while simultaneously seeking to invalidate the entire NPA by persuading senior Department officials that there was no federal interest at issue and the matter should be left to the discretion of state law enforcement officials. Through repeated communications with the USAO and senior Department officials, defense counsel fought the government's interpretation of the NPA's terms. They also sought and obtained review by the Department's Criminal Division and then the Office of the Deputy Attorney General, primarily on the issue of federal jurisdiction over what the defense insisted was "a quintessentially state matter." After reviewing submissions by the defense and the USAO, on June 23, 2008, the Office of the Deputy Attorney General informed defense counsel that the Deputy Attorney General would not intervene in the matter. Only then did Epstein agree to fulfill his obligation under the NPA, and on June 30, 2008, he appeared in state court and pled guilty to the pending state indictment charging felony solicitation of prostitution and, pursuant to the NPA, to a criminal information charging him with procurement of minors to engage in prostitution. Upon the joint request of the defendant and the state prosecutor, and consistent with the NPA, the court immediately sentenced Epstein to consecutive terms of 12 months' incarceration on the solicitation charge and 6 months' incarceration on the procurement charge, followed by 12 months of community control. Epstein began serving the sentence that day, in a minimum-security Palm Beach County facility. A copy of the NPA was filed under seal with the state court.

On July 7, 2008, a victim, identified as "Jane Doe," filed in federal court in the Southern District of Florida an emergency petition alleging that the government violated the Crime Victims' Rights Act (CVRA), 18 U.S.C. § 3771, when it resolved the federal investigation of Epstein without consulting with victims, and seeking enforcement of her CVRA rights.[2] In responding to the petition, the government, represented by the USAO, revealed the existence of the NPA, but did not produce it to the petitioners until the court directed it to be turned over subject to a protective order; the NPA itself remained under seal in the federal district court. After the initial filings and hearings, the CVRA case was dormant for almost two years while the petitioners pursued civil cases against Epstein.

---

[2] Emergency Victim's Petition for Enforcement of Crime Victim's [*sic*] Rights Act, 18 U.S.C. Section 3771, *Doe v. United States,* Case No. 9:08-cv-80736-KAM (S.D. Fla. July 7, 2008). Another victim subsequently joined the litigation as "Jane Doe 2."

Soon after he was incarcerated, Epstein applied for the Palm Beach County Sheriff's work release program, and the Sheriff approved his application. In October 2008, Epstein began spending 12 hours a day purportedly working at the "Florida Science Foundation," an entity Epstein had recently incorporated that was co-located at the West Palm Beach office of one of Epstein's attorneys. Although the NPA specified a term of incarceration of 18 months, Epstein received "gain time," that is, time off for good behavior, and he actually served less than 13 months of incarceration. On July 22, 2009, Epstein was released from custody to a one-year term of home detention as a condition of community control, and he registered as a sexual offender with the Florida Department of Law Enforcement. After victims and news media filed suit in Florida courts for release of the copy of the NPA that had been filed under seal in the state court file, a state judge in September 2009 ordered it to be made public.

By mid-2010, Epstein reportedly settled multiple civil lawsuits brought against him by victims seeking monetary damages, including the two petitioners in the CVRA litigation. During the CVRA litigation, the petitioners sought discovery from the USAO, which made substantial document productions, filed lengthy privilege logs in support of its withholding of documents, and submitted declarations from the AUSA and the FBI case agents who conducted the federal investigation. The USAO opposed efforts to unseal various records, as did Epstein, who was permitted to intervene in the litigation with respect to certain issues. Nevertheless, the court ultimately ordered that substantial records relating to the USAO's resolution of the Epstein case be made public. During the course of the litigation, the court made numerous rulings interpreting the CVRA. After failed efforts to settle the case, the parties' cross motions for summary judgment remained pending for more than a year.

In 2017, President Donald Trump nominated Acosta to be Secretary of Labor. At his March 2017 confirmation hearing, Acosta was questioned only briefly about the Epstein case. On April 17, 2017, the Senate confirmed Acosta's appointment as Labor Secretary.

In the decade following his release from incarceration, Epstein reportedly continued to settle multiple civil suits brought by many, but not all, of his victims. Epstein was otherwise able to resume his lavish lifestyle, largely avoiding the interest of the press. On November 28, 2018, however, the *Miami Herald* published an extensive investigative report about state and federal criminal investigations initiated more than 12 years earlier into allegations that Epstein had coerced girls into engaging in sexual activity with him at his Palm Beach estate.[3] The *Miami Herald* reported that in 2007, Acosta entered into an "extraordinary" deal with Epstein in the form of the NPA, which permitted Epstein to avoid federal prosecution and a potentially lengthy prison sentence by pleading guilty in state court to "two prostitution charges." According to the *Miami Herald*, the government also immunized from prosecution Epstein's co-conspirators and concealed from Epstein's victims the terms of the NPA. Through its reporting, which included interviews of eight victims and information from publicly available documents, the newspaper painted a portrait of federal and state prosecutors who had ignored serious criminal conduct by a wealthy man with powerful and politically connected friends by granting him a "deal of a lifetime" that allowed him both to escape significant punishment for his past conduct and to continue his

---

[3]    Julie K. Brown, "Perversion of Justice," *Miami Herald*, Nov. 28, 2018. https://www.miamiherald.com/news/local/article220097825.html.

abuse of minors.  The *Miami Herald* report led to public outrage and media scrutiny of the government's actions.[4]

On February 21, 2019, the district court granted the CVRA case petitioners' Motion for Partial Summary Judgment, ruling that the government violated the CVRA in failing to advise the victims about its intention to enter into the NPA.[5]  The court also found that letters the government sent to victims after the NPA was signed, describing the investigation as ongoing, "mislead [*sic*] the victims to believe that federal prosecution was still a possibility."  The court also highlighted the inequity of the USAO's failure to communicate with the victims while at the same time engaging in "lengthy negotiations" with Epstein's counsel and assuring the defense that the NPA would not be "made public or filed with the court."  The court ordered the parties to submit additional briefs regarding the appropriate remedies.  After the court's order, the Department recused the USAO from the CVRA litigation and assigned the U.S. Attorney's Office for the Northern District of Georgia to handle the case for the government.  Among the remedies sought by the petitioners, and opposed by the government, was rescission of the NPA and federal prosecution of Epstein.

On July 2, 2019, the U.S. Attorney's Office for the Southern District of New York obtained a federal grand jury indictment charging Epstein with one count of sex trafficking of minors and one count of conspiracy to commit sex trafficking of minors.  The indictment alleged that from 2002 until 2005, Epstein created a vast network of underage victims in both New York and Florida whom he sexually abused and exploited.  Epstein was arrested on the charges on July 6, 2019.  In arguing for Epstein's pretrial detention, prosecutors asserted that agents searching Epstein's Manhattan residence found thousands of photos of nude and half-nude females, including at least one believed to be a minor.  The court ordered Epstein detained pending trial, and he was remanded to the custody of the Bureau of Prisons and held at the Metropolitan Correctional Center in Manhattan.

Meanwhile, after publication of the November 2018 *Miami Herald* report, the media and Congress increasingly focused attention on Acosta as the government official responsible for the NPA.  On July 10, 2019, Acosta held a televised press conference to defend his and the USAO's actions.  Acosta stated that the Palm Beach State Attorney's Office "was ready to allow Epstein to walk free with no jail time, nothing."  According to Acosta, because USAO prosecutors considered this outcome unacceptable, his office pursued a difficult and challenging case and obtained a resolution that put Epstein in jail, forced him to register as a sexual offender, and provided victims with the means to obtain monetary damages.  Acosta's press conference did not end the controversy, however, and on July 12, 2019, Acosta submitted to the President his resignation as

---

[4]    *See, e.g.*, Ashley Collman, "Stunning new report details Trump's labor secretary's role in plea deal for billionaire sex abuser," *The Business Insider*, Nov. 29, 2018; Cynthia McFadden, "New Focus on Trump Labor Secretary's role in unusual plea deal for billionaire accused of sexual abuse," *NBC Nightly News*, Nov. 29, 2018; Anita Kumar, "Trump labor secretary out of running for attorney general after Miami Herald report," *McClatchy Washington Bureau*, Nov. 29, 2018; Emily Peck, "How Trump's Labor Secretary Covered For A Millionaire Sex Abuser," *Huffington Post*, Nov. 29, 2018; Julie K. Brown, et al., "Lawmakers issue call for investigation of serial sex abuser Jeffrey Epstein's plea deal," *Miami Herald*, Dec. 6, 2018.

[5]    *Doe v. United States,* 359 F. Supp. 3d 1201 (S.D. Fla., Feb. 21, 2019) (Opinion and Order, 9:08-80736-CIV-Marra).

Secretary of Labor.  In a brief oral statement, Acosta explained that continued media attention on his handling of the Epstein investigation rather than on the economy was unfair to the Labor Department.

On August 10, 2019, Epstein was found hanging in his cell and was later pronounced dead. The New York City Chief Medical Examiner concluded that Epstein had committed suicide.

As a result of Epstein's death, the U.S. Attorney's Office for the Southern District of New York filed a *nolle prosequi* to dismiss the pending indictment against Epstein.  On August 27, 2019, the district court held a hearing at which more than a dozen of Epstein's victims—including victims of the conduct in Florida that was addressed through the NPA—spoke about the impact of Epstein's crimes.  The court dismissed the Epstein indictment on August 29, 2019.

After Epstein's death, the federal district court in Florida overseeing the CVRA litigation denied the petitioners their requested remedies and closed the case as moot.  Among its findings, the court concluded that although the government had violated the CVRA, the government had asserted "legitimate and legally supportable positions throughout this litigation," and therefore had not litigated in bad faith.  The court also noted it expected the government to "honor its representation that it will provide training to its employees about the CVRA and the proper treatment of crime victims," as well as honoring its promise to meet with the victims.

On September 30, 2019, CVRA petitioner "Jane Doe 1" filed in her true name a petition for a writ of mandamus in the United States Court of Appeals for the Eleventh Circuit, seeking review of the district court's order denying all of her requested remedies.  In its responsive brief, the government argued that "as a matter of law, the legal obligations under the CVRA do not attach prior to the government charging a case" and thus, "the CVRA was not triggered in [the Southern District of Florida] because no criminal charges were brought."  Nevertheless, during oral argument, the government conceded that the USAO had not been "fully transparent" with the petitioner and had "made a mistake in causing her to believe that the case was ongoing when in fact the NPA had been signed."  On April 14, 2020, a divided panel of the Court of Appeals denied the petition, ruling that CVRA rights do not attach until a defendant has been criminally charged. On August 7, 2020, the court granted the petition for rehearing *en banc* and vacated the panel's opinion; as of the date of this Report, a briefing schedule has been issued, and oral argument is set for December 3, 2020.

## II.    THE INITIATION AND SCOPE OF OPR'S INVESTIGATION

After the *Miami Herald* published its investigative report on November 28, 2018, U.S. Senator Ben Sasse, Chairman of the Senate Judiciary Subcommittee on Oversight, Agency Action, Federal Rights and Federal Courts, sent a December 3, 2018 letter to OPR, citing the *Miami Herald*'s report and requesting that OPR "open an investigation into the instances identified in this reporting of possible misconduct by Department of Justice attorneys."  On February 6, 2019, the Department of Justice Office of Legislative Affairs advised Senator Sasse that OPR had opened

v

an investigation into the matter and would review the USAO's decision to resolve the federal investigation of Epstein through the NPA.[6]

After the district court issued its ruling in the CVRA litigation, on February 21, 2019, OPR included within the scope of its investigation an examination of the government's conduct that formed the basis for the court's findings that the USAO violated the CVRA in failing to afford victims a reasonable right to confer with the government about the NPA before the agreement was signed and that the government affirmatively misled victims about the status of the federal investigation.

During the course of its investigation, OPR obtained and reviewed hundreds of thousands of records from the USAO, the FBI, and other Department components, including the Office of the Deputy Attorney General, the Criminal Division, and the Executive Office for U.S. Attorneys. The records included emails, letters, memoranda, and investigative materials. OPR also collected and reviewed materials relating to the state investigation and prosecution of Epstein. OPR also examined extensive publicly available information, including depositions, pleadings, orders, and other court records, and reviewed media reports and interviews, articles, podcasts, and books relating to the Epstein case.

In addition to this extensive documentary review, OPR conducted more than 60 interviews of witnesses, including the FBI case agents, their supervisors, and FBI administrative personnel; current and former USAO staff and attorneys; current and former Department attorneys and senior managers, including a former Deputy Attorney General and a former Assistant Attorney General for the Criminal Division; and the former State Attorney and former Assistant State Attorney in charge of the state investigation of Epstein. OPR also interviewed several victims and attorneys representing victims, and reviewed written submissions from victims, concerning victim contacts with the USAO and the FBI.

OPR identified former U.S. Attorney Acosta, three former USAO supervisors, and the AUSA as subjects of its investigation based on preliminary information indicating that each of them was involved in the decision to resolve the case through the NPA or in the negotiations leading to the agreement. OPR deems a current or former Department attorney to be a subject of its investigation when the individual's conduct is within the scope of OPR's review and may result in a finding of professional misconduct. OPR reviewed prior public statements made by Acosta and another subject. All five subjects cooperated fully with OPR's investigation. OPR requested that all of the subjects provide written responses detailing their involvement in the federal investigation of Epstein, the drafting and execution of the NPA, and decisions relating to victim notification and consultation. OPR received and reviewed written responses from all of the subjects, and subsequently conducted extensive interviews of each subject under oath and before a court reporter. Each subject was represented by counsel and had access to relevant contemporaneous documents before the subject's OPR interview. The subjects reviewed and provided comments on their respective interview transcripts and on OPR's draft report. OPR

---

[6] The federal government was closed from December 22, 2018, to January 25, 2019. After initiating its investigation, OPR also subsequently received other letters from U.S. Senators and Representatives inquiring into the status of the OPR investigation.

carefully considered the comments and made changes, or noted comments, as OPR deemed appropriate; OPR did not, however, alter its findings and conclusions.

Finally, OPR reviewed relevant case law, statutes, regulations, Department policy, and attorney professional responsibility rules as necessary to resolve the issues presented in this case and to determine whether the subjects committed professional misconduct.

As part of its investigation, OPR examined the interactions between state officials and the federal investigators and prosecutors, but because OPR does not have jurisdiction over state officials, OPR did not investigate, or reach conclusions about, their conduct regarding the state investigation.[7]  Because OPR's mission is to ensure that Department attorneys adhere to the standards of professional conduct, OPR's investigation focused on the actions of the subject attorneys rather than on determining the full scope of Epstein's and his assistants' criminal behavior.  Accordingly, OPR considered the evidence and information regarding Epstein's and his assistants' conduct as it was known to the subjects at the time they performed their duties as Department attorneys.  Additional evidence and information that came to light after June 30, 2008, when Epstein entered his guilty plea under the NPA, did not affect the subjects' actions prior to that date, and OPR did not evaluate the subjects' conduct on the basis of that subsequent information.

OPR's investigation occurred approximately 12 years after most of the significant events relating to the USAO's investigation of Epstein, the NPA, and Epstein's guilty plea.  As a result, many of the subjects and witnesses were unable to recall the details of events or their own or others' actions occurring in 2006-2008, such as conversations, meetings, or documents they reviewed at the time.[8]  However, OPR's evaluation of the subjects' conduct was aided significantly by extensive, contemporaneous emails among the prosecutors and communications between the government and defense counsel.  These records often referred to the interactions among the participants and described important decisions and, in some instances, the bases for them.

## III.    OVERVIEW OF OPR'S ANALYTICAL FRAMEWORK

OPR's primary mission is to ensure that Department attorneys perform their duties in accordance with the highest professional standards, as would be expected of the nation's principal law enforcement agency.  Accordingly, OPR investigates allegations of professional misconduct against current or former Department attorneys related to the exercise of their authority to

---

[7]    In August 2019, Florida Governor Ron DeSantis announced that he had directed the Florida Department of Law Enforcement to open an investigation into the conduct of state authorities relating to Epstein.  As reported, the investigation focuses on Epstein's state plea agreement and the Palm Beach County work release program.

[8]    OPR was cognizant that Acosta and the three managers all left the USAO during, or not long after resolution of, the Epstein case, while the AUSA remained with the USAO until mid-2019.  Moreover, as the line prosecutor in the Epstein investigation and also as co-counsel in the CVRA litigation until the USAO was recused from that litigation in early 2019, the AUSA had continuous access to the USAO documentary record and numerous occasions to review these materials in the course of her official duties.  Additionally, in responding to OPR's request for a written response, and in preparing to be interviewed by OPR, the AUSA was able to refresh her recollection with these materials to an extent not possible for the other subjects, who were provided with relevant documents by OPR in preparation for their interviews.

investigate, litigate, or provide legal advice.[9]    OPR also has jurisdiction to investigate allegations of misconduct against Department law enforcement agents when they relate to a Department attorney's alleged professional misconduct.

In its investigations, OPR determines whether a clear and unambiguous standard governs the challenged conduct and whether a subject attorney violated that standard.    Department attorneys are subject to various legal obligations and professional standards in the performance of their duties, including the Constitution, statutes, standards of conduct imposed by attorney licensing authorities, and Department regulations and policies.    OPR finds misconduct when it concludes by a preponderance of the evidence that a subject attorney violated such a standard intentionally or recklessly.    Pursuant to OPR's analytical framework, when OPR concludes that (1) no clear and unambiguous standard governs the conduct in question or (2) the subject did not intentionally or recklessly violate the standard that governs the conduct, then it concludes that the subject's conduct does not constitute professional misconduct.    In some cases, OPR may conclude that a subject attorney's conduct does not satisfy the elements necessary for a professional misconduct finding, but that the circumstances warrant another finding.    In such cases, OPR may conclude that a subject attorney exercised poor judgment, made a mistake, or otherwise acted inappropriately under the circumstances.    OPR may also determine that the subject attorney's conduct was appropriate under the circumstances.[10]

## IV.    ISSUES CONSIDERED

In this investigation, OPR considered two distinct sets of allegations.    The first relates to the negotiation, execution, and implementation of the NPA.    The second relates to the USAO's interactions with Epstein's victims and adherence to the requirements of the CVRA.    The two sets of issues are described below and are analyzed separately in this Report.

### A.    The Negotiation, Execution, and Implementation of the NPA

In evaluating whether any of the subjects committed professional misconduct, OPR considered whether any of the NPA's provisions violated a clear or unambiguous statute, professional responsibility rule or standard, or Department regulation or policy.    In particular, OPR considered whether the NPA violated standards relating to (1) charging decisions, (2) declination of criminal charges, (3) deferred or non-prosecution agreements, (4) plea agreements, (5) grants

---

[9]    28 C.F.R. § 0.39a(a)(1).  OPR has authority to investigate the professional conduct of attorneys occurring during their employment by the Department, regardless of whether the attorney left the Department before or during OPR's investigation.  Over its 45-year history, OPR has routinely investigated the conduct of former Department attorneys.  Although former Department attorneys cannot be disciplined by the Department, OPR's determination that a former Department attorney violated state rules of professional conduct for attorneys could result in a referral to an appropriate state attorney disciplinary authority.  Furthermore, findings resulting from investigations of the conduct of Department attorneys, even former employees, may assist Department managers in supervising future cases.

[10]    In some instances, OPR declines to open an investigation based upon a review of the initial complaint or after a preliminary inquiry into the matter.  In December 2010, one of the attorneys representing victims in the CVRA litigation raised allegations that Epstein may have exerted improper influence over the federal criminal investigation and that the USAO had deceived the victims of Epstein's crimes about the existence of the NPA.  Pursuant to its standard policy, OPR declined to open an investigation into those allegations at that time in deference to the then-pending CVRA litigation.

of immunity, or (6) the deportation of criminal aliens. The potentially applicable standards that OPR considered as to each of these issues are identified and discussed later in this Report. OPR also examined whether the evidence establishes that any of the subjects were influenced to enter into the NPA, or to include in the NPA terms favorable to Epstein, because of an improper motive, such as a bribe, political consideration, personal interest, or favoritism. OPR also examined and discusses in this Report significant events that occurred after the NPA was negotiated and signed that shed additional light on the USAO's handling of the Epstein investigation.

### B.    The District Court's Conclusion That the USAO Violated the CVRA

To address the district court's adverse judicial findings, OPR assessed the manner, content, and timing of the government's interactions with victims both before and after the NPA was signed, including victim notification letters issued by the USAO and the FBI and interviews conducted by the USAO. OPR considered whether any of the subject attorneys violated any clear and unambiguous standard governing victim consultation or notification. OPR examined the government's lack of consultation with the victims before the NPA was signed, as well as the circumstances relating to the district court's finding that the USAO affirmatively misled Epstein's victims about the status of the federal investigation after the NPA was signed.

## V.    OPR'S FINDINGS AND CONCLUSIONS

OPR evaluated the conduct of each subject and considered his or her individual role in various decisions and events. Acosta, however, made the pivotal decision to resolve the federal investigation of Epstein through a state-based plea and either developed or approved the terms of the initial offer to the defense that set the beginning point for the subsequent negotiations that led to the NPA. Although Acosta did not sign the NPA, he participated in its drafting and approved it, with knowledge of its terms. During his OPR interview, Acosta acknowledged that he approved the NPA and accepted responsibility for it. Therefore, OPR considers Acosta to be responsible for the NPA and for the actions of the other subjects who implemented his decisions. Acosta's overall responsibility for the government's interactions or lack of communication with the victims is less clear, but Acosta affirmatively made certain decisions regarding victim notification, and OPR evaluates his conduct with respect to those decisions.

### A.    Findings and Conclusions Relating to the NPA

With respect to all five subjects of OPR's investigation, OPR concludes that the subjects did not commit professional misconduct with respect to the development, negotiation, and approval of the NPA. Under OPR's framework, professional misconduct requires a finding that a subject attorney intentionally or recklessly violated a clear and unambiguous standard governing the conduct at issue. OPR found no clear and unambiguous standard that required Acosta to indict Epstein on federal charges or that prohibited his decision to defer prosecution to the state. Furthermore, none of the individual terms of the NPA violated Department or other applicable standards.

As the U.S. Attorney, Acosta had the "plenary authority" under established federal law and Department policy to resolve the case as he deemed necessary and appropriate, as long as his decision was not motivated or influenced by improper factors. Acosta's decision to decline to initiate a federal prosecution of Epstein was within the scope of his authority, and OPR did not

ix

find evidence that his decision was based on corruption or other impermissible considerations, such as Epstein's wealth, status, or associations. Evidence shows that Acosta resisted defense efforts to have the matter returned to the state for whatever result state authorities deemed appropriate, and he refused to eliminate the incarceration and sexual offender registration requirements. OPR did not find evidence establishing that Acosta's "breakfast meeting" with one of Epstein's defense counsel in October 2007 led to the NPA, which had been signed weeks earlier, or to any other significant decision that benefited Epstein. The contemporaneous records show that USAO managers' concerns about legal issues, witness credibility, and the impact of a trial on the victims led them to prefer a pre-charge resolution and that Acosta's concerns about the proper role of the federal government in prosecuting solicitation crimes resulted in his preference for a state-based resolution. Accordingly, OPR does not find that Acosta engaged in professional misconduct by resolving the federal investigation of Epstein in the way he did or that the other subjects committed professional misconduct through their implementation of Acosta's decisions.

Nevertheless, OPR concludes that Acosta's decision to resolve the federal investigation through the NPA constitutes poor judgment. Although this decision was within the scope of Acosta's broad discretion and OPR does not find that it resulted from improper factors, the NPA was a flawed mechanism for satisfying the federal interest that caused the government to open its investigation of Epstein. In Acosta's view, the federal government's role in prosecuting Epstein was limited by principles of federalism, under which the independent authority of the state should be recognized, and the federal responsibility in this situation was to serve as a "backstop" to state authorities by encouraging them to do more. However, Acosta failed to consider the difficulties inherent in a resolution that relied heavily on action by numerous state officials over whom he had no authority; he resolved the federal investigation before significant investigative steps were completed; and he agreed to several unusual and problematic terms in the NPA without the consideration required under the circumstances. In sum, Acosta's application of federalism principles was too expansive, his view of the federal interest in prosecuting Epstein was too narrow, and his understanding of the state system was too imperfect to justify the decision to use the NPA. Furthermore, because Acosta assumed a significant role in reviewing and drafting the NPA and the other three subjects who were supervisors left the USAO, were transitioning to other jobs, or were absent at critical junctures, Acosta should have ensured more effective coordination and communication during the negotiations and before approving the final NPA. The NPA was a unique resolution, and one that required greater oversight and supervision than Acosta provided.

### B. Findings and Conclusions Relating to the Government's Interactions with Victims

OPR further concludes that none of the subject attorneys committed professional misconduct with respect to the government's interactions with victims. The subjects did not have a clear and unambiguous duty under the CVRA to consult with victims before entering into the NPA because the USAO resolved the Epstein investigation without a federal criminal charge. Significantly, at the time the NPA was signed, the Department did not interpret CVRA rights to attach unless and until federal charges had been filed, and the federal courts had not established a clear and unambiguous standard applying the CVRA before criminal charges were brought. In addition, OPR did not find evidence that the lack of consultation was for the purpose of silencing victims. Nonetheless, the lack of consultation was part of a series of government interactions with victims that ultimately led to public and court condemnation of the government's

Case 1:26-cv-01417-EGS    Document 9-3    Filed 05/28/26    Page 118 of 145

treatment of the victims, reflected poorly on the Department as a whole, and is contradictory to the Department's mission to minimize the frustration and confusion that victims of a crime endure.

OPR determined that none of the subjects was responsible for communications sent to certain victims after the NPA was signed that described the case as "under investigation" and that failed to inform them of the NPA. The letters were sent by an FBI administrative employee who was not directly involved in the investigation, incorporated standard form language used by the FBI when communicating with victims, and were not drafted or reviewed by the subjects. Moreover, the statement that the matter was "under investigation" was not false because the government in fact continued to investigate the case in anticipation that Epstein would not fulfill the terms of the NPA. However, the letters risked misleading the victims and contributed to victim frustration and confusion by failing to provide important information about the status of the investigation. The letters also demonstrated a lack of coordination between the federal agencies responsible for communicating with Epstein's victims and showed a lack of attention to and oversight regarding communication with victims.

After the NPA was signed, Acosta elected to defer to the State Attorney the decision whether to notify victims about the state's plea hearing pursuant to the state's own victim's rights requirements. Although Acosta's decision was within his authority and did not constitute professional misconduct, OPR concludes that Acosta exercised poor judgment when he failed to make certain that the state intended to and would notify victims identified through the federal investigation about the state plea hearing. His decision left victims uninformed about an important proceeding that resolved the federal investigation, an investigation about which the USAO had communicated with victims for months. It also ultimately created the misimpression that the Department intentionally sought to silence the victims. Acosta failed to ensure that victims were made aware of a court proceeding that was related to their own cases, and thus he failed to ensure that victims were treated with forthrightness and dignity.

OPR concludes that the decision to postpone notifying victims about the terms of the NPA after it was signed and the omission of information about the NPA during victim interviews and conversations with victims' attorneys in 2008 do not constitute professional misconduct. Contemporaneous records show that these actions were based on strategic concerns about creating impeachment evidence that Epstein's victims had financial motives to make claims against him, evidence that could be used against victims at a trial, and were not for the purpose of silencing victims. Nonetheless, the failure to reevaluate the strategy prior to interviews of victims and discussions with victims' attorneys occurring in 2008 led to interactions that contributed to victims' feelings that the government was intentionally concealing information from them.

After examining the full scope and context of the government's interactions with victims, OPR concludes that the government's lack of transparency and its inconsistent messages led to victims feeling confused and ill-treated by the government; gave victims and the public the misimpression that the government had colluded with Epstein's counsel to keep the NPA secret from the victims; and undercut public confidence in the legitimacy of the resulting agreement. The overall result of the subjects' anomalous handling of this case understandably left many victims feeling ignored and frustrated and resulted in extensive public criticism. In sum, OPR concludes that the victims were not treated with the forthrightness and sensitivity expected by the Department.

## VI.    ORGANIZATION OF THE REPORT

The Report is divided into three chapters.  In Chapter One, OPR describes the relevant federal, state, and local law enforcement entities involved in investigating Epstein's criminal conduct, as well as the backgrounds of the five subjects and their roles in the events in question.  OPR provides a brief profile of Epstein and identifies the defense attorneys who interacted with the subjects.

In Chapter Two, OPR sets forth an extensive account of events relating to the federal investigation of Epstein.  The account begins with the initial complaint in March 2005 by a young victim and her parents to the local police—a complaint that launched an investigation by local law enforcement authorities—and continues through the mid-2006 opening of the federal investigation; the September 2007 negotiation and signing of the NPA; Epstein's subsequent efforts to invalidate the NPA through appeals to senior Department officials; Epstein's June 2008 guilty plea in state court; and, finally, efforts by the AUSA to ensure Epstein's compliance with the terms of the NPA during his incarceration and until his term of home detention ended in July 2010.  After describing the relevant events, OPR analyzes the professional misconduct allegations relating to the decisions made regarding the development and execution of the NPA.  OPR describes the relevant standards and sets forth its findings and conclusions regarding the subjects' conduct.

Chapter Three concerns the government's interactions with victims and the district court's findings regarding the CVRA.  OPR describes the relevant events and analyzes the subjects' conduct in light of the pertinent standards.

OPR sets forth the extensive factual detail provided in Chapters Two and Three, including internal USAO and Department communications, because doing so is necessary for a full understanding of the subjects' actions and of the bases for OPR's conclusions.

# Exhibit D

**U.S. Department of Justice**

Office of the Deputy Attorney General

---

The Deputy Attorney General                    *Washington, D.C. 20530*

December 19, 2025

Members of Congress:

I write to notify you that today the Department of Justice is producing hundreds of thousands of pages of responsive materials in compliance with the Epstein Files Transparency Act (the Act). Under the leadership of President Donald J. Trump and Attorney General Pam Bondi, this unprecedented disclosure highlights our commitment to following the law, being transparent, and protecting victims. President Donald J. Trump signed the Act into law on November 19, 2025. In compliance with the Act, the Department of Justice—at the direction of the Attorney General—has been working to ensure that all responsive materials have been identified, collected, uploaded, reviewed, and publicly produced within 30 days as required under the Act. *See* Sec. 2(a).

This letter will summarize the Department's historic efforts and disclose specific details regarding the review and production process. Never in American history has a President or the Department of Justice been this transparent with the American people about such a sensitive law enforcement matter. Democrat administrations in the past have refused to provide full details of the Jeffrey Epstein saga. But President Trump, Attorney General Bondi, and FBI Director Patel are committed to providing full transparency consistent with the law.

As part of the collection and review process, the Department is continuing to review additional documents and other items for potential responsiveness. Just this week one of the Department's components provided additional victim information requiring updated review of materials, and in the last few weeks multiple courts have granted the Department's unsealing motions, requiring detailed review of thousands of pages of investigative and grand jury material. Several components have just provided documents this week. Because of the volume of the material and the requirement that every page of every document be reviewed for potential redactions under the Act, final stages of review of some material continue. A district court judge in the Southern District of New York separately imposed additional requirements on the United States Attorney for the Southern District of New York, adding additional layers of review to minimize the risk of inadvertent production of protected victim information. I anticipate this ongoing review being completed over the next two weeks.

### The Review Process

Today, the Department is producing hundreds of thousands of pages of documents responsive to the Act. This disclosure highlights President Trump's, Attorney General Bondi's, and Director Patel's absolute commitment to transparency consistent with the law. Prior to the

passage of the Act, the Department conducted a thorough review, including digital searches of databases, hard drives, and network drives as well as searches of real and personal properties. As noted in the July 6 Memorandum, this review did not reveal credible evidence that Epstein blackmailed prominent individuals, nor did it uncover evidence that could predicate an investigation against uncharged third parties. Because of various protective orders, grand jury secrecy laws, and Department practice, limited additional materials have been provided prior to this production. Recently, in addition to the Act being signed by President Trump, judges in the Southern District of Florida and the Southern District of New York authorized the Department to produce materials previously prohibited from production by protective orders and grand jury secrecy laws.

After the Act became effective, the Department prepared a Review Protocol for its attorneys to use while reviewing materials to determine whether an item is responsive under the Act and, if so, whether any information contained in those materials required redactions or withholding as allowed under the Act and other applicable law. *See* Sec. 2(c)(1); *see also* 5 U.S.C. § 552a (the Privacy Act of 1974).

The Review Protocol is consistent with the Act and instructed attorneys to redact or withhold material that (1) contained personally identifiable information of victims; (2) depicted or contained child sexual abuse materials (CSAM) as defined under 18 U.S.C. § 2256 and prohibited under 18 U.S.C. §§ 2252–2252A; (3) would jeopardize an active investigation or prosecution; (4) depicted images of death, physical abuse, or injury; and/or (5) properly classified national defense or foreign policy information. *See* Sec. 2(c)(1)(A)–(E). The Review Protocol is being produced as part of the Department's response under the Act and is attached to this letter.

In addition to the bases for withholding or redacting under the Act, the Department has withheld and redacted a limited amount of information otherwise covered by various privileges, including deliberative-process privilege, work-product privilege, and attorney-client privilege. These privileges are based in common law—not statutes—and Congress is fully aware of them. *See* Fed. R. Evid. 501; *Trammel v. United States*, 445 U.S. 40, 47 (1980) ("In . . . enacting Rule 501, Congress manifested an affirmative intention not to freeze the law of privilege."). It is a long-held principle that Congress speaks clearly when it intends to abrogate a common law principle or privilege. *See Bassett v. United States*, 137 U.S. 496, 505–06 (1890) ("[B]efore any departure from the rule affirmed through the ages of the common law—a rule having its solid foundation in the best interests of society—can be adjudged, the language declaring the legislative will should be so clear as to prevent doubt as to its intent and limit.").

Although the Act broadly categorizes items required to be produced, the Act does not include language expressly requiring the Department to produce privileged materials. *See* Sec. 2(a); *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022) ("Congress expresses its intentions

through statutory text passed by both Houses and signed by the President."). A privilege log will be produced in due course as required under the Act.

Protecting victims is of the highest priority for President Trump, the Attorney General, the Federal Bureau of Investigation, and the Department of Justice. As part of the review and production, the Department solicited counsel for any victims of Jeffrey Epstein and invited counsel to provide us with names of victims, whether previously identified or not. This process resulted in over 1,200 names being identified as victims or their relatives. The Department has redacted reference to such names. In addition to redacting the names of these victims, the Department has also redacted and is not producing any materials that could result in their identification.

The materials on the Department's website include those identified as responsive under the Act. Documents with Bates numbers "EFTA" followed by 8 digits are those identified during the process described herein after the Act's enactment. If a Bates number is missing from this category of documents means that the Department recently identified that missing document as containing information that the Act requires to be withheld or redacted. An updated version of that document with the victim or other information under the Act redacted will be uploaded to the website expeditiously. In addition, the website contains materials that the Department had in its possession that were previously available publicly. This second category of documents do not contain Bates numbers.

To ensure that all potentially responsive materials were identified, collected, and reviewed, the Department instructed all components with potentially responsive materials to produce those materials to the Justice Management Division (JMD). JMD, which serves as the management arm of the Department as well as Department's Chief Information Office, then uploaded materials it received onto a discovery platform so that attorneys could review for responsiveness and mark appropriate information for redactions as required under the Act. Materials that could not be uploaded onto the discovery platform because of its size or other compatibility issues were reviewed and redacted in their native format.

Potentially responsive materials were identified and collected from Main Justice, Federal Bureau of Investigation (FBI), Bureau of Prisons (BOP), Office of the Inspector General (OIG), Executive Office for United States Attorneys (EOUSA), the United States Attorney's Office for the Southern District of New York (USAO-SDNY), and the United States Attorney's Office for the Southern District of Florida (USAO-SDFL).

To ensure the maximum compliance possible under the Act in a 30-day window, JMD had its employees working on ingesting and uploading the voluminous materials so that Department attorneys could conduct their review on the discovery platform.

In collecting and providing materials to JMD to ingest and upload for attorney review, Department components erred on the side of over-collecting materials to ensure full transparency

in compliance with the Act. As a result of these broad collections, the vast majority of the items that components provided to JMD were non-responsive under the Act.

The review team consisted of more than 200 Department attorneys working to determine whether materials were responsive under the Act and, if so, whether redactions or withholding was required. The review had multiple levels. First, 187 attorneys from the Department's National Security Division (NSD) conducted a review of all items produced to JMD for responsiveness and any redactions under the Act. Second, a quality-control team of 25 attorneys conducted a second-level review to ensure that victim personally identifying information was properly redacted and that materials that should not be redacted were not marked for redaction. The second-level review team consisted of attorneys from the Department's Office of Privacy and Civil Liberties (OPCL) and Office of Information Policy (OIP)—these attorneys are experts in privacy rights and reviewing large volumes of discovery. After the second-level review team completed its quality review, responsive materials were uploaded onto the website for public production as required under the Act. *See* Sec. 2(a).  Finally, Assistant United States Attorneys from the Southern District of New York reviewed the responsive materials to confirm appropriate redactions so that the United States Attorney for the Southern District of New York could certify that victim identifying information was appropriately protected.

Consistent with the Act, the Department attorneys reviewed all materials produced by its components for responsiveness. Specifically, the Department attorneys reviewed and marked as responsive "all unclassified records, documents, communications, and investigative materials . . . that relate to: (1) Jeffrey Epstein including all investigations, prosecutions, or custodial matters; (2) Ghislaine Maxwell; (3) flight logs or travel records . . . for any aircraft, vessel, or vehicle owned, operated, or used by Jeffrey Epstein or any related entity; (4) individuals, including government officials, named or referenced in connection with Epstein's criminal activities, civil settlements, immunity or plea agreements, or investigatory proceedings; (5) entities . . . with known or alleged ties to Epstein's trafficking or financial networks; (6) any immunity deals, non-prosecution agreements, plea bargains, or sealed settlements involving Epstein or his associates; (7); internal DOJ communications, including emails, memos, meeting notes, concerning decisions to charge, not charge, investigate, or decline to investigate Epstein or his associates; (8) all communications, memoranda, directives, logs, or metadata concerning the destruction, deletion, alteration, misplacement, or concealment of documents, recordings, or electronic data related to Epstein, his associates, his detention and death, or any investigative files; [and] (9) documentation of Epstein's detention or death, including incident reports, witness interviews, medical examiner files, autopsy reports, and written records detailing the circumstances and cause of death."

Consistent with the Act, the Department will provide an explanation for any redacted and withheld materials as part of this production. *See* Sec. 2(c)(2).

Today's Production

The production includes portions of the FBI New York investigative file for the 2018 Epstein criminal case for child sex trafficking and 2019 Maxwell criminal case; the FBI Miami investigative file for the 2006 Epstein criminal case for child prostitution; the FBI Miami investigative file for the 2009 Alfredo Rodriguez criminal case for obstruction of justice; the FBI New York investigative file for the 2019 Epstein death investigation; the FBI New York investigative file for a threat made against one of Epstein's victims; investigative materials underlying OIG's June 2023 report into Epstein's death; BOP materials related to Epstein's custody at Metropolitan Correctional Center New York (MCC New York), including visitor logbooks, commissary records, and count slips; grand-jury materials from the SDNY Epstein criminal case, SDNY Maxwell criminal case, and SDFL Epstein criminal case; court records from civil and criminal cases involving Epstein, Maxwell, and the Epstein estate; and materials produced by the DOJ in various cases brought under the Freedom of Information Act (FOIA). All produced materials will be available at justice.gov/epstein.

The materials produced today are in addition to those previously produced by this Department of Justice, including the following:

- On July 6, 2025, the Department released over 20 hours of video footage showing the outer cell area of the night Epstein committed suicide.
- On August 22, 2025, the Department released over 500 transcript pages and 6 hours of audio recordings of the Deputy Attorney General's interview of Ghislaine Maxwell.
- On August 22, 2025, the Department produced to Congress over 33,000 pages of documents responsive to a subpoena requesting documents related to the Epstein and Maxwell cases.

## Conclusion

This Department's commitment to transparency and compliance with the law has been historic. Even before the Act's passage, never before has there been a Department-wide effort to provide this level of transparency for a criminal case that ended less than 7 years earlier. The Attorney General is grateful to the Department attorneys, staff, and employees who worked long hours to ensure that the Department complied with the Act.

The Act requires the Department to publicly produce all responsive materials within 30 days of its enactment. *See* Sec. 2(a). The Department has worked diligently to meet the Act's deadline. But the volume of materials to be reviewed—many of which continue to be produced to JMD—means that the Department must publicly produce responsive documents on a rolling basis. The Department's need to perform rolling productions is consistent with well-settled caselaw that statutes should be interpreted to not require the impossible. *See Anniston Mfg. Co. v. Davis*, 301 U.S. 337, 350 (1937); *see also McNeil v. Time Ins. Co.*, 205 F.3d 179, 187 (5th Cir. 2000) ("It is a flawed and unreasonable construction of any statute to read it in a manner that demands the impossible.").

Similarly, in response to court orders granting motions to unseal grand-jury materials and materials covered by protective orders, USAO-SDNY produced 3.6 million records to the Department. Many of these materials are duplicative of materials previously produced to the Department by the FBI. Department attorneys continue to review these large productions from USAO-SDNY to confirm their duplicity. Moreover, the United States Attorney for the Southern District of New York was given access to today's production to allow him to make appropriate certifications as directed by a judge in the Southern District of New York. Any non-duplicated, responsive materials will be produced forthwith.

The Department will continue to follow the Review Protocol and add to the public website materials that are responsive under the Act, and the Department will inform Congress when that review and production are complete by the end of this year. The Department's commitment to transparency, following the law, and protecting all victims under the leadership of President Trump, Attorney General Bondi, and FBI Director Patel will never waver.

Sincerely,

Todd Blanche

Deputy Attorney General

# Exhibit E

**U.S. Department of Justice**

Office of the Deputy Attorney General

_____

The Deputy Attorney General                    *Washington, D.C. 20530*

January 30, 2026

**Re:  Epstein Files Transparency Act – Production of Department Materials**

President Trump signed the Epstein Files Transparency Act (the Act) into law on November 19, 2025, directing the Department of Justice to produce, with few exceptions, all documents, files, records, videos and images related to the investigations and prosecutions of Jeffrey Epstein and Ghislane Maxwell.[1] Today's production marks the Department's compliance with its production obligations under the Act.

## Overview

As detailed below, the Department's document identification and review protocols consisted of multiple levels of review and quality control procedures designed to ensure compliance with the Act, resulting in the production of all materials from the Department, with few identified exceptions. More than 500 attorneys and reviewers from the Department contributed to this effort, with the objective of identifying all potentially responsive materials for review and production while carefully redacting any information that could identify victims or that was otherwise required to be redacted under law. In addition, the United States Attorney's Office for the Southern District of New York (USAO-SDNY) employed an additional review protocol to ensure compliance with a court order under which United States Attorney Jay Clayton must certify that, with respect to certain materials, a rigorous process was undertaken to protect victims against any clearly unwarranted invasion of personal privacy.

The Department's collection efforts resulted in more than 6 million pages being identified as potentially responsive, including Department and FBI emails, interview summaries, images,

_____

[1] In relevant part, the Act requires the Department to publish (in a searchable and downloadable format), among other things, "all unclassified records, documents, communications, and investigative materials in the possession of the Department . . . that relate to (1) Jeffrey Epstein including all investigations, prosecutions, or custodial matters; (2) Ghislaine Maxwell; (3) flight logs and travel records . . . ; and (4) individuals, including government officials, named or referenced in connection with Epstein's criminal activities." *See* Sec. 2(a).

videos, and various other materials collected and generated during the various investigations and prosecutions covered by the Act.

These files were collected from five primary sources: (1) the Florida and New York cases against Epstein; (2) the New York case against Maxwell; (3) the New York cases investigating Epstein's death; (4) the Florida case investigating a former butler of Epstein; and (5) multiple FBI investigations; and (6) the Office of Inspector General investigation into Epstein's death. The Department erred on the side of over-collecting materials from various sources to best ensure maximum transparency and compliance with the Act. Prudently over-collecting, coupled with past intra-Department sharing of (and, therefore, duplication of) files across offices and jurisdictions, necessarily means that the number of non-duplicative, responsive pages is significantly smaller than the total number of pages initially collected. As a result, today, the Department is releasing the over 3 million responsive pages, including more than 2,000 videos and 180,000 images. Combined with prior releases, this makes the total production nearly 3.5 million pages released in compliance with the Act.

The Department's efforts to identify all potentially responsive documents has been extensive. This process included identifying materials stored in various formats in multiple offices spanning multiple investigations and prosecutions over a period of over twenty years. As a result, the document identification process was substantially manual and iterative with the document review process often leading Department personnel to search locations not previously identified. These efforts included conferring with available relevant personnel and third parties to best ensure that document identification efforts were informed by personnel associated with the investigative and prosecutorial efforts.

The Department will upload the materials described below through the course of the day. The materials produced by the Department are best reviewed with an understanding of the document identification and review protocol employed by the Department, including the Department's approach to the collection of materials from multiple sources and the redaction of victim-identifying information and other information as contemplated by the Act. This protocol is described below along with a discussion of the Department's approach to (1) the production of certain documents covered by court orders, including an order by the Southern District of New York (SDNY) court handling the case against Maxwell as well as sealing orders in a separate civil action (to which the Department is not a party) as described in further detail below, and (2) the production of sexually explicit material.

### Document Identification and Review Protocol

The Department implemented and periodically updated a review protocol that tracks the language of the Act. Importantly, the protocol provided reviewers with instructions on how to identify and redact victim identifying information and privileged materials. The protocol was updated from time to time as the Department learned more about the scope and type of potentially responsive materials, the various types of information that could identify victims, and

the capabilities and limitations of its document management systems. For example, reviewers were provided with Frequently Asked Questions (FAQs) to update guidance and instructions as common questions arose during the review. The final document identification and review protocol are being produced today as part of the Department's response under the Act.

The protocol established by the Department included several layers of review. The first level of review was completed by over 500 members of the Department, including trial attorneys from the National Security Division and the Criminal Division at Main Justice, Assistant United States Attorneys from the Southern District of Florida, the Southern District of New York, the Northern District of New York, and attorneys and specialists at the Federal Bureau of Investigation. Following the first level of review, a second-level review was conducted by a group of 40 specialized attorneys. These attorneys conducted a sample-based review of the files reviewed by the first-level reviewers to maximize compliance with the Act and the identification and review protocol, including the FAQs. As is common practice in any large-scale document review, if a second-level reviewer identified common errors or over-redactions, those issues were relayed back to the first-level reviewers to ensure that other files were redacted as contemplated by the Act and in accordance with the identification and review protocol. The attorneys from this second-level review team included attorneys from the Department's Office of Privacy and Civil Liberties (OPCL) and Office of Information Policy (OIP), many of whom are experts in privacy rights and have relevant experience with large-scale document reviews.

*Additional SDNY Quality Control Review.* To ensure compliance with the SDNY court order requiring the United States Attorney for the SDNY to certify that materials released under court order (i.e., materials covered by an SDNY court protective order and grand jury materials) had been rigorously reviewed and, through that review, none of released records had been identified to contain personally identifiable information of victims "the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," the Department implemented additional quality control procedures for these materials. Namely, with the exception of materials covered by the SDFL Quality Control Review described below, attorneys from SDNY reviewed: (i) any document identified through search terms as containing a known victim name; (ii) categories of particularly sensitive victim documents (such as prior statements of victims and other related witnesses); and (iii) a random sampling of remaining documents. SDNY's review was focused on reviewing and applying redactions to protect victim information. This process provided another layer of assurance of compliance with the Act and the protection of victims while separately complying with the SDNY court order.

*Additional SDFL Quality Control Review.* Attorneys from the Southern District of Florida (SDFL) also conducted several layers of review focused on reviewing and applying redactions to protect victim information. A set of 36 attorneys conducted an initial review of SDFL files. Thereafter, a set of 10 attorneys conducted a second-level review of the redactions, which was filed by a third-level review based on searches for sensitive victim information. This

process provided another layer of assurance of compliance with the Act and the protection of victim-identifying information while separately complying with the SDNY court order.

In practice, virtually all of the time and attention of Department personnel who participated in the manual review and redaction efforts was devoted to maximizing the protection of victim-identifying information.

*Subsequent Reporting Under the Act.* Under the Act, the Department must subsequently "submit to the House and Senate Committees on the Judiciary a report listing (1) all categories of records released and withheld; (2) a summary of redactions made, including legal basis; [and] (3) a list of all government officials and politically exposed persons named or referenced in the released materials." *See* Sec. 3 (cleaned up). To that end, and as disclosed in the December 19 letter to Congress, the categories of documents withheld include those permitted under the Act: Files that "(A) contain personally identifiable information of victims or victims' personal and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy; (B) depict or contain child sexual abuse materials (CSAM) as defined under 18 U.S.C. 2256 and prohibited under 18 U.S.C. 2252–2252A; (C) would jeopardize an active federal investigation or ongoing prosecution, provided that such withholding is narrowly tailored and temporary; [or] (D) depict or contain images of death, physical abuse, or injury of any person." *See* Sec. 2(c)(1). Although the Act allows for withholding for items necessary "to be kept secret in the interest of national defense or foreign policy"—no files are being withheld or redacted on that basis.

If after that report is submitted any member of Congress wishes to view personally any portions of the production in unredacted form, they are welcome to make arrangements with the Department to do so. These arrangements should be made through the leadership of the House and Senate Committees on the Judiciary and will be subject to customary and appropriate confidentiality undertakings.

*Privileged-Based Redactions.* Further, consistent with the December 19, 2025 letter, the Department withheld or redacted files covered by various privileges, including deliberative-process privilege, the work-product doctrine, and attorney-client privilege. In total, approximately 200,000 pages have been redacted or withheld based on various privileges. A formal report with a summary of redactions made and list of all government officials and politically exposed persons named or referenced in the released materials will be submitted to the House and Senate Committees on the Judiciary within 15 days of today's release.

*Duplications, Potential Inconsistencies and Victim Engagement.* Considering various factors, including the volume of documents reviewed, the presence of duplicative and partially duplicative documents, and the number of attorneys and reviewers involved, inconsistencies will likely exist in how reviewers applied redactions. The multiple-layered review process, including quality control check, was designed to minimize inconsistencies, but variations are inevitable given the volume of materials reviewed, the necessity for manual review, the importance of

redacting victim information, and the iterative nature of the various elements of the protocol. For example, during this process, the Department continued to engage with attorneys representing victims and others. This engagement led to additional victim names being added to the review guidance. In addition, conferring with victim counsel and further review of communications involving people initially identified as victims caused the Department to conclude that certain individuals whose names were initially being redacted out of an abundance of caution should no longer be redacted. At that point, those names were not redacted on a go-forward basis. And while the second-level reviewers took steps to minimize the inconsistencies in redacting those individuals' information, inconsistencies likely remain.

The Department remains committed to protecting the privacy of victims and welcome continued engagement from victims and their counsel. In that regard, the Department has established an email inbox for victims to reach us directly to correct redaction concerns when appropriate.

*Production Format.* In general, documents have been produced in the format that they were collected and loaded into the document management system. For example, if a document obtained from a third party during the criminal investigation originally had redactions in it, the produced version of that document contains those redactions. Additionally, electronic files (e.g., emails) were provided or obtained in various formats. As they were loaded into the document management system for review, these various formats have caused certain emails to display differently, appear cut off, or display with symbols. In some instances, these documents contain previously applied Bates numbers. Those Bates numbers do not reflect whether an item is responsive under the Act. Only those documents that include a Bates number with "EFTA" in its designation are those that are responsive under the Act. The Department has reviewed and produced these items as they were formatted upon entry into the document management system.

*Foreign Language Documents and Technically Incompatible Documents.* The Department's collection of documents included pages in various foreign languages. Because it was not practicable for a first-level reviewer to determine the responsiveness of a foreign-language document, those pages have not been produced. Similarly, some materials could not be uploaded for review on the Department's discovery platform because of technical issues with the files. Those items could not be reviewed for responsiveness and have not been produced.

*Protective and Sealing Orders.* A portion of the documents collected pursuant to the Act include materials that a law firm produced to the SDNY in 2019 pursuant to a grand jury subpoena during the criminal investigation into Ghislaine Maxwell. For the law firm to produce documents responsive to the SDNY subpoena, the SDNY U.S. Attorney sought and obtained a court order allowing the law firm to produce to SDNY materials otherwise covered by a protective order from a separate civil action (again, to which the Department is not a party), and some of which have been filed under seal in that action. The Department concluded that prior to producing the materials pursuant to the Act, it would be prudent to seek an order from the court

Page **5** of **6**

allowing production of the materials subject to sealing orders in the civil lawsuit. To that end, the Department has filed that motion in the U.S. District Court for the Southern District of New York and, if and to the extent the motion is granted, will promptly release the materials with appropriate redactions. Additionally, the Department has moved in the U.S. District Court for the Southern District of New York to release certain grand jury materials from an SDNY case charging corrections officers who worked at the correctional facility when Epstein killed himself. If that motion is granted, the materials will be released promptly with appropriate redactions pursuant to the Act.

*Sexually Explicit Materials.* This production contains sexually explicit videos and images recovered from Epstein's electronic devices pursuant to a search warrant. The Act requires public release of these materials. To comply with the Act while also protecting the identities of female victims or possible victims, females portrayed in the pornographic videos and images have been redacted. Even videos that appear to be commercial pornography have been released in redacted form as part of this production because the Department could not confirm that the individuals in these videos were not victims. As a result, today's production includes redacted sexually explicit materials, requiring anyone entering the Epstein library to verify that they are over the age of 18.

## Conclusion

Today's release marks the end of a comprehensive document identification and review process to ensure transparency to the American people and compliance with the Act. The Department has engaged in an unprecedented and extensive effort to do so. After submitting the formal report to Congress required under the Act and publishing the written justifications in the Federal Register, the Department's obligations under the Act will be completed.

Sincerely,

PAMELA J. BONDI
United States Attorney General

TODD BLANCHE
Deputy United States Attorney General
United States Department of Justice

# Exhibit F

**U.S. Department of Justice**

Office of the Deputy Attorney General

_Washington, D.C. 20530_

February 14, 2026

Chairman Chuck Grassley
Senate Judiciary Committee
224 Dirksen Senate Office Building
Washington, DC 20510

Chairman Jim Jordan
House Judiciary Committee
2138 Rayburn House Office Building
Washington, DC 20515

Ranking Member Dick Durbin
Senate Judiciary Committee
224 Dirksen Senate Office Building
Washington, DC 20510

Ranking Member Jamie Raskin
House Judiciary Committee
2138 Rayburn House Office Building
Washington, DC 20515

Re:  Epstein Files Transparency Act – Section 3 Report to Congress

Section 3 of the Epstein Files Transparency Act ("the Act") requires the Department of Justice, within 15 days of completing the release required under the Act, to submit to the House and Senate Committees on the Judiciary a report listing: "(1) All categories of records released and withheld; (2) a summary of redactions made, including legal basis; and (3) a list of all government officials and politically exposed persons named or referenced in the released materials." _See_ Sec. 3 (cleaned up).

Consistent with Section 3 of the Act, the Department provides the following information.

**Categories of Records Released and Withheld**

_Categories of Records Released._ In accordance with the requirements of the Act, and as described in various Department submissions to the courts of the Southern District of New York assigned to the Epstein and Maxwell prosecutions and related orders,[1] the Department released all "records, documents, communications and investigative materials in the possession of the Department" that "relate to" any of nine different categories:

---

[1]  _See United States v. Epstein_, 19 Cr. 490 (RMB) (S.D.N.Y.) Dkts. 85, 86, 87, 88, 90, 91, 92, 93, 94, 97, 98, 99, 100; _United States v. Maxwell_, 20 Cr. 330 (PAE) (S.D.N.Y.) Dkts. 810, 811, 813, 819, 820, 823, 826, 839, 845, 846, 847, 848, 849.

(1) Jeffrey Epstein, including all investigations, prosecutions, or custodial matters; (2) Ghislaine Maxwell; (3) flight logs or travel records, including but not limited to manifests, itineraries, pilot records, and customs or immigration documentation, for any aircraft, vessel, or vehicle owned, operated, or used by Jeffrey Epstein or any related entity; (4) individuals, including government officials, named or referenced in connection with Epstein's criminal activities, civil settlements, immunity or plea agreements, or investigatory proceedings; (5) entities (corporate, nonprofit, academic, or governmental) with known or alleged ties to Epstein's trafficking or financial networks; (6) any immunity deals, non-prosecution agreements, plea bargains, or sealed agreements involving Epstein or his associates; (7) internal DOJ communications, including emails, memos, meeting notes, concerning decisions to charge, not charge, investigate, or decline to investigate Epstein or his associates; (8) all communications, memoranda, directives, logs, or metadata concerning the destruction, deletion, alteration, misplacement, or concealment of documents, recordings, or electronic data related to Epstein, his associates, his detention and death, or any investigative files; and (9) documentation of Epstein's detention or death, including incident reports, witness interviews, medical examiner files, autopsy reports, and written records detailing the circumstances and cause of death.

Sec. 2(a) (cleaned up).

*Categories of Records Withheld.* The only category of records withheld were those records where permitted withholdings under Section 2(c) and privileged materials were not segregable from material responsive under Section 2(a). As discussed in the Department's December 19, 2025, and January 29, 2026, letters to Congress (the Prior EFTA Letters), the privileges that applied to the withheld records were deliberative-process privilege, work-product privilege, and attorney-client privilege.

No records were withheld or redacted "on the basis of embarrassment, reputational harm, or political sensitivity, including to any government official, public figure, or foreign dignitary." Sec. 2(b)(1).

### Summary of Redactions Made and Legal Basis

Consistent with the Act, the Department, in consultation with victim counsel and victims directly, engaged in an extensive process to identify and redact "segregable portions of records that (A) contain personally identifiable information of victim or victims' personal and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy; (B) depict or contain child sexual abuse materials (CSAM) as defined under 18 U.S.C. 2256 and prohibited under 18 U.S.C. 2252–2252A; (C) would jeopardize an active federal investigation or ongoing prosecution, provided that such withholding is narrowly tailored and temporary; and (D) depict or contain images of death, physical abuse, or injury of any person." *See* Sec. 2(c).

Although permitted by the Act, no materials were redacted or withheld on that basis that a record "contain[ed] information specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and are in fact properly classified pursuant to such Executive order." *See* Sec. 2(c)(1)(E).

As described in detail in the SDNY-EFTA Orders and Submissions and the Prior EFTA Letters, the Department, as permitted by the Act, undertook an extensive process to redact victim names and victim personally identifiable information, including extensive engagement with victims and their counsel. This engagement is ongoing, and the Department remains steadfast in its commitment to protecting victims. The Department notes, and as discussed in the SDNY-EFTA Orders and Submissions, unredacted versions of these materials are available for inspection at the Department by members of Congress, and certain members of Congress have come to the Department to inspect unredacted materials.

As discussed above and in the Prior EFTA Letters, the Department redacted a limited amount of information covered by various privileges, including deliberative-process privilege, work-product privilege, and attorney-client privilege. The legal basis for these redactions and withholding is that these privileges are long-recognized and based in common law. *See* Fed. R. Evid. 501; *Trammel v. United States*, 445 U.S. 40, 47 (1980) ("In . . . enacting Rule 501, Congress manifested an affirmative intention not to freeze the law of privilege."). Given the presumption against repeal of common-law principles, the Supreme Court has recognized that such "privilege[s] should not be held to have been abrogated or limited unless Congress has at least used clear statutory language." *FBI v. Fazaga*, 595 U.S. 344, 355 (2022); *see Bassett v. United States*, 137 U.S. 496, 505–06 (1890) ("[B]efore any departure from the rule affirmed through the ages of the common law—a rule having its solid foundation in the best interests of society—can be adjudged, the language declaring the legislative will should be so clear as to prevent doubt as to its intent and limit."); *see also Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022) ("Congress expresses its intentions through statutory text passed by both Houses and signed by the President.").

### List of All Government Officials and Politically Exposed Persons

Below is a list of all government officials and "politically exposed persons" named or referenced in the released materials. The term "politically exposed persons" was not defined in the Act, but consistent with Section 3 of the Act, Department reviewers were directed to notate "all government officials and politically exposed persons named or referenced" in any document, including videos and images, reviewed during this process.

This list includes (as directed by the Act) all persons where (1) they are or were a government official or politically exposed person and (2) their name appears in the files released under the Act at least once. Names appear in the files released under the Act in a wide variety of contexts. For example, some individuals had extensive direct email contact with Epstein or

Maxwell while other individuals are mentioned only in a portion of a document (including press reporting) that on its face is unrelated to the Epstein and Maxwell matters.[2]

| | | |
|---|---|---|
| Acosta, Alexander | Adelson, Miriam | Allen, Woody |
| Allred, Gloria | Andrew Mountbatten-Windsor | Arthur Edward Rory Guinness |
| Assange, Julian | Audrey, Strauss | Avakian, Stephanie |
| Babino, Vincent | Baldwin, Alec | Band, Doug |
| Bannon, Steve | Barak, Ehud | Barr, William |
| Becerra, Xavier | Belohlavek, Lanna | Berman, Geoffrey |
| Beyonce | Bezos, Jeff | Biden, Ashley |
| Biden, Hunter | Biden, Jill | Biden, Joe |
| Birger, Laura | Bistricer, David | Bistricer, Marc |
| Black, Leon | Blair, Tony | Blanche, Todd |
| Blinken, Antony | Boies, David | Bolton, John |
| Bondi, Pam | Bongino, Dan | Bono |
| Book, Lauren | Booker, Cory | Bowdich, David |
| Boyd, Stephen E. | Bradshaw, Ric | Branson, Richard |
| Brennan, John | Brockman, John | Brunel, Jean Luc |
| Buckley, Sean | Bull, Gerald | Bush Jr., George |
| Bush, George W. | Bush, Jeb | Byrne, Patrick |
| Calk, Stephen | Capone, Russell | Carlson, Tucker |
| Carper, Tom | Castro, Fidel | Cheney, Dick |
| Cher | Chomsky, Noam | Clayton, Jay |
| Clinton, Bill | Clinton, Chelsea | Clinton, Hillary |
| Clooney, George | Cobain, Kurt | Cohen, Michael |
| Colleran, Brian | Collins, Linda | Comey, James |
| Comey, Maureen | Conway, George | Copperfield, David |
| Cosby, Bill | Daza, Omar | De Niro, Robert |
| Dershowitz, Alan | Desantis, Ron | Diana, Princess of Wales |
| Diller, Barry | Donahue, Phil | Donaleski, Rebekah |
| Dupont, Kathleen | Economou, George | Egauger, Michael |
| Eisenberg, John | Elizabeth II | Ellison, Keith |
| Emmanuel, Rahm | Epstein, Jeffrey | Erben, Germann |
| Feinberg, Stephen | Ferguson, Sarah | Filip, Mark |
| Flynn, Michael | Foley, Mark | Fortelni, Marius |
| Friedland, Edward | Frost, Phillip | Garland, Merrick |
| Gates, Bill | Gates, Melinda | Geithner, Timothy |
| Giuliani, Rudy | Goldman, Dan | Graham, Lindsey |
| Haley, Nikki | Harris, Kamala | Harrish, Joshua |
| Hatch, Orin | Hawk, Rony | Heiss, Howard |
| Higgins, Tony | Ho, Stanley | Hoffman, Reid |
| Holder, Eric | Horowitz, Andreesen | Horowitz, Michael |
| Hosenball, Mark | Hoyer, Steny | Huckabee, Mike |
| Huckabee, Sarah | Hutner, Florence | Inge Rokke, Kjell |
| Iveagh, Clare | Jackson, Michael | Jagger, Mick |
| Jarecki, Henry | Jay Z | Jayapal, Pramila |

---

[2]  Any omissions from the list are unintentional and, as explained in the previous letters to Congress, a result of the volume and speed with which the Department complied with the Act. Individuals whose names were redacted for law-enforcement sensitive purposes are not included.

Jeffries, Hakeem

Johnson, Hank

Jones, Alex

Joplin, Janis

Kasich, John

Kendall Rowlands, John

Kennedy Jr., Robert F.

Kerry, John

Khanna, Ro

Kline, Carl

Krisher, Barry

Kudlow, Larry

Kushner, Jared

Kyl, Jon

Lady Victoria Hervey

Lefkowitz, Jay

Lefroy, Jeremy

Leo, Leonard

Lew, Jack

Lewinsky, Monica

Lieu, Ted

Lofgren, Zoe

Lonergan, Jessica

Lorber, Howard

Lord Robert May

Lutnick, Howard

Lynch, Loretta

Mace, Nancy

Mandelson, Peter

Mao, Coreen

Margolin, James

Markey, Ed

Markle, Meghan

Massie, Thomas

Maxwell, Ghislaine

Maxwell, Robert

May, Theresa

McCain, John

McFarland, Nicole

Meadows, Mark

Menendez, Robert

Milano, Alyssa

Milikowski, Nathan

Milken, Michael

Mnuchin, Steve

Moe, Alison

Monaco, Lisa

Monroe, Marilyn

Mook, William

Moskowitz, Jared

Mueller III, Robert s.

Mulvaney, Mick

Murdoch, Rupert

Musk, Elon

Nadler, Jerry

Napolitano, Janet

Nassar, Larry

Netanyahu, Benjamin

Newsom, Gavin

Obama, Barack

Obama, Michelle

Ocasio Cortez, Alexandria

O'Donnell, Rosie

Oz, Mehmet

Papapetru, Sophia

Parker, Daniel

Patel, Kash

Paul, Ron

Pecorino, Joseph

Pelosi, Nancy

Pence, Mike

Pestana, Diego

Phelan, John

Plaskett, Stacey

Plourde, Lee

Podesta, Tony

Pomerantz, Lara

Pompeo, Mike

Pope John Paul II

Pope, Susan

Power, Samantha

Presley, Elvis

Presley, Lisa Marie

Prince Harry, Duke of Sussex

Prince Philip

Pritzker, JB

Pritzker, Thomas

Quayle, Dan

Raskin, Jamie

Ratcliffe, John

Ratner, Brett

Readler, Chad

Reagan, Ronald

Recarey, Joseph

Reiter, Michael

Reno, Janet

Reynolds, Tom

Rice, Susan

Richardson, Bill

Rod-Larsen, Terje

Rogers, Matthew

Rohrbach, Andrew

Romney, Mitt

Roos, Nicolas

Rosen, Jeffrey

Rosenstein, Rod

Ross, Diana

Rossmiller, Alexander

Roth, John

Routch, Timothy

Rove, Karl

Rowan, Marc

Rubenstein, Howard

Rubio, Marco

Ruemmler, Kathy

Ryan, Paul

Salinger, Pierre

Sasse, Ben

Scanlon, Mary Gay

Scarola, John

Schenberg, Janis

Schiff, Adam

Schlaff, Martin

Schumer, Amy

Schumer, Chuck

Schwarzman, Stephen

Scott, Tim

Sekulow, Jay

Senatore, Adrienne

Sessions, Jeff

Shamir, Yitzhak

Shapiro, Ben

Shappert, Gretchen

Shea, Timothy

Siad, Daniel

Snowden, Edward

Soros, Alex

Soros, George

Spacey, Kevin

Spitzer, Eliot

Springsteen, Bruce

Stabenow, Debbie

Staley, Jes

Starmer, Keir

Starr, Kenneth

Stoltenberg, Jens

Stordalen, Gunhild

Stordalen, Petter

Straub, Glenn

Streisand, Barbara

Sultan Ahmed bin Sulayem

Summers, Larry

Swalwell, Eric

Sweeney Jr., William
Thiel, Peter
Trump, Ivanka
Vance, JD
Warsh, Kevin
Williams, Damian
Wyden, Ron
Zucker, Jeff

Taylor Green, Marjorie
Thomas-Jacobs, Carol
Trump, Melania
Villafana, Marie
Wexner, Abigail
Wolff, Michael
Yung, Mark
Zuckerberg, Mark

Thatcher, Margaret
Trump, Donald
Tucker, Chris
Walker, Richard
Wexner, Les
Woodward, Stanley
Zampolli, Paolo

Sincerely,

PAMELA J. BONDI
United States Attorney General

_Todd Blanche_

TODD BLANCHE
Deputy United States Attorney General
United States Department of Justice

# Exhibit G

**From:** "jeffrey E." <jeevacation@gmail.com>
**To:** Robert Trivers <█████████████>
**Subject:** Re:
**Date:** Tue, 02 Aug 2016 23:04:15 +0000

---

easy, lets talk on the phone tomoorw at least

On Tue, Aug 2, 2016 at 6:53 PM, Robert Trivers <█████████████> wrote:
Jeffrey

i am in Brooklyn now, tomorrow NYC for two days and then back to Jersey Friday

we do not need to see each other in haste

i would like to spend some quality time with you, a day, a half a day

but i am in and out of the US via Florida almost every month

e.g.three times in September

all best

bob

On Tue, Aug 2, 2016 at 10:50 AM, Robert Trivers <█████████████> wrote:
█. out of e-mail contact until early afternoon tomorrow Wednesday

On Tue, Aug 2, 2016 at 10:11 AM, Robert Trivers <█████████████> wrote:
but am flexible

On Tue, Aug 2, 2016 at 10:03 AM, Robert Trivers <█████████████> wrote:
exit 8 Jersey Turnpike Freehold

On Tue, Aug 2, 2016 at 7:28 AM, jee <jeevacation@gmail.com> wrote:
where will you be on the weekend

On Aug 2, 2016, at 7:27 AM, Robert Trivers <█████████████> wrote:

Jeffrey

are you by any chance around on Monday afternoon

i could book an early flight from Newark to West Palm Beech arriving sometime after 1pm if you were free

otherwise i will fly down later that day (the 8th) with my son to Ft Lauderdale

things are fine

EFTA00822573

here is wishing you the best

On Sun, Jul 31, 2016 at 6:55 PM, Robert Trivers <████████████> wrote:
no problem

On Sun, Jul 31, 2016 at 5:26 PM, jeffrey E. <jeevacation@gmail.com> wrote:
sorry i thought you meant tomorw

On Sun, Jul 31, 2016 at 5:25 PM, Robert Trivers <████████████> wrote:
many thanks indeed

i am due to fly in with my son arriving FLL Monday the 8th at 5pm but he is 17 and perfectly happy to fly on his own

so if you are suggesting a much earlier departure to West Palm Beech, no problem

i would treasure some quality time with you

all best

On Sun, Jul 31, 2016 at 7:30 AM, jeffrey E. <jeevacation@gmail.com> wrote:
sorry to hear about your lows.  .  what time on monday  will you be in florida.   if you fly to palm beach early we can spend some time.   I can orgnize your tickt if you are ok with that.

On Sun, Jul 31, 2016 at 2:13 AM, Robert Trivers <████████████> wrote:
Jeffrey

i am in New Jersey now doing my Foundation taxes and moving north to New Brunswick for a couple of days and then NYC to see my latest grandson—i will be in FLL Monday until Wednesday back to Jamaica; would love to spend some time with you—alone among my friends you have gone trough as much as i or worse but we have rarely discussed the details; was VERY low for a couple of week in Jamaica—suicidal, that is to say, homicidal, making a rank-ordered list of whom i would kill or first; couldn't imagine anyone on your list besides perhaps a lawyer (one on my list) but then i don't really know you

spend some time dealing with jobs and job opportunities, CUNY perhaps, U of Kentucky at Lexington, Oklahoma in Stillwater (kind of hard to imagine, although it is a completely open-carry state so you'd be armed against them

all best to you, what about that island of yours?


On Sat, Jul 30, 2016 at 7:30 PM, jeffrey E. <jeevacation@gmail.com> wrote:
where are you?


--
    please note
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for

EFTA00822574

the use of the addressee. It is the property of
JEE
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to jeevacation@gmail.com, and
destroy this communication and all copies thereof,
including all attachments. copyright -all rights reserved

--

please note
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
JEE
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to jeevacation@gmail.com, and
destroy this communication and all copies thereof,
including all attachments. copyright -all rights reserved

--

please note
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
JEE
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to jeevacation@gmail.com, and
destroy this communication and all copies thereof,
including all attachments. copyright -all rights reserved

EFTA00822575

--
    please note
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
JEE
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to jeevacation@gmail.com, and
destroy this communication and all copies thereof,
including all attachments. copyright -all rights reserved

EFTA00822576