UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KATIE PHANG,<br><br>       Plaintiff,<br><br>       v.<br><br>TODD BLANCHE, in his official capacity as<br>Acting Attorney General of the United States,<br><br>       Defendant. | Civil Action No. 26-1417 (EGS) |

**MOTION TO INTERVENE**

Pursuant to Rule 24(b) of the Federal Rules of Civil Procedure, proposed Intervenor K.L. Smith ("Movant") respectfully moves to intervene in this action to protect the public interest. This motion is supported by the enclosed memorandum of law.

**ARGUMENT**

Counsel for Donald Trump avers that "'creating a cause of action is a legislative endeavor,' *Egbert v. Boule*, 596 U.S. 482, 491 (2022) [and that] Congress did not create one in the EFTA, *see* Pub. L. No. 119-38." ECF #19 at 8. **But there is no compelling reason why it had to.** Congress routinely legislates against a backdrop of established judicial remedies. The relevant question is therefore not whether the EFTA created a new cause of action, but whether its mandatory commands are enforceable through common law remedies that predate the Constitution itself.

"A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both." Letter from James Madison to W.T. Barry (Aug. 4, 1822), in 9 *The Writings of James Madison* 103, 103 (Gaillard Hunt ed., 1910). "The only

1


RECEIVED

JULY 15 2026

Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

effective restraint upon executive policy [is] in an informed and critical public opinion which alone can here protect the values of democratic government." *New York Times Co. v. United States*, 403 US 713, 728 (1971) (Stewart, J., concurring).  By and through our agents in Congress, the people have commanded a timely and complete release of the Epstein Files, and the Attorney General remains in willful defiance of ministerial duties imposed via their statutory command.

In our constitutional system, sovereignty resides in the people. Professor (Justice) Story elaborates: "the *jus summi imperii*, the absolute right to govern ... [resides] in the people of the nation." 2 J. Story, *Commentaries* at §§ 207.  Public officials exercise authority only as our authorized agents: "All the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it." *United States v. Lee*, 106 U.S. 196, 220 (1882). And as an essential corollary, the people must have some mechanism for doing the binding.  As St. George Tucker adds, "representative democracy ceases to exist the moment that the public functionaries are by any means absolved from their responsibility to their constituents." 1 *Tucker's Blackstone* 297 (editor's app'x.).  And since the first English settlers graced our shores, the writ of mandamus has been used to compel our agents in government to attend to their duties.

When Congress creates a statutory entitlement belonging to the public at large, and an executive officer refuses to perform a ministerial duty owed to that public, does Article III permit judicial review only at the behest of specially situated plaintiffs?  What if there are no specially situated plaintiffs?  Does Congress' mandate become precatory?

Put differently, if no member of the public may seek mandamus to compel performance of a ministerial duty owed to the public, who may?

The existing parties are litigating whether the APA authorizes relief.  Movant seeks to address a distinct but overlapping question: whether Congress's use of mandatory language ("shall") in the

Epstein Files Transparency Act ("EFTA") imposed a ministerial duty on the Attorney General,

thereby triggering the traditional remedy of mandamus. Because both theories arise from the same

alleged refusal to perform the same statutory duty, Rule 24(b)'s common-question requirement is

plainly satisfied. And as Movant seeks only to present a distinct legal theory arising from the same

operative facts, intervention will neither unduly delay these proceedings nor prejudice the rights

of the existing parties.

*Efforts to Confer and Relevance to the Case*

Movant conferred with counsel for Plaintiff, who stated that Plaintiff takes no position on in-

tervention. Movant did not confer with counsel for the Defendant on grounds of perceived futility,

for a reason central to the merits of this intervention. As Judge Williams of the Southern District

of Florida recently observed:

> Lead Plaintiff and Defendants are public servants—the pinnacle of the Executive Branch—
> sworn to uphold the law, faithfully perform the duties of their office, and protect the inter-
> ests of the American public. The issue before the Court is whether, instead, they ignored
> ethical norms, court rules, and legal authority to manipulate the judicial process.

Order, *Trump v. Internal Revenue Service*, No. 25-cv-23866-KMW, slip op. at 2 (S.D. Fla. July

13, 2026). Judge Williams directed the Clerk to transmit her Order to the relevant authorities,

"where disciplinary proceedings are currently ongoing" against both the Defendant and lead coun-

sel Woodward. Id. at 54.

Whether the sui generis saga playing out in Judge Williams' court results in sanctions is beside

the point. In Federalist No. 51, Madison observed rhetorically that government is "the greatest of

all reflections on human nature," The Federalist No. 51, 322 (James Madison) (C. Rossiter ed.

1961), and Montesquieu observed that "[c]onstant experience shows us that every man invested

with power is apt to abuse it, and to carry his authority as far as it will go." Charles de Secondat,

3

Baron de Montesquieu, *The Spirit of Laws* 150 (T. Nugent trans., G. Bell & Sons 1899) (1748). "Power concedes nothing without a demand. It never did and it never will." Frederick Douglass, West India Emancipation (speech), (Aug. 3, 1857).  It is therefore unlikely that Movant's participation will be welcomed by the Trump Department of Justice.

 Madison concluded that "dependence on the people is ... the primary control on the government," The Federalist No. 51 at 322, but for the people to control the government, we must have robust access to timely information and an effective mechanism for controlling our servants in government.  The prerogative writs are indispensable components of the legal toolbox the Framers bequeathed to us.

**CONCLUSION**

 For the foregoing reasons, Movant should be permitted to participate in this matter, whether as an intervenor or, at minimum, as amicus curiae, so that the Court may consider the availability of meaningful remedies and preserve the People's ability to hold their agents in government accountable to law.

Respectfully submitted this 15th day of July, 2026,



K.L. Smith
3649 Evergreen Pkwy. #504
Evergreen, CO. 80437-0504
Manncoulter.fox@gmail.com
(720) 404-5383

**CERTIFICATE OF SERVICE**

I hereby certify that on July 15, 2026, I caused to be served the foregoing MOTION TO INTERVENE and accompanying Memorandum of Law in support of it via DCD filing, First-Class Mail and e-mail on the Parties at the following addresses:

Brendan Ballou (D.C. Bar No. 241592)
Public Integrity Project
1763 Columbia Rd. NW Ste. 175
Washington, DC 20009
Tel. (917) 684-3900
brendan@publicintegrityproject.org

Stanley E. Woodward, Jr. (D.C. Bar No. 997320)
Associate Attorney General
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530
Tel. 202-514-2000
stanley.woodward@usdoj.gov

/s/ K. L. Smith
K. L. Smith

5

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KATIE PHANG,

       Plaintiff,

    v.

TODD BLANCHE, in his official capacity as
Acting Attorney General of the United States,

       Defendant.

Civil Action No. 26-1417 (EGS)

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO INTERVENE**

Respectfully submitted this 15th day of July, 2026,



K.L. Smith
3649 Evergreen Pkwy. #504
Evergreen, CO. 80437-0504
Manncoulter.fox@gmail.com
(720) 404-5383

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ........................................................................................................ 1

I. WHAT THE FRAMERS INTENDED .................................................................... 1

    A. Marbury, Redux ................................................................................................ 3

    B. Courts Must Give Effect to Every Clause of the Constitution ................................ 4

II. STANDING: A POWER GRAB FOR THE AGES ................................................ 5

    A. The Origins of Modern Standing Doctrine ........................................................ 5

    B. *Ubi Jus, Ibi Remedium*: The Constitutional Collision ........................................ 6

    C. *Qui Facit Per Alium Facit Per Se* .................................................................... 9

        1. Perversion of Justice ................................................................................ 10

        2. It's Not the Crime, It's the Cover-Up ...................................................... 11

        3. *Cui Bono*? .............................................................................................. 12

III. A MODEST PROPOSAL .................................................................................... 14

CONCLUSION .......................................................................................................... 15

APPENDIX ................................................................................................ unpaginated

# TABLE OF AUTHORITIES

**CASE**                                                                        **PAGE**

*Anderson v. Griswold*, No. 23CV32577
(Dist. Ct., City & Cnty. of Denver Nov. 17, 2023) ........................................................ 7

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ...................................................... 7

*Connecticut Nat'l Bank v. Germain,* 503 U.S. 249 (1992) ...................................... 4

*Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102 (1980) .............. 4

*Doe 1 v. United States*, 359 F. Supp. 3d 1201 (S.D. Fla. 2019) ........................................... 10

*Egbert v. Boule*, 596 U.S. 482 (2022) ................................................................. 4

*Fairfax's Devisee v. Hunter's Lessee*, 11 U.S. 603 (1813) ..................................... 2

*Flast v. Cohen,* 392 U.S. 83 (1968) ...................................................................... 6

*Frothingham v. Mellon,* 262 U.S. 447 (1923) ...................................................... 5

*Heydon's Case* [1584] 76 Eng. Rep. 637 (K.B.) ................................................... 4

*Lake County v. Rollins,* 130 U.S. 662 (1889) ...................................................... 4

*Louisiana ex rel. Sandlin v. Watkins,* 21 La. Ann. 631 (1869) ............................... 9

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ........................................... 14

*Marbury v. Madison*, 5 U.S. 137 (1803) ....................................................... passim

*Montclair v. Ramsdell,* 107 U.S. 147 (1883) ...................................................... 4

*Myers v. United States,* 272 U.S. 52 (1926) ...................................................... 7

*New York Times Co. v. United States,* 403 U.S. 713 (1971) ................................. 10

*Norton v. Shelby County*, 118 U.S. 425 (1886) ................................................. 8

*Olmstead v. United States,* 277 U.S. 438 (1928) ............................................... 14

*Planned Parenthood v. Casey,* 505 U.S. 833 (1992) ........................................ 5, 6

*Sierra v. City of Hallandale Beach, Fla.,* 996 F.3d 1110 (11th Cir. 2021) ................... 6

*Trump v. Slaughter,* No. 25-332 (U.S. June 29, 2026) ...................................................... 7

*United States ex rel. Riley v. St. Luke's Episcopal Hosp.*,
   982 F. Supp. 1261 (S.D. Tex. 1997) ............................................................ 6

*United States v. Lee*, 106 U.S. 196 (1882) ......................................................... 9, 15

*United States v. Texas*, 507 U.S. 529 (1993) ....................................................... 2

*United States v. Stanley (Civil Rights Cases),* 109 U.S. 3 (1883) ...................................... 7

*Whitney v. Robertson*, 124 U.S. 190 (1888) ........................................................ 8

*Worthy v. Barrett*, 63 N.C. 199 (1869) .............................................................. 9

*Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 (1987) ......................... 9

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. III ........................................................................................... passim

U.S. Const. art. VI, cl. 2 .................................................................................. 8

U.S. Const. amend. IX ...................................................................................... 2

U.S. Const. amend. X ....................................................................................... 2

U.S. Const. amend. XIV, § 3 ............................................................................ 7, 8, 9

## STATUTES

28 U.S.C. § 1361 .............................................................................................. 4, 8

D.C. Code §§ 16-3501 et seq. .......................................................................... 7

District of Columbia Organic Act of 1801, ch. 15, 2 Stat. 103 (Feb. 27, 1801) ............... 3

Epstein Files Transparency Act,
    Pub. L. No. 119-38 ...................................................................................... passim

## RULES

Fed. R. Civ. P. 81(b) ........................................................................................ 4, 8

## OTHER AUTHORITIES

**PAGE**

1 Annals of Congress (1789) ............................................................... 2, 15

Baude, William & Michael Stokes Paulsen, *The Sweep and Force of
    Section Three*, 172 U. Pa. L. Rev. 605 (2024) ............................... 7

Barnett, Randy E., *Restoring the Lost Constitution: The Presumption of Liberty* (2004) .. 2

Berger, Raoul, *Standing to Sue in Public Actions: Is it a Constitutional Requirement?*,
    78 Yale L.J. 816 (1969) ..................................................... 15

Brown, Julie K., *Perversion of Justice*, Miami Herald (2018) ........................... 10

CBS This Morning, *As Focus Turns to Jeffrey Epstein's Ranch, Official Says:
    "There Is a Story to Be Told in New Mexico"* (Aug. 22, 2019) ................... 11

Coke, Edward, 1 *Institutes of the Lawes of England*  (1642) ........................... 6

*Das geschah in Epsteins abgelegener Zorro Sex-Ranch in New Mexico*,
    Blick (Aug. 3, 2020) ......................................................... 12

Draper, Robert, *'I Was Just So Naïve': Inside Marjorie Taylor Greene's Break
    with Trump*, N.Y. Times Mag. (Dec. 29, 2025) ............................... 13

Fallon, Richard H., Jr. et al., *Hart & Wechsler's The Federal Courts and the
    Federal System* (7th ed. 2015) .............................................. 6

Federal Judicial Ctr., *Prohibition in the Federal Courts: A Timeline* (undated) ............... 5

*Federalist No. 46* (James Madison) ................................................. 9

Frankfurter, Felix & James M. Landis, *The Business of the Supreme Court:
    A Study in the Federal Judicial System* (1928) ............................... 6

Jaffe, Louis L., *The Citizen as Litigant in Public Actions: The Non-Hohfeldian
    or Ideological Plaintiff*, 116 U. Pa. L. Rev. 1033 (1968) ..................... 15

Kaplan, Zach, *Why Weren't They Released During the Biden Administration?*,
    NewsNation (Nov. 28, 2025) .................................................. 12

Larson, David, *NC's 'Great Refusal' to Sign US Constitution Led
    to Bill of Rights*, Carolina J., (Apr. 3, 2026) ............................. 2

Lohmann, Patrick, *NM Land Commissioner Seeks Probe into Allegation of Two Girls Buried Near Epstein Ranch*, Source NM (Feb. 10, 2026) ............................................. 11

New Mexico Department of Justice, *Statement from the New Mexico Department of Justice Regarding Zorro Ranch* (Feb. 19, 2026) ...................................................... 11

Note, *Private Prosecution: A Remedy for District Attorneys' Unwarranted Inaction*, 65 Yale L. J. 209, 209 (1955) .......................................................... 1

Nixon, Richard, *Conversation with H.R. Haldeman and John Dean* (Mar. 21, 1973), reprinted in *Watergate: The Most Critical Nixon Conversations*, Time (May 13, 1974) ........................................................................................ 11

Padgett, John F., *Plea Bargaining and Prohibition in the Federal Courts*, 1908–1934, 24 Law & Soc'y Rev. 367 (1990) ...................................................................... 5

Restatement (Third) of Agency § 8.11 (Am. L. Inst. 2006) ................................................ 9

Scalia, Antonin, *A Matter of Interpretation: Federal Courts and the Law* (1997) ............ 6

Scripps News, *Why Didn't the Feds Search Epstein's Zorro Ranch? Former AG Speaks Out* (YouTube, June 2026) ................................................................. 12

Stephen, James Fitzjames, *History of the Criminal Law* (1883) ....................................... 1

Story, Joseph, *Commentaries on the Constitution of the United States* § 207–08............. 15

Taft, William H., *Three Needed Steps of Progress*, 8 A.B.A. J. 34 (1922) ........................ 5

Tani, Max, *How Fox News Massaged a Trump Interview*, Semafor (June 9, 2024) ......... 12

Terrell, Steve, *Epstein Accuser Says She Was Told to Have Sex with Gov. Richardson*, Las Cruces Sun-News (Aug. 10, 2019) .......................................................... 12

Torrez, Raúl, Letter to Todd Blanche (June 30, 2026) ...................................................... 13-14

Tucker, Eric & Alanna Durkin Richer, *Epstein Client List Doesn't Exist, DOJ Says, Walking Back Theory Bondi Promoted*, PBS NewsHour (July 7, 2025) ........................ 12

Tucker, St. George, 1 *Tucker's Blackstone* 297 (editor's app'x.) ....................................... 15

Wilson, James, 2 *The Works of James Wilson* (Robert G. McCloskey ed., 1967) ............ 10

**INTRODUCTION**

> Bob Robber robs a bank. Attorney General Tom Robber directs his staff to not prosecute the crime.  John Robber's Supreme Court treats his authority to prosecute federal crimes as exclusive, and blesses his decision.  Is it the perfect crime?

Under the Framers' Constitution, the answer is an emphatic no.  When institutions charged with enforcing the law either failed or declined to act, the Framers provided the aggrieved citizenry with effective remedies.  But under the Red Queen Constitution—amended repeatedly *sub rosa* by generations of judges, without cause or justification—that answer is no longer clear.

## I.   WHAT THE FRAMERS INTENDED

The Constitution is not a suicide pact. Fearing the worst, the Framers provided the citizenry with an impressive toolbox of remedies, grounded in the common law, to be invoked when the system broke down—as it has here. Mandamus and prohibition were available where public officials acted outside the scope of their agency. Quo warranto remedied usurpations of office. Scire facias enforced the good behavior tenure of Article III judges. Habeas remedied unlawful imprisonment. And private criminal prosecution ensured that leaders would obey the law. As Sir James Fitzjames Stephen observed, they form the collective sword of liberty:

> [N]o stronger or more effectual guarantee can be provided for the due observance of the law of the land, by all persons under all circumstances, than is given by **the power, conceded to everyone by the English system**, of testing the legality of any conduct of which he disapproves, either on private or on public grounds, by a criminal prosecution[1].

Rules don't work if people have no fear of them. The specter of citizen-initiated action was intended to instill healthy fear in our agents in government.

---

[1] Note, *Private Prosecution: A Remedy for District Attorneys' Unwarranted Inaction*, 65 Yale L. J. 209, 209 (1955) (*quoting* 1 James Fitzjames Stephen, *History of the Criminal Law* 496 (1883), emphasis added).

These safeguards interposed between the people and "the magistrate who exercised the sovereign power" were constitutionally preserved by the Tenth Amendment's reservation of powers. Madison left no doubt as to his intention to preserve the citizen's ancient right to wield this arsenal of remedies at need, observing that

> ...those who opposed [the proposed Constitution] disliked it because it did not contain effectual provison [sic] against encroachments on particular rights, **and those safeguards which they have been long accustomed to have interposed between them and the magistrate who exercised the sovereign power**: nor ought we to consider them safe, while a great number of our fellow citizens think these securities necessary.

1 *Annals of Congress* 439 (1789) (statement of Rep. Madison) (emphasis added).

Madison's solution—which literally saved the Constitution[2]—became our modern-day Ninth and Tenth Amendments. All the rights and remedies available to the English subject were preserved in perpetuity unless expressly yielded, creating a "presumption of liberty." *See generally*, Randy Barnett, *Restoring the Lost Constitution: The Presumption of Liberty* (2004).

Existing law provided additional fortifications. It is a well-established principle of statutory construction that "[t]he common law ... ought not to be deemed to be repealed, unless the language of a statute be clear and explicit for this purpose." *Fairfax's Devisee v. Hunter's Lessee*, 11 U.S. 603, 623 (1813). "Statutes which invade the common law ... are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident [and] to abrogate a common-law principle, the statute must 'speak directly' to the question addressed by the common law." *United States v. Texas*, 507 U.S. 529, 534 (1993).

---

[2] David Larson, NC's 'Great Refusal' to sign US Constitution led to Bill of Rights, *Carolina J.,* Apr. 3, 2026 (noting that North Carolina refused to ratify the Constitution without a bill of rights; with New York and Virginia aligned, the risk of disunion would have been intolerably high).

## A.  Marbury, Redux

The case before this Court is remarkably reminiscent of *Marbury v. Madison*, 5 U.S. 137 (1803). While the facts are common currency to every American lawyer, they are worth revisiting, albeit briefly:

> The election of 1800 was vicious. Jefferson defeated Adams, marking the first peaceful transfer of power between rival political parties in American history.   It was peaceful, but it wasn't cordial. The Federalists were being driven from power, and they were not happy about it.
>
> During the lame-duck period between the election and Jefferson's inauguration, the Federalist Congress passed the Judiciary Act of 1801, creating a slew of new judicial offices. President Adams promptly filled them with fellow Federalists. The appointments came so late that they became known as the Midnight Judges**.** One of the men appointed was William Marbury, who received a commission as a justice of the peace for the District of Columbia.
>
> The commissions were signed and sealed. But some were not physically delivered before Jefferson took office.  Marbury's was among them.  And Jefferson refused to deliver them.
>
> Marshall dismissed the case for lack of jurisdiction, but only after writing the opinion he wanted the country to read.

Importantly, William Marbury was commissioned pursuant to the District of Columbia Organic Act of 1801, ch. 15, 2 Stat. 103 (Feb. 27, 1801), which did not create a statutory cause of action should the Executive refuse to deliver a lawfully issued commission.  In reliance on Blackstone and Lord Mansfield, *Marbury*, 5 U.S. at 168, Marshall concluded that because the act was ministerial in nature, a mandamus directing Madison to deliver the commission was the appropriate remedy. *Id*. at 173.  But as a court cannot act without jurisdiction, the Marshall Court had no lawful authority to issue it.

*Marbury* begs the natural question raised in this case: When the Executive refused to obey the law in 1801, why did nobody think the absence of a congressionally created cause of action ended the matter?   Congress wrote the Epstein Files Transparency Act ("EFTA"), Pub. L. No. 119-38, with presumptive awareness of the fact that "[t]he district courts shall have original jurisdiction of

3

any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff," 28 U.S.C. § 1361, and relief in the nature of mandamus is available via motion.  Fed. R. Civ. P. 81(b).  "Creating a cause of action is a legislative endeavor," *Egbert v. Boule*, 596 U.S. 482, 491 (2022), but there is no discernible reason why Congress must constantly reinvent remedies that have existed for centuries.  This is the proper court for an EFTA enforcement action. Congress imposed a ministerial duty; mandamus is the appropriate remedy whenever the Executive refuses to perform it.

## B.  Courts Must Give Effect to Every Clause of the Constitution

Chief Justice Marshall summarized constitutional exegesis in one elegant sentence: "It cannot be presumed that any clause in the constitution is intended to be without effect; and, therefore, such a construction is inadmissible, unless the words require it." *Marbury,* 5 U.S. at 174; see *Heydon's Case* [1584] 76 Eng. Rep. 637, 638 (K.B.) (statutes are to be construed to suppress the mischief and advance the remedy).  Every word has meaning, and it is the task of the judge to give them life.

"The object of construction, applied to a constitution, is to give effect to the intent of its framers … and when the text of a constitutional provision is not ambiguous, the courts … are not at liberty to search for its meaning beyond the instrument." *Lake County v. Rollins*, 130 U.S. 662, 670 (1889).  Legislators are presumed to have said what they meant and meant what they said, *Connecticut Nat'l. Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (Thomas, J; collecting 200 years' worth of cases), and "[a]bsent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 109 (1980).  Moreover, it is "the duty of the court to give effect, if possible, to every clause and word of a statute." *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883).

4

This is a juridical corset, which our courts are expected to wear.

## II.   STANDING: A POWER GRAB FOR THE AGES[3]

### A.  The Origins of Modern Standing Doctrine

*The Imperial Judiciary lives. It is instructive to compare this Nietzschean vision of us unelected, life-tenured judges— leading a Volk who will be "tested by following," and whose very "belief in themselves" is mystically bound up in their "understanding" of a Court that "speak[s] before all others for their constitutional ideals"—with the somewhat more modest role envisioned for these lawyers by the Founders.*

~Justice Antonin Scalia[4]

As Chief Justice Taft admitted, the judicially-invented modern doctrine of "standing" is less of a constitutional imperative than it was a docket management tool.  A reaction to an avalanche of impending federal litigation, brought about by the Volstead Act.  In his own words, "unless something is done, [the federal courts] are likely to be swamped, and delay is a denial of justice." William H. Taft, *Three Needed Steps of Progress*, 8 A.B.A. J. 34, 34 (1922).[5]  But rather than ask Congress to create new courts capable of handling the work, Taft explored creative ways to shut the courthouse doors in the faces of the people.

While modern standing doctrine is usually defended as a restraint on judicial power, it was a cynical expansion of it.  As Justice Douglas observed in dissent, "*Frothingham*, decided in 1923, was in the heyday of substantive due process, when courts were sitting in judgment on the wisdom or reasonableness of legislation. ... [the Court] was indeed transforming itself into the Council of

---

[3] The arguments summarized herein are developed in greater detail in the attached Appendix A, consisting of Appellant's Opening Brief in *Smith v. Trump*, No. 26-5164 (D.C. Cir. filed Jun. 17, 2026).

[4] *Planned Parenthood v. Casey*, 505 U.S. 833, 1002 (1992) (Scalia, J., concurring in the judgment in part and dissenting in part).

[5] In Taft's defense, this was a direct consequence of Prohibition, trebling the size of the federal criminal docket. Fed. Judicial Ctr., *Prohibition in the Federal Courts: A Timeline* (last visited May 26, 2026), https://www.fjc.gov/history/exhibits/prohibition-in-federal-courts-timeline. This further gave rise to the widespread use of plea bargains. See John F. Padgett, *Plea Bargaining and Prohibition in the Federal Courts*, 1908–1934, 24 Law & Soc'y Rev. 367 (1990).

5

Revision which was rejected by the Constitutional Convention." *Flast v. Cohen*, 392 U.S. 83, 107 (1968) (Douglas, J., dissenting).  Justice Frankfurter was brutally candid: "At the heart of the proposal was the conservation of the Supreme Court as the arbiter of legal issues of national significance. But this object could hardly be attained so long as there persisted the obstinate conception that the Court was to be the vindicator of all federal rights." Felix Frankfurter & James M. Landis, *The Business of the Supreme Court: A Study in the Federal Judicial System* 260–61 (Macmillan 1928) (Johnson Reprint Corp. 1972).  Chief Justice Marshall respectfully disagreed.

At the risk of stating the obvious, "[d]espite the clarity with which the Court articulates the elements of standing, the Constitution contains no Standing Clause." Richard H. Fallon, Jr. et al., *Hart & Wechsler's The Federal Courts and the Federal System* 101 (7th ed. 2015). Nor can it be fairly extracted from the plain text of Article III. "The text is the law, and it is the text that must be observed." Antonin Scalia, *A Matter of Interpretation: Federal Courts and the Law* 22 (1997). "It is the function of a judge not to make, but to declare the law, according to the golden metewand of the law and not by the crooked cord of discretion." 1 E. Coke, *Institutes of the Lawes of England* 51 (1642).  Standing doctrine lays waste to three hundred years' worth of precedent, based on a doctrine that is not even implied by the white spaces between the Constitution's text.

**B.  *Ubi Jus, Ibi Remedium*: The Constitutional Collision**

Standing is "a doctrine born largely of judicial creativity." *Sierra v. City of Hallandale Beach, Fla.*, 996 F. 3d 1110, 1128 (11th Cir. 2021) (Newsom, J., concurring).  "The Court's modern conception of standing, as an Article III requirement, did not come into being until relatively recently." *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 982 F. Supp. 1261, 1267 (S.D. Tex. 1997) (per Hoyt, J.) (citation omitted).  Given the considered judgment of both the academy and originalist judges, it is fair to say that standing doctrine is "on a collision course with itself." *Planned*

*Parenthood,* 505 U.S. at 1002 (Scalia, J., concurring in the judgment in part and dissenting in part). But we need not attend the scene of the accident. There are certain classes of controversies where the modern judge-made doctrine of standing conflicts unavoidably with the remainder of the law. We return to *Marbury v. Madison*: "If two laws conflict with each other, the courts must decide on the operation of each." *Marbury*, 5 U.S. at 177.

By way of illustration, Section Three of the Fourteenth Amendment stands for the proposition that an oathbreaking adjudged insurrectionist not absolved by Congress is constitutionally barred from serving as President. U.S. Const. amend. XIV, § 3. The judge of a competent court found after a full trial on the merits in which Donald Trump fully participated by clear and convincing evidence that he had engaged in insurrection, *Anderson v. Griswold,* No. 23CV32577, ¶¶ 241, 298 (Dist. Ct., City & Cnty. of Denver, Nov. 17, 2023), and appellate courts did not disturb the trial court's factual findings. During that trial, Trump stipulated that he had sworn out a qualifying oath. *Id.* at ¶ 56. And this Court can take judicial notice of the fact that Congress has never, by the required vote of two-thirds of each House, removed Trump's disability. He cannot lawfully serve in that position, even for a minute. (This argument is advanced in detail in the Appendix.)

Section Three is pellucid. And by definition, self-executing.[6] But who can enforce that provision? Both the Attorney General and the District Attorney for the District of Columbia are authorized by statute to do so, D.C. Code §§ 16-3501 et seq., but they are by law the alter egos of the President—subordinate officers, who can be removed from their position for any reason or no reason at all. *Trump v. Slaughter*, No. 25-332 (U.S. June 29, 2026); See *Myers v. United States,* 272 U.S. 52 (1926). No one would expect Donald Trump to enforce Section Three against Donald

---

[6] The Fourteenth Amendment is self-executing. *United States v. Stanley (Civil Rights Cases),* 109 U.S. 3, 20 (1883) ("the Thirteenth amendment, as well as the Fourteenth, is undoubtedly self-executing without any ancillary legislation"), *City of Boerne v. Flores*, 521 U.S. 507, 524 (1997) (Fourteenth); *see* William Baude & Michael S. Paulsen, *The Sweep and Force of Section Three*, 172 U. Pa. L. Rev. 605 (2024).

7

Trump, and if everyone else is barred from enforcing Section Three by the doctrine of standing, it becomes unenforceable.  It is harder to extract the doctrine of standing from Article III than an impacted wisdom tooth, but even if we could, Article III must be interpreted in a manner that gives effect to subsequent constitutional and statutory enactments such as Section Three and the EFTA. *Whitney v. Robertson*, 124 U.S. 190 (1888) (harmonization principle).[7]

Remarkably, analysis of the EFTA is not all that different.  Clause 2 of Article VI provides that "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land."  U.S. Const. art. VI, cl. 2.  Whereas a legislative act repugnant to the Constitution is void *ab initio*, *Marbury*, 5 U.S. at 176; *Norton v. Shelby County,* 118 U.S. 425, 442 (1886), laws made by Congress pursuant to their constitutional authority are our supreme law.  And where two valid federal laws conflict, courts first attempt to give effect to both; if reconciliation is impossible, "the one last in date will control the other." *Whitney,* 124 U.S. at 194. Thus, even if modern standing doctrine could be extracted from the white spaces between the words of Article III, it cannot be applied in such a manner as to render the EFTA ineffectual.

Any suggestion that Congress did not have the raw authority to enact the EFTA, or impose mandatory obligations on the Executive branch, is too extravagant to be maintained.  And Congress routinely legislates against a backdrop of existing remedies.  Congress also knew that federal courts possess mandamus jurisdiction under 28 U.S.C. § 1361 and that relief in the nature of man-

---

[7] Specifically, the *Whitney* Court observed that

> By the Constitution a treaty is placed on the same footing, and made of like obligation, with an act of legislation. Both are declared ... to be the supreme law of the land, and no superior efficacy is given to either over the other. When the two relate to the same subject, the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either; but if the two are inconsistent, the one last in date will control the other....

*Whitney,* 124 U.S. at 194.

damus is available through ordinary civil procedure. Congress need not constantly reenact remedies that have existed for centuries.

Congress did not need to create the writ of *quo warranto* to enforce Section Three of the Fourteenth Amendment. Courts have adjudicated Section Three challenges through *quo warranto* where available, *see e.g., Louisiana ex rel. Sandlin v. Watkins*, 21 La. Ann. 631 (La. 1869), or mandamus, if not. *E.g., Worthy v. Barrett*, 63 N.C. 199, 205 (1869). The same logic should apply with respect to the EFTA. Mandamus is the Swiss Army knife of prerogative writs. When government officials refuse to do what the law commands, it is the tool judges have reached for, since before the Founding, where no other adequate remedy is available. See e.g., *Marbury, supra.*

C. *Qui Facit Per Alium Facit Per Se*

The principal architects of our Constitution built it on the bedrock of agency. Governments are "agents and trustees of the people," *The Federalist* No. 46, 294 (James Madison) (C. Rossiter ed. 1961), and "the officers of the government, from the highest to the lowest, are creatures of the law." *United States v. Lee*, 106 U.S. 196, 220 (1882). Accordingly, basic principles of agency drive this case. These creatures of the law have a fiduciary duty to act loyally for our benefit, and a concomitant duty to provide the people with facts that they "know has reason to know, or should know" that we as principals would wish to have the facts. Restatement (Third) of Agency § 8.11 (Am. L. Inst. 2006). The EFTA is an explicit communication of that wish, and as a matter of law, our wish is Defendant Todd Blanche's command.

We hired the FBI and Department of Justice to investigate and prosecute crimes. Technically, We the People could do it ourselves,[8] but as a rule, we would rather not.

---

[8] Constitutionally speaking, private criminal prosecution is presumably still available, see *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 816 and n. 2 (1987) (Scalia, J., concurring in part) (acknowledging the historical practice of private prosecution and agnosticism as to its continued viability); see also, Stephen, supra.

9

But citizenship is not a spectator sport.  As Justice Wilson reminds us, "[t]he supreme power resides in the people, and [we] never part with it."  2 *The Works of James Wilson* 752 (Robert G. McCloskey ed., 1967).  Effective oversight of our servants depends upon timely access to essential information. As Justice Stewart observed, "[t]he only effective restraint upon executive policy [is] in an informed and critical public opinion which alone can here protect the values of democratic government." *New York Times Co. v. United States*, 403 U.S. 713, 728 (1971) (Stewart, J., concurring).  That is what makes the Department of Justice's pattern of obstreperous conduct so constitutionally problematic.

1.  *Perversion of Justice*

The people are not demanding disclosure in a vacuum.  The Department's handling of the Epstein matter has been marred by a history of secrecy, beginning with the non-prosecution agreement negotiated by United States Attorney (and Trump Secretary of Labor) Alexander Acosta in 2007. As documented by Pulitzer Prize-winning journalist Julie K. Brown, federal prosecutors concealed the agreement from the victims while granting Epstein extraordinary concessions. Julie Brown, Perversion of Justice, *Miami Herald* (2018) (five-part expose).  The result was a judicial finding that the victims' "right to conferral under the CVRA [Crime Victims' Rights Act] was violated." *Doe 1 v. United States*, 359 F. Supp. 3d 1201, 1222 (S.D. Fla. 2019).

Congress passed the CVRA under the expectation that it would be followed.  It instructed our agents how they were to treat crime victims. The Department's decision to conceal the agreement from those victims was not a mere exercise of discretion; it was the willful refusal to follow the law in such a troubling case.  Standing alone, this is sufficient to demand an accounting.

10

2. *It's Not the Crime, It's the Cover-Up*.

Those of a certain age will remember this phrase, from the Watergate scandal: "You can say I don't remember. You can say I don't recall." That instruction from trained lawyer President Nixon to commit perjury was one of the smoking guns that shot down a Presidency. Richard Nixon, Conversation with H.R. Haldeman and John Dean (Mar. 21, 1973), reprinted in Watergate: The Most Critical Nixon Conversations, *Time* (May 13, 1974). When people are evasive, there usually is a reason, and it is rarely an honorable one.

There appears to be an Epstein story in New Mexico,[9] which local authorities are currently investigating. A tipster alleged that two "'foreign girls' died of strangulation during 'rough, fetish sex' and were later buried on 'orders of Jeffrey and Madam G,'" Patrick Lohmann, NM land commissioner seeks probe into allegation of two girls buried near Epstein ranch, Source NM (States Newsroom), Feb. 10, 2026. This information was reportedly forwarded to the Trump FBI in 2019, id., but it appears that the tip was not timely forwarded to New Mexico authorities.

Movant is not in a position to evaluate 'tips,' but former New Mexico Attorney General Hector Balderas was investigating Jeffrey Epstein's activities at the Zorro Ranch when he was indicted in 2019. The timeline he offers is disturbing on its face:

1. Balderas was independently investigating Epstein.
2. The Southern District of New York (SDNY) asked New Mexico to defer.
3. Balderas deferred to their request because the feds had "the bigger hammer."
4. The SDNY promised cooperation to induce their deferral.
5. New Mexico authorities closed their investigation at the request of SDNY.[10]
6. The promised cooperation never materialized.

---

[9] As focus turns to Jeffrey Epstein's ranch, official says: "There is a story to be told in New Mexico", CBS This Morning (Aug. 22, 2019).

[10] New Mexico authorities to close their parallel investigation "at the request of the U.S. Attorney's Office for the Southern District of New York." Statement from the New Mexico Department of Justice Regarding Zorro Ranch, N.M. Dep't Just. (Feb. 19, 2026), https://nmdoj.gov/press-release/statement-from-the-new-mexico-department-of-justice-regarding-zorro-ranch/

7. The Zorro Ranch was not searched.[11]
8. In a later interview, Balderas described conduct he had never seen before and spoke of "early signs of the cover-up."[12]

Time is of the essence in a criminal investigation, as evidence tends to be lost over time. Former Governor and Ambassador Bill Richardson may have had information,[13] but he passed away in 2023. Epstein's housekeeper identified Andrew Mountbatten-Windsor (then Prince Andrew, Duke of York) as having visited the ranch, as well.[14] That the Ranch was not searched appears on its face to be a profound departure from customary police work, which Balderas lamented.

### 3. *Cui Bono*?

But the story doesn't end there. In the face of a campaign pledge to release the Epstein files[15]—according to *Herald* reporter Brown, there was an ongoing criminal investigation under the Biden Administration[16]—the Trump Administration closed the investigations and declared that "no more files related to the wealthy financier's sex trafficking investigation would be made."[17] And in response, Rep. Ro Khanna (D-CA) introduced H.R. 4405 on July 15, 2025. When the bill stalled in the face of Donald Trump's remarkably fierce opposition, Rep. Thomas Massie (R-KY) initiated

---

[11] Why didn't the feds search Epstein's Zorro Ranch? Former AG speaks out, Scripps News (Youtube, Jun. 2026) (https://www.youtube.com/watch?v=c9d52CKGHlk at 2:40)

[12] Id. (full interview).

[13] Per a 2016 deposition, "A woman who says convicted sex offender Jeffrey Epstein kept her as a teenage sex slave claims in a sworn deposition that a woman who served as the New York financier's procurer directed her to have sex with Bill Richardson while he was governor of New Mexico." Steve Terrell, Epstein accuser says she was told to have sex with Gov. Richardson, *Las Cruces Sun News* (*The Santa Fe New Mexican*) (Aug. 10, 2019) (reprint).

[14] Das geschah in Epsteins abgelegener Zorro Sex-Ranch in New Mexico, *Blick* (Switzerland) (Aug. 3, 2020) (Movant's translation, using Google Translate).

[15] See e.g., Max Tani, How Fox News massaged a Trump interview, *Semafor*, Jun. 9, 2024 (point-link to interview at https://www.youtube.com/watch?list=PLlTLHnxSVuIzi_tPVKjt5y7KMgvlch5o6&t=2119).

[16] Zach Kaplan, Why weren't they released during the Biden administration?, *News Nation*, Nov. 28, 2025, reprinted at https://docs.house.gov/meetings/JU/JU00/20260211/118951/HHRG-119-JU00-20260211-SD013.pdf. (The original article has since been updated.)

[17] Eric Tucker and Alanna Durkin Richer, Epstein client list doesn't exist, DOJ says, walking back theory Bondi promoted, *PBS* (Assoc. Press), Jul. 7, 2025.

a discharge petition, in obvious defiance the Republican leadership. The House passed the EFTA by a vote of 427–1 on November 18, 2025; the Senate passed it by unanimous consent the very next day.

While it is impossible to know how hard Trump tried to keep the Epstein Files hidden, former Rep. Marjorie Taylor Greene (R-GA) claims that he gave her a reason for his intransigence: "My friends will get hurt." Robert Draper, 'I Was Just So Naïve': Inside Marjorie Taylor Greene's Break with Trump, N.Y. Times Magazine, Dec. 29, 2025.  If true, her statement raises an obvious question: who are these friends, and how would they be harmed by the release of information Congress has directed the Executive Branch to disclose?

But even that is beside the point.  The New Mexico Department of Justice has reopened its old investigation into Epstein's activities at the Zorro Ranch.  But inexplicably, the Trump Department of Justice has doggedly refused to share unredacted information with New Mexican authorities. Attorney General Raúl Torrez wrote on June 30:

> The New Mexico Department of Justice ("NMDOJ") writes with urgent purpose. Without complete and prompt access to relevant unredacted records held by the United States Department of Justice ("USDOJ"), survivors of serious criminal conduct at Jeffrey Epstein's Zorro Ranch in New Mexico are being denied justice. That harm is a direct consequence of the USDOJ's continued failure to comply with the NMDOJ's outstanding records request.
>
> Heavily redacted open-source records already establish that multiple survivors were brought to Zorro Ranch in Santa Fe County, New Mexico, on numerous occasions, where they were subjected to sexual abuse and exploitation. The redacted records show that, under those redactions, records in the USDOJ's custody contain the names of survivors, witnesses, co-conspirators, and other individuals whose identities are essential to the NMDOJ's ability to fulfill its obligation to investigate and prosecute criminal conduct occurring within this State. The NMDOJ's efforts to obtain these materials through cooperative means have been extensive and, to date, unsuccessful:
>
> [list of six attempts to solicit cooperation since February]
>
> Despite verbal assurances of cooperation from the USDOJ, access to the requested records has not been granted, no substantive response has been provided, and more than 130

13

days have now elapsed since the NMDOJ's initial request. The NMDOJ views this length of time as an unreasonable delay under any rule of reason.

Raul Torrez (Attorney General of New Mexico), Letter to Todd Blanche, Jun. 30, 2026 at 1-2.

Slow-walking material that might embarrass The Boss is one thing, but slow-walking leads and evidence that might imperil a criminal investigation is something else entirely. This may or may not be beyond the scope of the EFTA, but it certainly should not be beyond the reach of mandamus. As Justice Brandeis famously observed,

> *. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself.*

*Olmstead v. United States*, 277 U.S. 438, 485 (1928) (Brandeis, J., dissenting).

We have a right to expect that our agents in government will serve the People through obedience to the law, not their superiors through subservience to power.

## III.  A MODEST PROPOSAL

Intervenor does not ask this Court to inter *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). Most controversies involve private rights, and standing doctrine may serve a useful policy function there. Even if *Lujan* were struck down, Congress would retain broad authority to limit the class of litigants authorized to seek remedies where appropriate. The problem arises when the doctrine is applied to public duties owed to the Nation as a whole. In such cases, rigid application of standing doctrine can render independent constitutional and statutory commands effectively unenforceable. The task before this Court is not to discard *Lujan*, but to reconcile it with the remainder of the law.

14

Issuance of a mandamus here is consistent with the Framers' design and historical practice. The Framers designed the Constitution to prevent unchecked executive power—a principle rooted in their experience under King George III, as chronicled in the Declaration. Consistent with this aim, as discussed earlier, the Framers constitutionalized the prerogative writs, preserving the citizen's right to enforce the law when the Executive abuses his delegated authority. 1 *Annals of Congress* 450 (1789) (statement of Rep. Madison).  Historically, nothing in Article III required a non-Hohfeldian litigant to possess an outsized personal stake in a matter. See e.g., Louis L. Jaffe, *The Citizen as Litigant in Public Actions: The Non-Hohfeldian or Ideological Plaintiff*, 116 U. Pa. L. Rev. 1033 (1968); Raoul Berger, *Standing to Sue in Public Actions: Is it a Constitutional Requirement?*, 78 Yale L.J. 816 (1969).

Intervenor is not asking for a revolution, so much as fealty to the Framers' design.  This is, at essence, the same proposition Intervenor advances in *Smith v. Trump*, as set forth in the attached brief: There is a limited category of cases where mechanical application of standing doctrine creates an absurd contradiction in the law.  Fortunately, courts need not choose between rote application of *Lujan* and the remainder of the law.  When Congress passes a law, it is not supposed to be an exercise in futility.  And where a scalpel will do, a meat-cleaver is undesirable.

## CONCLUSION

In our constitutional system, sovereignty resides in the people. Professor (Justice) Story elaborates: "the *jus summi imperii*, the absolute right to govern ... [resides] in the people of the nation." 2 J. Story, *Commentaries* at § 207.  Public officials exercise authority only as agents of law: "All the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it." *United States v. Lee*, 106 U.S. 196, 220 (1882). And as an essential corollary, the people must have some mechanism for doing the binding.  As St. George Tucker adds, "repre-

sentative democracy ceases to exist the moment that the public functionaries are by any means absolved from their responsibility to their constituents." 1 *Tucker's Blackstone* 297 (editor's app'x.).

In the EFTA, Congress imposed a duty. The Executive refused to perform it. The common law supplied the remedy long before the Constitution was written. Nothing more is required. Enforcement of mandatory statutory duties cannot depend solely upon the fortunate chance that some citizen suffers an injury sufficient to satisfy modern standing doctrine.

Sovereignty resides in the people. The EFTA was enacted for their benefit. As the American people deserve a seat at the table, Movant respectfully requests leave to participate in this litigation, if only to present this narrow issue.

Respectfully submitted this 15th day of July, 2026,

K.L. Smith
3649 Evergreen Pkwy. #504
Evergreen, CO. 80437-0504
Manncoulter.fox@gmail.com
(720) 404-5383

16

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

KATIE PHANG,

       Plaintiff,

   v.

TODD BLANCHE, in his official capacity as
Acting Attorney General of the United States,

       Defendant.

Civil Action No. 26-1417 (EGS)

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO INTERVENE**

# APPENDIX A

**No. 26-5164**

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

K. L. SMITH,

　*Petitioner-Appellant*,

v.

DONALD J. TRUMP,

　*Defendant-Appellee*.

---

On Appeal from the United States District Court
for the District of Columbia
Case No. 1-25-cv-03602-CJN

---

## OPENING BRIEF OF APPELLANT K. L. SMITH

---

K. L. Smith
3649 Evergreen Pkwy., #504
Evergreen, CO 80437-0504
Manncoulter.fox@gmail.com
(720) 404-5383

Oral argument is hereby requested.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and D.C. Circuit Rule 26.1, as Appellant is a natural person, no corporate disclosure statement is required.

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties and Amici

Appellant is K. L. Smith.

Appellee is Donald J. Trump.

No amici appeared below.

### B. Rulings Under Review

The ruling under review is the Order of the United States District Court for the District of Columbia entered on April 16, 2026, dismissing the action.

### C. Related Cases

Appellant is aware of the following related matters:

*Smith v. Trump*, No. 2025-CAB-004825 (D.C. Super. Ct.).

*Smith v. Flores*, No. 25-cv-01042 (D.D.C.).

i

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ............................................ i

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES    i

TABLE OF CONTENTS ........................................................ ii

TABLE OF AUTHORITIES .......................................................... iv

JURISDICTIONAL STATEMENT ............................................. 1

ISSUE PRESENTED ................................................................. 2

STATEMENT OF THE CASE AND SUMMARY OF THE ARGUMENT    2

ARGUMENT .............................................................................. 5

I.  UNDER THE FRAMERS' CONSTITUTION, GENERALIZED
    GRIEVANCES ARE GENERALLY JUSTICIABLE .......................... 6

    A. Form Follows Function ................................................... 6

    B. "A Page of History is Worth a Volume of Logic" .......................... 11

    C. *Frothingham*: The Birth of Standing ................................. 12

    D. The Saving Grace of Common Sense ............................... 14

    E. A Tale of Two Constitutions ............................................ 16

II.  THE FRAMERS OF THE FOURTEENTH AMENDMENT
     INTENDED IT TO BE ENFORCED ................................................ 19

    A. Congress Intended Section 3 to Be Enforced via Quo Warranto ..... 20

    B. The D.C. Code Provides a Blueprint for Enforcement ...................... 22

    C. The *Newman* Problem—and the Law's Solution ............................. 24

III.  THE DOCTRINE OF STANDING IS A TWENTIETH CENTURY
      JUDICIAL AMENDMENT TO THE CONSTITUTION ................... 26

   A. To the Framers, the People Were Citizens, Not Serfs ...................... 28

   B. *CASA*: The Revenge of Originalism ................................................ 31

   C. The Timing Paradox: Why Standing Falls Here ............................. 32

   D.  The Scalia Test ................................................................................ 35

        1. The Pennsylvania Delegation Would Never Have Agreed .......... 35

        2. Standing Is a Source of Unending Judicial Mischief ................... 38

        3. Scalia vs. Scalia: The *Lujan* Paradox ........................................... 39

   E. Roberts vs. Roberts ............................................................. 42

   F. For Sake of Completeness: Collateral Estoppel ............................... 43

IV. A MODEST PROPOSAL ........................................................................ 46

CONCLUSION ............................................................................................ 48

CERTIFICATE OF COMPLIANCE ........................................................... 49

CERTIFICATE OF SERVICE ..................................................................... 50

ADDENDUM ................................................................................................ 51

# TABLE OF AUTHORITIES

(Pursuant to D.C. Circuit Rule 28(a)(5), all pertinent constitutional provisions, statutes, and regulations are reproduced in the Addendum.)

## TABLE OF CONSTITUTIONAL/STATUTORY PROVISIONS

CONSTITUTIONAL PROVISIONS                                        PAGE

U.S. Const. art. I, § 3, cl. 3 ................................................................... 2
U.S. Const. art. I, § 8 ........................................................................ 18, 38
U.S. Const. art. III, § 1 ........................................................................ 16
U.S. Const. art. III, § 2, cl. 1 ............................................................... 8
U.S. Const. art. VI, cl. 2 ...................................................................... 31
U.S. Const. amend. IX ..................................................................... 29, 37
U.S. Const. amend. X ....................................................................... 29, 38
U.S. Const. amend. XIII .................................................................... 20
U.S. Const. amend. XIV, § 3 ............................................. 1-4, 20-24, 26, 30, 33, 42-44, 47


OTHER STATUTORY PROVISIONS                                       PAGE

28 U.S.C. § 1331 ................................................................................. 1
28 U.S.C. § 1291 ................................................................................. 1
Act of June 25, 1948, ch. 645, 62 Stat. 992–93 ......................................... 22
Act of Mar. 3, 1901, ch. 854, 31 Stat. 1189 .............................................. 25
Act of Mar. 4, 1909, ch. 321, 35 Stat. 1153–54 ......................................... 22
D.C. Code §§ 16-3501–3503 ................................................................ 1, 22-24
Enforcement Act of 1870, ch. 114, § 14, 16 Stat. 143 (1870) ................... 21
Fed. R. Civ. P. 2 ................................................................................ 22
Fed. R. Civ. P. 12(b)(6) ...................................................................... 1
Fed. R. Civ. P. 81(b) .......................................................................... 22
Judiciary Act of 1789, ch. 20, 1 Stat. 73 ................................................ 1
Judiciary Act of 1925, ch. 229, 43 Stat. 936 (1925) ................................. 17
Sheppard-Towner Maternity Act of 1921, ch. 135, 42 Stat. 224 .............. 38
Statute of Quo Warranto, 18 Edw. I, Stat. 2 (1290) ................................. 21
Sup. Ct. R. 10 .................................................................................... 18

iv

# TABLE OF CASES

CASE                                                                                        PAGE

*Adam v. Saenger*, 303 U.S. 59 (1938) ........................................................    45

*Allen v. Wright*, 468 U.S. 737 (1984) ........................................................    5

*Anderson v. Griswold,* No. 23CV32577
   (Dist. Ct., City & Cnty. of Denver Nov. 17, 2023) ...............................    3, 44

*Arizona v. United States*, No. 11-182
   (Scalia, J., bench statement June 25, 2012) ...............................    35

*Arnett v. Kennedy*, 416 U.S. 134 (1974) .......................................................    37

*Ashby v. White*, 92 Eng. Rep. 126 (K.B. 1703) ............................................    4

*Baker v. Carr*, 369 U.S. 186 (1962) ..................................................    12

*Bell v. United States*, 349 U.S. 81 (1955) ........................................................    14

*Biden v. Nebraska*, 143 S. Ct. 2355 (2023) ........................................................    35

*Brown v. Board of Education*, 347 U.S. 483 (1954) ...................................    18

*Cawthorn v. Amalfi*, 35 F.4th 245 (4th Cir. 2022) .......................................    2

*Cheney v. United States District Court for the District of Columbia*,
   541 U.S. 913 (2004) ...............................    4

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ............................................    20

*Claflin v. Houseman*, 93 U.S. 130 (1876) ....................................................    45

*Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264 (1821) ...................................    9, 12, 16, 33, 39

*Craig v South Australia* (1995) 184 CLR 163, 175 (H.C. Austl.) ...............    17

CASE PAGE

*Crowell v. Benson*, 285 U.S. 22 (1932) ...................................................... 25

*DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,*
 485 U.S. 568 (1988) ................................................................ 26

*Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022) ..... 42

*Engel v. Vitale*, 370 U.S. 421 (1962) ................................................... 16

*Erickson v. Pardus,* 551 U.S. 89 (2007) ..................................................... 17

*Erie R.R. Co. v. Tompkins,* 304 U.S. 64 (1938) ......................................... 5

*Esparraguera v. Dep't of the Army*, 101 F.4th 28, 33 (D.C. Cir. 2024)....... 1

*Fairfax's Devisee v. Hunter's Lessee*, 11 U.S. 603 (1813) .......................... 29

*Field v. Clark*, 143 U.S. 649 (1892) ................................................... 18

*Flast v. Cohen*, 392 U.S. 83 (1968) ...................................................... 43

*Foster v. Neilson,* 27 U.S. 253 (1829) .................................................... 9

*Frothingham v. Mellon*, 262 U.S. 447 (1923) .................................... 13, 38

*Golden v. Zwickler*, 394 U.S. 103 (1969) ............................................ 37

*Gouriet v. Union of Post Office Workers*, [1978] A.C. 435 (H.L.) .............. 4

*Haggar Co. v. Helvering*, 308 U.S. 389 (1940) ..................................... 35

*Hayburn's Case*, 2 U.S. 409 (1792) ...................................................... 8

*Heydon's Case* [1584] 76 Eng. Rep. 637 (K.B.) ................................... 19

*Hollister v. Soetoro*, 601 F. Supp. 2d 179 (D.D.C. 2009) ......................... 23

*Holt v. Hobbs*, 574 U.S. 352 (2015) ..................................................... 17

CASE                                                                                          PAGE

*Jarrolt v. Moberly*, 103 U.S. 580 (1880) ...................................................... 33

*Juliana v. United States*, 947 F.3d 1159 (9th Cir. 2020) ............................. 18

*Kamper v. Hawkins*, 3 Va. (1 Va. Cas.) 20 (1793) ...................................... 8

*Korematsu v. United States*, 323 U.S. 214 (1944) ...................................... 16

*Louisiana ex rel. Sandlin v. Watkins*, 21 La. Ann. 631 (La. 1869) ............. 22

*Loving v. Virginia,* 388 U.S. 1 (1967) ......................................................... 36

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992) ............................. 32, 33, 39-41, 47

*Luther v. Borden*, 48 U.S. (7 How.) 1 (1849) .............................................. 11

*Marbury v. Madison*, 5 U.S. 137 (1803) .................................................. 14, 19-20, 38, 41-43, 47

*Martin v. Malhoyt*, 830 F.2d 237 (D.C. Cir. 1987) .................................... 44

*McCulloch v. Maryland*, 17 U.S. 316 (1819) ............................................. 15

*Minor v. Happersett*, 88 U.S. 162 (1874) ................................................... 5

*Moore v. East Cleveland*, 431 U.S. 494 (1977) .......................................... 37

*Moragne v. States Marine Lines*, 398 U.S. 375 (1970) .............................. 37

*N.M. ex rel. White v. Griffin,*
   No. D-101-CV-2022-00473 (N.M. Dist. Ct. Santa Fe Cnty. 2022) ....... 3, 44, 46

*New York Trust Co. v. Eisner*, 256 U.S. 345 (1921) ................................... 11

*Newman v. United States ex rel. Frizzell*, 238 U.S. 537 (1915) ................ 22, 32

*Obergefell v. Hodges,* 576 U.S. 644 (2015) ............................................. 36, 39

CASE                                                                        PAGE

*Osborn v. Bank of the United States*, 22 U.S. 738 (1824) ...................... 9, 11, 38, 41

*Palko v. Connecticut*, 302 U.S. 319 (1937) ................................................. 37

*Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979) ................................. 43, 45

*Pennoyer v. Neff*, 95 U.S. 714 (1878) ......................................................... 45

*Plessy v. Ferguson*, 163 U.S. 537 (1896) ..................................................... 16

*Powell v. McCormack*, 395 U.S. 486 (1969) ............................................... 21

*Reno v. Flores*, 507 U.S. 292 (1993) ........................................................... 37

*Rex v. Speyer* [1916] 1 K.B. 595 ................................................................ 10

*Robi v. Five Platters, Inc.*, 838 F.2d 318 (9th Cir. 1988) ........................... 44

*Roe v. Wade,* 410 U.S. 113 (1973) ............................................................... 36

*Sibley v. Obama*, No. 1:12-cv-01832 (D.D.C. 2012) ................................. 23

*Sierra v. City of Hallandale Beach, Fla.*, 996 F.3d 1110 (11th Cir. 2021) .. 41

*Smith v. Flores*, No. 25-cv-1042 (CJN) (D.D.C. 2026) .............................. 18

*Smith v. Trump* ..................................................................................... 11, 33

*Speiser v. Randall*, 357 U.S. 513 (1958) ..................................................... 37

*Surya Dev Rai v. Ram Chander Rai,* (2003) 6 SCC 675 (India) ................. 18

*Taitz v. Obama*, 707 F. Supp. 2d 1 (D.D.C. 2010) ..................................... 23

*Trump v. Anderson*, 601 U.S. 100, 144 S. Ct. 662 (2024) .................... 3, 20, 42, 47

*Trump v. CASA, Inc.,* 606 U.S. 831 (2025) ............................................. 32, 43

CASE                                                                    PAGE

*Trump v. Internal Revenue Service*,
    No. 1:26-cv-20609 (S.D. Fla. Apr. 24, 2026) ........................................    23

*Trump v. United States*, 603 U.S. 593 (2024) ...............................................    47

*Union Pacific R.R. v. Hall*, 91 U.S. 343 (1876) ..........................................    12

*United Public Workers of America v. Mitchell*, 330 U.S. 75 (1947) .........    34

*United States ex rel. Riley v. St. Luke's Episcopal Hosp.*,
    982 F. Supp. 1261 (S.D. Tex. 1997) ........................................................    31

*United States ex rel. Wisconsin v. First Federal Savings & Loan Ass'n*,
    151 F. Supp. 690 (E.D. Wis. 1957) ........................................................    22

*United States v. Butler*, 297 U.S. 1 (1936) .................................................    39

*United States v. Carolene Products Co.*, 304 U.S. 144 (1938) ..................    36

*United States v. Kirby*, 74 U.S. 482 (1868) .................................................    26

*United States v. Lee*, 106 U.S. 196 (1882) ..................................................    30

*United States v. Peters*, 9 U.S. 115 (1809) ..................................................    18

*United States v. Stanley (Civil Rights Cases)*, 109 U.S. 3 (1883) ...............    20

*United States v. Texas*, 143 S. Ct. 1964 (2023) ...........................................    35

*United States v. Texas*, 507 U.S. 529 (1993) ...............................................    30

*University of Mysore v. C.D. Govinda Rao*, AIR 1965 SC 491 (India) ......    21

*Washington v. Glucksberg*, 521 U.S. 702 (1997) ........................................    36

*West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943)    16

*Williams v. Suffolk Insurance Co.*, 38 U.S. 415 (1839) ..............................    9

| CASE | PAGE |
|---|---|

*Worthy v. Barrett,* 63 N.C. 199 (1869) ........................................................ 22

*Yamaha Corp. of America v. United States*,
    961 F.2d 245 (D.C. Cir. 1992) ............................................... 43, 44

## TABLE OF OTHER AUTHORITIES

PAGE

1 Annals of Congress (1789) ................................................. 29, 31, 39

Aristotle, *Politics*, Bk. III, Pt. VIII ................................................. 19

Bacon, Francis, *Essays* LVI (Of Judicature) (1620) .................................. 5

Barnett, Randy E., *Restoring the Lost Constitution:*
    *The Presumption of Liberty* (2004) ........................................ 29, 37

Baude, William & Michael S. Paulsen, *The Sweep and Force of*
    *Section Three*, 172 U. Pa. L. Rev. 605 (2024) ...................................... 20

Berger, Raoul, *Standing to Sue in Public Actions: Is It a Constitutional*
*Requirement?*, 78 Yale L.J. 816 (1969) ....................................... 26, 41

Blackman, Josh, *Judge Posner on Judging, Birthright Citizenship,*
    *and Precedent* (Nov. 6, 2015) ................................................. 27

Blackstone, William, *Commentaries on the Laws of England* (1765-1769)   5, 7

Bork, Robert H., *Coercing Virtue: The Worldwide Rule of Judges* (2003)   27

Carlin, George, *It's Bad for Ya* (HBO television broadcast Mar. 1, 2008),
    transcript reprinted in *Scraps from the Loft* (Nov. 10, 2016) ................. 14

Crowe, Justin, *The Forging of Judicial Autonomy: Political*
    *Entrepreneurship and the Reforms of William Howard Taft*,
    69 J. Pol. 73 (2007) ............................................................... 12

PAGE

Declaration of Independence (U.S. 1776) ................................................. 36, 40

Declaration of the Causes and Necessity of Taking Up Arms
(U.S. July 6, 1775) ................................................................. 42

Dickens, Charles, *Oliver Twist* (1837–39) ................................................. 6

Dorn, Nathan, *James Wilson and Natural Law in the First Years
of the Republic*, In Custodia Legis (Law Library of Congress)
(Apr. 30, 2026) ...................................................................... 7

Fallon, Richard H., Jr., et al., *Hart & Wechsler's The Federal
Courts and the Federal System* (7th ed. 2015) ...................................... 41

Fletcher, William A., *The Structure of Standing*,
98 Yale L.J. 221 (1988) ............................................................. 34

Frankfurter, Felix & James M. Landis, *The Business of the
Supreme Court: A Study in the Federal Judicial System* (1928) ........... 14

Hall, Shannon, *Exxon Knew About Climate Change Almost 40 Years Ago*,
Scientific American (Oct. 26, 2015) ................................................. 18

Hamilton, Alexander, *Objections and Answers Respecting
the Administration* (Aug. 18, 1792) ................................................ 48

Hamilton, Alexander, *Report on Manufactures* (Dec. 7, 1792) ................. 39

Hartnett, Edward A., *The Standing of the United States: How Criminal
Prosecutions Show That Standing Doctrine Is Looking for Answers
in All the Wrong Places*, 97 Mich. L. Rev. 2239 (1999) ....................... 31

Heflin, J. Thomas, Remarks on the Judiciary Act of 1925,
66 Cong. Rec. 2928 (Feb. 3, 1925) ................................................ 17

Hind's *Precedents of the House of Representatives* ch. 14 (1907) ............. 2

Holmes, Oliver Wendell, Jr., *The Common Law* (1881) .......................... 16

PAGE

Jaffe, Louis L., *Standing to Secure Judicial Review: Private Actions*,
75 Harv. L. Rev. 255 (1961) ................................................................ 26

Jaffe, Louis L., *The Citizen as Litigant in Public Actions: The Non-Hohfeldian or Ideological Plaintiff*, 116 U. Pa. L. Rev. 1033 (1968) 32

Jefferson, Thomas, *Notes on the State of Virginia* (1785) ......................... 40

Larson, David, *NC's "Great Refusal" to Sign U.S. Constitution Led to Bill of Rights*, Carolina Journal (Apr. 3, 2026) ........................... 29

Mark, Gregory A., *The Vestigial Constitution: The History and Significance of the Right to Petition*, 66 Fordham L. Rev. 2153 (1998) 27

Note, *Private Prosecution: A Remedy for District Attorneys' Unwarranted Inaction*, 65 Yale L. J. 209 (1955) .................................... 28

Oldfather, Chad, *Defining Judicial Inactivism: Models of Adjudication and the Duty to Decide*, 94 Geo. L.J. 121 (2006) ................................... 16

Padgett, John F., *Plea Bargaining and Prohibition in the Federal Courts, 1908–1934*, 24 Law & Soc'y Rev. 367 (1990) ........................... 13

Paust, Jordan J., *International Law as Law of the United States* (2d ed. 2003) ........................................................................................ 27

Pierce, Richard J., Jr., *Is Standing Law or Politics?*,
77 N.C. L. Rev. 1741 (1999) ................................................................ 34

Pushaw, Robert J., Jr., *Article III's Case/Controversy Distinction and the Dual Functions of Federal Courts*, 69 Notre Dame L. Rev. 447 (1994) 27

Rakove, Jack N., *It's Not Just a Constitutional Crisis in the Trump Era. It's Constitutional Failure*, Washington Monthly, June 27, 2025 ........ 48

Restatement (Second) of Judgments § 1 (1982) ........................................ 45

PAGE

Ricks, Sarah, *The Perils of Unpublished Non-Precedential Federal Appellate Opinions: A Case Study of the Substantive Due Process State-Created Danger Doctrine in One Circuit*,
81 Wash. L. Rev. 217 (2006) ........................................................... 25

Scalia, Antonin, *A Matter of Interpretation: Federal Courts and the Law* (1997) .......................................................... 41

Scalia, Antonin, *Constitutional Relevance of Foreign Court Decisions* (C-SPAN broadcast Jan. 13, 2005) ..................................................... 41

Scalia, Antonin, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881 (1983) ......... 40, 41, 46

Schwartz, David S., *Mr. Madison's War on the General Welfare Clause*, 56 U.C. Davis L. Rev. 887 (2022) ......................................... 39

Spanbauer, Julie M., *The First Amendment Right to Petition Government for a Redress of Grievances: Cut from a Different Cloth*,
21 Hastings Const. L.Q. 15 (1993) .................................................… 27

Stansbury, Arthur J., *Elementary Catechism on the Constitution of the United States* (1828) .................................................... 15

Stephen, James Fitzjames, *History of the Criminal Law of England* (1883)    28, 41

Story, Joseph, *Commentaries on the Constitution of the United States* (1833) .................................................... 10, 30, 39

Sunstein, Cass R., *Standing and the Privatization of Public Law*,
88 Colum. L. Rev. 1432 (1988) ........................................................... 34

Sunstein, Cass R., *What's Standing After Lujan? Of Citizen Suits, "Injuries," and Article III*, 91 Mich. L. Rev. 163 (1992) ....................... 35

Taft, William H., *Three Needed Steps of Progress*, 8 A.B.A. J. 34 (1922)    13

The Federalist No. 23 ............................................................................ 39

PAGE

The Federalist No. 78 ................................................................ 5, 6, 15

*The People's {Ancient and Just} Liberties Assrted in the Tryal of
   William Penn and William Mead* (1670) ............................... 36

Thomas, Clarence, *A Conversation with Justice Clarence Thomas*,
   Imprimis (Oct. 2007) ............................................................ 31

Tribe, Laurence H., *American Constitutional Law* 110 (2d ed. 1988) ..... 34

Tucker, St. George, *Blackstone's Commentaries* app'x. ......................... 30

United States Courts/Federal Judicial Center, *Prohibition
   in the Federal Courts: A Timeline*............................................. 13

Wilson, James, *The Works of James Wilson* (1790-92 lectures)
   (James D. Andrews ed., 1896) ............................................... 7, 18

## JURISDICTIONAL STATEMENT

Appellant seeks enforcement of a self-executing constitutional disqualification against an individual allegedly unlawfully exercising the Office of President within the District of Columbia through the traditional remedy of quo warranto, expressly preserved by Congress in D.C. Code §§ 16-3501–3503 and the Judiciary Act of 1789. As this case arises directly under the Constitution of the United States, U.S. Const. amend. XIV, § 3, this Court has jurisdiction. 28 U.S.C. § 1331.

The District is a proper venue, as Congress expressly vested the United States District Court for the District of Columbia with jurisdiction over quo warranto proceedings challenging persons who "unlawfully hold[] or exercise[] . . . a public office of the United States," D.C. Code § 16-3501, and the Presidency is a qualifying public office.

 The District Court dismissed this matter on grounds of "standing"—a twentieth century judicial invention, with no apparent foundation in either the Constitution or common law. This Court reviews dismissals under Rule 12(b)(6) *de novo* and "accept[s] the operative complaint's well-pleaded factual allegations as true." *Esparraguera v. Dep't of the Army*, 101 F.4th 28, 33 (D.C. Cir. 2024).

As the District Court issued its final appealable order on April 16, 2026, and the appeal was perfected on May 11, 2026, this appeal is timely. 28 U.S.C. § 1291.

1

**ISSUE PRESENTED**

Did the trial court err in requiring a showing of standing as a prerequisite to issuance of a quo warranto against Appellee Donald Trump?

**STATEMENT OF THE CASE AND SUMMARY OF THE ARGUMENT**

An oathbreaking adjudged insurrectionist not absolved by Congress is constitutionally barred from serving as President. U.S. Const. amend. XIV, § 3.  Thus, based on the judgment of a competent court, Donald Trump is constitutionally ineligible to serve. The pertinent Section of the Fourteenth Amendment provides:

> No person shall ... hold any office, civil or military, under the United States, ... [**then, D**] who, having previously taken an oath ... as an officer of the United States ... to support the Constitution of the United States [**Condition A**], shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof [**Condition B**]. But Congress may by a vote of two-thirds of each House, remove such disability [**not Condition C**].

U.S. Const. amend. XIV, § 3 (excerpted; interpretive commentary supplied).

It is a hard ban. Like the requirement that a Senator be over thirty, have been a citizen for at least nine years, and an inhabitant of that State. U.S. Const. art. I, § 3, cl. 3. The only difference is that it is not necessarily a permanent ban. U.S. Const. amend. XIV, § 3. And that fact is legally controlling.[1]

---

[1] It is Appellant's position that Congress could fix Trump's eligibility problem, even today. *See* the cases of John Rice, 1 Hind's *Precedents of the House of Representatives* ch. 14, § 460, at 472-73 (1907), Lewis McKenzie, *id.* at 476-78, and wartime governor of North Carolina Zebulon Vance. "[T]he Vance saga proves that 'the Senate accepted the premise that, if it chose, it could have removed the disabilities of Zebulon Vance after his election, a procedure that had been followed for officials elected by several other southern states.'" *Cawthorn v. Amalfi,* 35 F. 4th 245, 280 (4th Cir. 2022) (Richardson, J., concurring; citation omitted).

Section Three distills to a simple rule: **If A and B but NOT C, then D.** And every fact of legal consequence is capable of judicial notice:

1. The judge of a competent court found after a full trial on the merits in which Trump fully participated by clear and convincing evidence that he had engaged in insurrection, *Anderson v. Griswold*, No. 23CV32577, ¶¶ 241, 298 (Dist. Ct., City & Cnty. of Denver, Nov. 17, 2023) [**Condition B**]. *Trump v. Anderson,* 601 U.S. 100 (2024), did not disturb the trial court's factual findings.[2]
2. During that trial, Trump stipulated that he had sworn out a qualifying oath. Id. at ¶ 56. [**Condition A**].
3. Congress has never, by the required vote of two-thirds of each House, removed Trump's disability [**not Condition C**].

Ergo, Trump may not serve as President [**then, D**].

The only open questions are who may enforce this provision and how it may be enforced. These questions are answered by historical practice. First, it is clear that the framers of the Amendment intended that they be enforced by courts pursuant to the ancient writ of quo warranto. Second, although they expected that the primary enforcers would be federal and state attorneys general, the law made provisions for private citizens to invoke the writ when public officials declined due to partisanship, indolence, or sloth. See e.g., *N.M. ex rel. White v. Griffin*, No. D-101-CV-2022-300473 (N.M. Dist. Ct. Santa Fe Cnty. 2022) (private relator had standing to

---

[2] The only question of law properly before the Supreme Court in *Trump* was whether "the Colorado Supreme Court err[ed] in ordering President Trump excluded from the 2024 presidential primary ballot," *Trump v. Anderson*, Pet. Br. at (i). As such, the question of whether Trump could legally serve as President was never before the Court. Nor could it have been in early 2004 on ripeness grounds, as Congress could have removed that disability at any time—even after the election. U.S. Const. amend. XIV § 3.  Collateral estoppel is available at the discretion of the Court.

proceed). The suggestion that a former insurrectionist could not be a Congressman, judge, or member of the Otero (N.M.) County Board of Commissioners, but could somehow serve as President, is so patently absurd that to even state the case is to refute it. The law must therefore contain some mechanism by which it can be enforced against a usurper masquerading as President when the system fails.

The Framers' Constitution furnishes that mechanism: the public interest lawsuit. When enforcement of Section Three against the President depends on officials who serve at the President's pleasure, the conflict of interest is self-evident. Even asking a judge appointed by Donald Trump to preside over a matter deciding his personal fate creates the appearance of a conflict. See *Cheney v. United States District Court for the District of Columbia*, 541 U.S. 913 (2004) (Scalia, J., mem.). But as Section Three creates the right not to be governed by an oathbreaking adjudged insurrectionist, the law must provide an effective remedy, as a right without a remedy is a logical absurdity. *Ashby v. White* [1703] 92 Eng. Rep. 126, 136 (K.B.).

The public interest lawsuit enables the system to overcome these conflicts. The citizen's right to challenge unconstitutional laws affecting him and to compel public officials to obey the law is "a valuable constitutional safeguard against inertia or partiality on the part of authority," *Gouriet v. Union of Post Ofc. Workers* [1978] A.C. 435, 477 (H.L.), flourishing a pedigree as old as the common law itself. Yet, the district court dismissed the action on standing grounds. This appeal followed.

4

**ARGUMENT**

As Chief Justice Taft admits, the judicially-invented twentieth century doctrine of "standing" is less of a constitutional imperative than it is a docket management tool. It has no foundation in the Constitution, is at odds with historical practice, does violence to the bedrock principle of separation of powers, and invites unrestrained judicial discretion. At bare minimum, it cannot apply to public interest litigation, as its stringent application there would effectively void the Constitution itself.

Modern standing doctrine is ostensibly built on the bedrock of "separation of powers." *Allen v. Wright*, 468 U.S. 737, 752 (1984). The conceptual flaw with this premise is that the Framers separated those powers in 1789, and the judiciary has no constitutional authority to upset that balance.[3] The Framers' baseline assumption was that justiciable public-right disputes were to be adjudicated, and that prerogative writs supplied effective vehicles for enforcement.

---

[3] It has long been understood that the judicial office is to declare law, not make it. As Sir Francis Bacon explained, the office of the judge "is *jus dicere*, and not *jus dare*; to interpret law, and not to make law." Francis Bacon, *Essays* LVI (Of Judicature) (1620). Blackstone similarly observed that a judge is "sworn to determine, not according to his own judgments, but according to the known laws." 1 Wm. Blackstone, *Commentaries on the Laws of England* 69 (1765).

The Constitution entrusted the federal judiciary with the judicial Power—authority to apply the law of the land to the facts of every case properly before it, but not to revise the Constitution itself. Under our system the judicial role is "to decide what the law is, not to declare what it should be." *Minor v. Happersett*, 88 U.S. 162, 178 (1874); accord, e.g., The Federalist No. 78, 468-69 (Alexander Hamilton) (C. Rossiter ed. 1987). When courts exceed that authority, their acts constitute "an unconstitutional assumption of powers … which no lapse of time or respectable array of opinion should make us hesitate to correct." *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79 (1938).

## I. UNDER THE FRAMERS' CONSTITUTION, GENERALIZED GRIEVANCES ARE GENERALLY JUSTICIABLE.

*"If the law supposes that," said Mr. Bumble, squeezing his hat emphatically in both hands, "the law is a ass—a idiot."*

~Charles Dickens[4]

Under Britain's unwritten "constitution," Parliament was supreme. **This was the evil the Framers intended to remedy.** In all things great and small, "the Constitution ought to be preferred to the statute, the intention of the people to the intention of their agents." The Federalist No. 78 at 467 (Hamilton). The core purpose of courts of justice under the Framers' system was to serve as a bulwark against legislative and executive overreach. But if courts cannot remedy a large and ill-defined set of flagrant constitutional violations because they are "generalized grievances," they can no longer serve in their intended capacity.

This is the fatal conceptual flaw of the Taft-era reforms.

### A. Form Follows Function.

If there is anyone who can speak with more authority about the Framers' intention in crafting Article III than Justice James Wilson, it is difficult to imagine who. A signatory to the Declaration of Independence, Wilson served on the Committee on Detail drafting Article III—the original is literally in his own hand.[5] The first in his

---

[4] Charles Dickens, *Oliver Twist* Ch. LI (1837–39) [sic].

[5] The Committee on Detail in Philadelphia was comprised of Wilson, John Rutledge, Oliver Ellsworth, Edmund Randolph, and Nathaniel Gorham. George Wythe, who taught both Jefferson and

famous series of lectures on the law in 1791 was attended by Washington, Adams, and most of Congress.[6] One of his lectures compared America's new Constitution with Britain's unwritten one. Quoting Blackstone, he explained the conceptual problem with parliamentary supremacy:

> "[I]f the parliament will positively enact a thing to be done, which is unreasonable; I know of no power that can control it: and the examples usually alleged in support of this sense of the rule do none of them prove, that, where the main object of a statute is unreasonable, the judges are at liberty to reject it: for that were to set the judicial power above that of the legislature, which would be subversive of all government." "No court has power to defeat the intent of the legislature, when couched in such evident and express words, as to leave no doubt concerning its intention."

1 *The Works of James Wilson* 539 (James D. Andrews ed., 1896).

By contrast, under the American system, the written Constitution is the supreme law—which no judge, legislative body, or executive may lawfully transgress:

> Now, let us suppose, that the legislature should pass an act, manifestly repugnant to some part of the constitution; and that the operation and validity of both should come regularly in question before a court . ... The supreme power of the United States has given one rule: a subordinate power in the United States has given a contradictory rule: the former is the law of the land; as a necessary consequence, the latter is void, and has no operation. In this manner it is the right and it is the duty of a court of justice, under the constitution of the United States, to decide.

---

John Marshall, left the Convention early for personal reasons.  Of those gentlemen, only Wilson wrote and spoke extensively.

[6] Nathan Dorn, James Wilson and Natural Law in the First Years of the Republic, *In Custodia Legis* (Law Library of Congress) (Apr. 30, 2026), https://blogs.loc.gov/law/2026/04/james-wilson-and-natural-law-in-the-first-years-of-the-republic/.

7

> The effects of this salutary regulation, necessarily resulting from the constitution, are great and illustrious. In consequence of it, the bounds of the legislative power—a power the most apt to overleap its bounds—are not only distinctly marked in the system itself; but effectual and permanent provision is made, that every transgression of those bounds shall be adjudged and rendered vain and fruitless. What a noble guard against legislative despotism!

Id. at 541.

As a matter of law and logic, the jurisdiction of our courts to hear these questions must be plenary. "The judicial Power shall extend to ALL Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority." U.S. Const. art. III, § 2, cl. 1 (emphasis added). Not "some" cases. The more generalized the grievance, the more important that the courts serve as a check against legislative power.

The Jay Court reflected this understanding, scrupulously respecting the limits of their remit. When asked to give advisory opinions and administer pension claims, they refused because that was outside that remit.[7] Chief Justice Marshall added meat to the judicial bones in his pellucid opinions in *Marbury, Cohens, McCulloch*, and *Osborn*, but those opinions were already integral to early American law. *E.g., Kamper v. Hawkins*, 3 Va. 20 (1793) (often referred to as proto-*Marbury*).

---

[7] Letter from the Justices of the Supreme Court to President George Washington (Aug. 8, 1793), National Archives, https://www.archives.gov/college-park/highlights/justices-to-washington (advisory opinions); *Hayburn's Case*, 2 U.S. 409, 410 (1792) (letter of Wilson, J., et al.) ("Because the business directed by this act is not of a judicial nature. It forms no part of the power vested by the Constitution in the courts of the United States; the Circuit court must, consequently, have proceeded without constitutional authority.").

And "all cases" meant all cases.[8] Chief Justice Marshall famously expressed the Court's remit in terms of duty:

> It is most true that this Court will not take jurisdiction if it should not but it is equally true, that it must take jurisdiction if it should. The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the constitution. We cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the constitution. Questions may occur which we would gladly avoid, but we cannot avoid them. All we can do is, to exercise our best judgment, and conscientiously to perform our duty.

*Cohens v. Virginia,* 19 U.S. 264, 404 (1821). Shortly thereafter, he defined a case:

> [T]he 3d article declares, "that the judicial power shall extend to all cases in law and equity arising under this constitution, the laws of the United States, and treaties made, or which shall be made, under their authority."

> This clause enables the judicial department to receive jurisdiction to the full extent of the constitution, laws, and treaties of the United States, when any question respecting them shall assume such a form that the judicial power is capable of acting on it. That power is capable of acting only when the subject is submitted to it by a party who asserts his rights in the form prescribed by law. It then becomes a case, and the constitution declares, that the judicial power shall extend to all cases arising under the constitution, laws, and treaties of the United States.

*Osborn v. Bank of the United States*, 22 U.S. 738, 819 (1824).

---

[8] While some States authorize their courts to issue advisory opinions, *e.g.,* Colo. Const. art. VI, § 3, they are not "cases" under *Osborn,* as no party is asserting rights. Similarly, political questions provide no objective rule of decision, and were understood to fall outside the judicial power. *E.g., Foster v. Neilson*, 27 U.S. 253, 309 (1829) (a question "respecting the boundaries of nations ... [is] more a political than a legal question"). In short, "the action of the political branches of the government in a matter that belongs to them, is conclusive." *Williams v. Suffolk Ins. Co.,* 38 U.S. 415, 421 (1839).

In his influential *Commentaries*, Justice (Professor) Story confirms this under-standing, in observing that the judicial duty is triggered—and thereby, facilitated—by a well-pleaded complaint:

> Another inquiry may be, what constitutes a case within the meaning of this clause. It is clear, that the judicial department is authorized to exercise juris-diction to the full extent of the constitution, laws, and treaties of the United States, whenever any question respecting them shall assume such a form, that the judicial power is capable of acting upon it. When it has assumed such a form, it then becomes a case; and then, and not till then, the judicial power attaches to it. A case, then, in the sense of this clause of the constitution, arises, when some subject, touching the constitution, laws, or treaties of the United States, is submitted to the courts by a party, who asserts his rights in the form prescribed by law.

3 J. Story, *Commentaries on the United States Constitution* § 1640 (1836).

But what are the citizen's rights? In England, "[e]very subject,' said Justice Lush, "has an interest in securing that public duties shall be exercised only by those com-petent to exercise them." *Rex v. Speyer L.R.* [1916] 1 K.B. 595, 628. What had ex-isted in England as a public right incident to subjectship became, under the American theory of popular sovereignty, a constitutional right of the people to insist that public power be exercised only by lawful officers. And in the wake of the Civil War, that set of individuals no longer included oathbreaking adjudged insurrectionists not ab-solved by Congress. U.S. Const. amend. XIV, § 3.

All that was required to create a "case" in 1868 was a party asserting rights in the form prescribed by law—here, the writ of quo warranto—adverse parties, a live

controversy, and the availability of a judicial remedy the court could provide. All four of those requisites are met in *Smith v. Trump.*

**B. "A Page of History is Worth a Volume of Logic"[9]**

As legal history is not taught in the standard law school curriculum, few lawyers appreciate how radical the judicial rewrite of our Constitution has been. And sadly, that translates to "experts," plying their trade in a fog of ignorance.

At the dawn of our Republic, courts operated under a writ system, which was the rough equivalent of playing *Jeopardy*: If you forgot to phrase your answer in the form of a question, you lost. For example, if someone owed you money under a sealed contract, you used the writ of Debt.  If it was an informal promise, you used the writ of Assumpsit.  Using the wrong one meant automatic dismissal. A demurrer (motion challenging legal sufficiency) could end the case instantly on these grounds, without ever reaching the real dispute.

The Framers' approach was syllogistic. A legal question had to "assume such a form that the judicial power is capable of acting on it." *Osborn,* 22 U.S. at 819. This is in contrast to political questions, where courts have no judicially discoverable and manageable standards with which to resolve disputes. *E.g., Luther v. Borden*, 48

---

[9] *New York Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921) (per Holmes, J.).

U.S. 1 (1849). *Baker v. Carr*, 369 U.S. 186 (1962), refined that doctrine, leaving readily applicable jurisdictional lines.

Under the Framers' design, every dispute was assigned to the appropriate branch of government. If a case was justiciable, a court had to hear it; to not do so would be "treason to the constitution." *Cohens,* 19 U.S. at 404. The Supreme Court noted "a decided preponderance of American authority in favor of the doctrine, that private persons may move for a mandamus to enforce a public duty, not due to the government as such, without the intervention of the government law-officer." *Union Pacific R.R. v. Hall*, 91 U.S. 343, 355 (1876). There were no gaps in the system. The law was settled—until the Taft Court decided to unsettle it.

## C. *Frothingham*: The Birth of Standing

"In his first four years as Chief Justice of the United States, William Howard Taft convinced Congress to pass two reform bills that substantially enhanced the power of the federal courts, the Supreme Court, and the Chief Justice." These reforms were justified by concern that, in Taft's own words, "unless something is done, [the federal courts] are likely to be swamped, and delay is a denial of justice."[10]

---

[10] Justin Crowe, *The Forging of Judicial Autonomy: Political Entrepreneurship and the Reforms of William Howard Taft*, 69 J. of Pol. 73, 73 (Feb. 2007).

12

William H. Taft, *Three Needed Steps of Progress*, 8 A.B.A. J. 34, 34 (1922).[11] But rather than ask Congress to create new courts capable of handling the work, Chief Justice (and former President) Taft explored creative ways to shut the courthouse doors.

The most pernicious of these new judicial inventions was the modern doctrine of standing. It was introduced in a case where the constitutionality of a federal tax was challenged. A more pristine example of judicial policy-making is hardly imaginable:

> If one taxpayer may champion and litigate such a cause, then every other taxpayer may do the same, not only in respect of the statute here under review but also in respect of every other appropriation act and statute whose administration requires the outlay of public money, and whose validity may be questioned. The bare suggestion of such a result, **with its attendant inconveniences**, goes far to sustain the conclusion which we have reached, that a suit of this character cannot be maintained.

*Frothingham v. Mellon,* 262 U.S. 447, 487 (1923) (emphasis added).

"Attendant inconveniences?" The Taft reforms were a triumph of judicial hubris. Justice Frankfurter was brutally candid: "At the heart of the proposal was the conservation of the Supreme Court as the arbiter of legal issues of national significance. But this object could hardly be attained so long as there persisted the obstinate

---

[11] In Taft's defense, this was a direct consequence of Prohibition, trebling the size of the federal criminal docket. Fed. Judicial Ctr., *Prohibition in the Federal Courts: A Timeline* (last visited May 26, 2026), https://www.fjc.gov/history/exhibits/prohibition-in-federal-courts-timeline. This further gave rise to the widespread use of plea bargains. See John F. Padgett, *Plea Bargaining and Prohibition in the Federal Courts*, 1908–1934, 24 Law & Soc'y Rev. 367 (1990).

13

conception that the Court was to be the vindicator of all federal rights." Felix Frankfurter & James M. Landis, *The Business of the Supreme Court: A Study in the Federal Judicial System* 260–61 (Macmillan 1928) (Johnson Reprint Corp. 1972). These reforms were a fundamental breach of the social contract, as expounded by Chief Justice Marshall: "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection." *Marbury v. Madison*, 5 U.S. 137, 163 (1803).

## D. The Saving Grace of Common Sense[12]



*Just when these American citizens needed their rights the most, their government took 'em away. And rights aren't rights if someone can take 'em away. They're privileges.*

~George Carlin[56]    13

The Constitution is not an abstruse document, accessible only by kings and philosophers. It was intended to be understood. It was literally reduced to a catechism for primary school students:

---

[12] Justice Frankfurter counseled that we should read the law "with the saving grace of common sense." *Bell v. United States*, 349 U.S. 81, 83 (1955).

[13] George Carlin, It's Bad for Ya (transcript), *Scraps from the Loft* (Nov. 10, 2016), (HBO television broadcast Mar. 1, 2008).

Q. But suppose Congress should make a law contrary to the Constitution, must the people obey it?
A. No.
Q. Who is to determine whether any law is contrary to the Constitution or no, the people themselves?
A. No: but certain persons whom they have appointed, [called Judges of the Supreme Court of the United States.]

Arthur J. Stansbury, *Elementary Catechism on the Constitution of the United States* 11 (1828).

"A constitution, to contain an accurate detail of all the subdivisions of which its great powers will admit, and of all the means by which they may be carried into execution, would partake of the prolixity of a legal code, and could scarcely be embraced by the human mind." *McCulloch v. Maryland*, 17 U.S. 316, 407 (1819). But it can be distilled to essentials that even a child can grasp. Hamilton is more precise: "the courts were designed to be an intermediate body between the people and the legislature, in order, among other things, to keep the latter within the limits assigned to their authority." *The Federalist No. 78* at 467 (Hamilton).

"Every transgression of those bounds." "ALL Cases, in Law and Equity." The The Framers used absolute terms, with a purpose. The judiciary was designed to restrain the coordinate branches. As most of the questions that matter to society affect society generally, any citizen could challenge the legality of governmental conduct. When Rev. Stansbury wrote, modern standing doctrine was still a century in the future. The notion that the scope of the judicial power was reduced from any

15

question respecting the Constitution that assumes such a form that the judicial power is capable of acting on it to "only those controversies judges choose to entertain" is as nonsensical as it is illicit. "The life of the law has not been logic: it has been experience." Oliver Wendell Holmes, Jr., *The Common Law* 1 (1881).

### E. A Tale of Two Constitutions

Majorities can pass laws, elect Presidents, and raise standing armies, but the only redoubt the citizen has is in the shelter of the courts.  And ultimately, we are all a minority of one.

Our courts were at their noblest when they protected individuals from the tyranny of the majority. E.g., *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 642 (1943); *Engel v. Vitale*, 370 U.S. 421 (1962). And our judges were at their noblest when they stood alone. E.g., *Plessy v. Ferguson*, 163 U.S. 537, 552 (1896) (Harlan, J., dissenting); *Korematsu v. United States*, 323 U.S. 214, 242 (1944) (Jackson, J., dissenting). This is what the Framers envisioned when they empowered judges with fixed salaries and lifetime tenure subject to the condition of good behavior. U.S. Const. art. III, § 1. And our judges are at their worst when they deliberately avoid their duty to decide, which Chief Justice Marshall described as "treason to the constitution," *Cohens*, 21 U.S. at 404, a practice common enough for a professor to give it a name: "judicial inactivism." Chad Oldfather, *Defining Judicial Inactivism: Models of Adjudication and the Duty to Decide*, 94 Geo. L.J. 121 (2006).

16

Two cases will illustrate the constitutionally fatal contradiction modern standing doctrine precipitates. The first is where the Supreme Court reversed an unpublished (not even precedential!) per curiam opinion, *Holt v. Hobbs*, 509 Fed.Appx. 561 (8th Cir. 2013), *rev'd,* 574 U.S. 352 (2015), where a Muslim plaintiff complained about regulations prohibiting him from growing his beard. But the Supreme Court rescued Holt's constitutionally protected rights from the bowels of lower court indifference, as it does from time to time. See e.g., *Erickson v. Pardus*, 551 U.S. 89 (2007) (per curiam reversal of scandalously inadequate Tenth Circuit de novo review).

This is how the system was designed: Every man's right is protected, and everyone's rights are protected.  In objecting to The Judiciary Act of 1925, ch. 229, 43 Stat. 936 (1925) (abolishing the common law right to certiorari review), Senator Heflin of Alabama observed: "If one man's right were preserved and safeguarded the court in that action served a just purpose and it could well afford to consider 100 to 200 cases if necessary in order to do justice by even one American citizen. ... I am not ready to surrender the average citizen's right to appeal and accept in its stead discretionary power given to the judges of the Supreme Court." 66 Cong. Rec. 2928 (Feb. 3, 1925).[14]

---

[14]  At common law, certiorari is a supervisory writ, apprising a superior court of "jurisdictional error, failure to observe some applicable requirement of procedural fairness, fraud and 'error of law on the face of the record.'" *Craig v South Australia* (1995) 184 CLR 163, 175 (H.C. Austl.) (citations omitted). "The underlying policy is that all inferior courts and authorities have only limited jurisdiction or powers and must be kept within their legal bounds. This is the concern of the

17

Now, contrast this with more generalized grievances, such as the Trump tariffs. According to the Constitution, the taxing power resides in Congress. U.S. Const. art. I, § 8. And while Congress can delegate aspects of the power to impose tariffs to the President, see e.g., *Field v. Clark*, 143 U.S. 649 (1892), it is axiomatic that a man who cannot serve as President cannot lawfully impose them. Appellant's harm is, therefore, immediate and ongoing. See *Smith v. Flores*, No. 25-cv-1042 (CJN) (D.D.C. 2026) (challenging the Trump tariffs). But if a usurper picks a lot of pockets, it is of less constitutional consequence than if he only picks a few?

And there is the defining crisis of our times: global warming. We have known that it would be a problem since the 1970s—at least, they knew it at Exxon. Shannon Hall, Exxon Knew about Climate Change almost 40 years ago, *Scientific American*, Oct. 26, 2015. A group of youngsters sued "to enforce the most basic structural principle embedded in our system of ordered liberty: that the Constitution does not condone the Nation's willful destruction." *Juliana v. United States*, 947 F.3d 1159, 1175 (9th Cir. 2020) (Staton, J., dissenting). Had the case gone to trial, and resulted in liability, a district court could have awarded an array of remedies. See *Brown v.*

---

Crown, for the sake of orderly administration of justice, but it is a private complaint which sets the Crown in motion." *Surya Dev Rai v. Ram Chander Rai,* (2003) 6 SCC 675 (India).

The Senator's concern was well-founded. The Supreme Court no longer endeavors to correct even egregious errors, Sup. Ct. R. 10, forever interring the concept of equal justice under law. **Needless to say, the Framers did not intend this**. *United States v. Peters*, 9 U.S. 121, 126 (1795); 2 *Works of Wilson* 149-50 (central purpose of a supreme court is to ensure uniformity of outcomes).

18

*Board of Education of Topeka*, 347 U.S. 483 (1954). But again, it was a generalized grievance, and Taft-era standing rules were invoked.

This illustrates the conceptual absurdity of the modern judge-invented doctrine of standing. While the length of a beard might matter to a hundred prisoners, there is nothing of greater consequence to our children than a livable environment. They have no political power by definition, so the suggestion that they take it to City Hall is facially absurd. The more generalized the grievance, the more important it is to society in aggregate, and the more justiciable it is.

What modern standing doctrine has done is create a broad class of vital individual and structural rights for which there is no remedy at law. Without courts to enforce them, the citizen has no effective defense against the tyranny of the majority—or a well-heeled oligarch class. And that, in turn, marks the de facto death of our Republic. "Oligarchy is when men of property have the government in their hands." Aristotle, *Politics*, Bk. III, Pt. VIII.

## II.  THE FRAMERS OF THE FOURTEENTH AMENDMENT INTENDED IT TO BE ENFORCED.

> *It cannot be presumed that any clause in the constitution is intended to be without effect; and, therefore, such a construction is inadmissible, unless the words require it.*
> ~*Marbury v. Madison*, 5 U.S. at 174.

The Constitution is expected to function, and courts exist to ensure that it does. See *Heydon's Case* [1584] 76 Eng. Rep. 637, 638 (K.B.) (statutes are to be construed

19

to suppress the mischief and advance the remedy). The Thirty-Ninth Congress had a clear vision of how former Rebels would be prevented from reassuming power after their restoration to the Union, and neither judicial doctrine nor statute may be construed to nullify Section Three in practice.

**A. Congress Intended Section 3 to be Enforced via Quo Warranto.**

The Fourteenth Amendment is self-executing. *United States v. Stanley (Civil Rights Cases),* 109 U.S. 3, 20 (1883) ("the Thirteenth amendment, as well as the Fourteenth, is undoubtedly self-executing without any ancillary legislation"), *City of Boerne v. Flores*, 521 U.S. 507, 524 (1997) (Fourteenth); *see* William Baude & Michael S. Paulsen, *The Sweep and Force of Section Three*, 172 U. Pa. L. Rev. 605 (2024). But more importantly, **it cannot *not* be**. *Marbury,* 5 U.S. at 174.

That the framers of the Fourteenth Amendment understood that it was self-executing is established by the historical evidence. Upon readmission of Georgia to representation, Col. Nathan Tift was elected as a Democrat to the Fortieth Congress. The Fourteenth Amendment was ratified on July 9, 1868—presumably, while Tift was *en route*. But rather than remove Tift's disability, **Congress passed a private bill enabling him to serve out that Term—but no more**. *Trump v. Anderson*, 601 U.S. 100, ___, 144 S. Ct. 662, 669 & n.2. Then, Georgia sent six secessionists to the Forty-First Congress which the members refused to seat, including Tift.

20

Biographical Directory: Forty-First Congress at 179 & fn. 11, https://www.govinfo.gov/content/pkg/GPO-CDOC-108hdoc222/pdf/GPO-CDOC-108hdoc222-3-41.pdf.

Simply put, if an enabling statute were necessary to enforce Section Three, the Fortieth Congress had no need to pass a private bill to seat Col. Tift. Conversely, if such legislation were a prerequisite to exclusion, the Forty-First Congress could not have barred him from serving. See *Powell v. McCormack*, 395 U.S. 486 (1969) (Congress may not exclude a duly elected member who satisfies the Constitution's qualifications). **The *Anderson* majority elided this dispositive point.**

Crucially, Congress relied on the ancient writ of quo warranto,[15] the traditional judicial mechanism for testing unlawful claims to public office, to enforce Section Three's disqualification. It enacted the Enforcement Act of 1870, imposing a duty on local federal district attorneys to prioritize civil actions removing insurrectionists holding nonlegislative office—federal or state—in violation of Section Three, relying on quo warranto or a state analogue to enforce it. Enforcement Act of 1870, §14, 16 Stat. 143 (1870). In the District of Columbia, as part of its supervision of the

---

[15] The writ of quo warranto is uniquely British, and almost as old as Magna Carta. Statute of Quo Warranto, 18 Edw. I Stat. 2 (1290). But its application was never confined to England. Courts throughout the common-law world have employed the writ (or its statutory equivalents) to remove officials unlawfully holding public office, confirming its role as a structural safeguard of popular sovereignty. The mechanics are substantially identical to those prescribed in the D.C. Code, where a citizen may proceed without a showing of injury, but only after the Attorney-General declines. *See e.g., University of Mysore v. C.D. Govinda Rao*, AIR 1965 SC 491 (India) (explaining the writ).

District, Congress also enacted the predecessor to D.C. Code 16-3501, et seq., pre-supposing judicial enforcement of Section Three. Courts have adjudicated Section Three challenges through *quo warranto* where available, *see e.g., Louisiana ex rel. Sandlin v. Watkins*, 21 La. Ann. 631 (La. 1869), or mandamus, if not. *E.g., Worthy v. Barrett*, 63 N.C. 199, 205 (1869).

When they ran out of Confederates to remove, Congress repealed the portion of the Act imposing a duty on prosecutors to prioritize Section Three enforcement, 35 Stat. 1153–1154; 62 Stat. 992–993, but the common law remedy of quo warranto remained.[16]  And this remedy remains available today, consistent with the Framers' design.

## B. The D.C. Code Provides a Blueprint for Enforcement

The D.C. quo warranto statute furnishes a functional enforcement blueprint for Section Three. D.C. Code § 16-3501 authorizes a civil quo warranto proceeding against any person within the District of Columbia who "unlawfully holds or exercises" a federal office. The Presidency plainly qualifies as such an office, and the

---

[16] Although the Federal Rules of Civil Procedure abolished the formal writ system, see Fed. R. Civ. P. 2, 81(b), the substance of the remedy survives in modern civil practice. In the District of Columbia, Congress has preserved quo warranto by statute, see D.C. Code §§ 16-3501 et seq., while elsewhere it is pursued as a civil action "in the nature of" quo warranto. See *United States ex rel. State of Wisconsin v. First Federal Sav. & Loan Ass'n*, 151 F. Supp. 690 (E.D. Wis. 1957) (entertaining such an action under modern procedure); cf. *Newman v. United States ex rel. Frizzell*, 238 U.S. 537 (1915) (addressing relator authority in quo warranto proceedings in the District of Columbia).

President necessarily exercises it within the District. As the proceeding is civil in nature, the relevant facts need only be established by a preponderance of the evidence.

The statutory scheme reflects a carefully calibrated division of authority. The Attorney General or United States Attorney retains primary responsibility to institute proceedings, whether on his own motion or upon the relation of a private citizen. D.C. Code § 16-3502. But Congress also included a failsafe mechanism. If those officials refuse to act, an "interested person" may petition the court directly for leave to proceed in the name of the United States. D.C. Code § 16-3503.

This failsafe mechanism carries unique importance when the target of the quo warranto is the President himself. Structurally, the President's political appointees function as his alter ego, who serve at his pleasure and are bound to advance his legal position. And at the risk of stating the obvious, Donald Trump won't be inclined to prosecute himself. See *Trump v. Internal Revenue Service,* No. 1:26-cv-20609 (S.D. Fla. Apr. 24, 2026), ECF No. 41, at 3 & n.2.

By requiring leave of court, the District's statutory scheme protects officeholders from frivolous or unsupported challenges. For example, President Obama was the subject of a series of suits challenging his eligibility. See, e.g., *Taitz v. Obama*, 707 F. Supp. 2d 1, 2-3 (D.D.C. 2010); *Hollister v. Soetoro*, 601 F. Supp. 2d 179, 181 (D.D.C. 2009); *Sibley v. Obama*, No. 1:12-cv-01832 (D.D.C. 2012). Because the

judge acts as gatekeeper in quo warranto proceedings—leave is granted only upon a judicial determination that the petition is legally sufficient, D.C. Code §§ 16-3501–3503—those claims were rejected at the threshold as unsupported or otherwise insufficient to proceed.

By contrast, Appellant's claim rests on a judgment entered after trial, a stipulated fact, and a fact subject to judicial notice. The reviewing court may also consider whether the other court's findings have preclusive effect. On its face, the claim is neither frivolous nor unsupported.

Taken together, the statute reflects a carefully calibrated enforcement scheme: primary enforcement responsibility lies with public officials, but courts retain authority to permit private relators to test unlawful claims to federal office. The only sticking point was the addition of the words "interested party" in the D.C. Code of 1902, which was never so much as debated in Congress. In short, courts have read that term in a way which inadvertently nullifies Section Three.

## C. The *Newman* Problem—and the Law's Solution

> **THE COURT:** At a conference of the Third Circuit, the Court of Appeals defended their unpublished opinions on the ground that they're not well reasoned, they don't give them much thought.  So it's hard to say that that's a well-reasoned opinion that has any precedential value.
> **MR. WINEBRAKE:** Well, we concede—

24

**THE COURT: It's instructive on what they'll do without much thought.[17]**

Congress does a lot of things without much thought, and the original enactment of the D.C. Code in 1901 appears to have been one of them. Act of March 3, 1901, ch. 854, 31 Stat. 1189 (codifying the laws of the District of Columbia). It was one of ten enrolled bills, passed in the rush to finish the session. 56 Cong. Rec. 3603 (1901). There was no substantive floor debate. If even one Congressman read it, it would be remarkable. Congress took the time to define "insane person" and "lunatic," 31 Stat. at 1189, but not "interested person." To put it charitably, the Senate spent more floor time on the introduction of reindeer to Alaska. 34 Cong. Rec. 90 (1900) (56th Cong., 2d Sess.). That the statute they were passing could have been read as nullifying a section of a constitutional amendment—at least, as it applied to the President—would never have occurred to them.

But our system is self-correcting. "When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Crowell v. Benson*, 285 U.S. 22, 62 (1932). "[W]here an otherwise acceptable construction of a statute

---

[17] Sarah Ricks, *The Perils of Unpublished Non-Precedential Federal Appellate Opinions: A Case Study of the Substantive Due Process State-Created Danger Doctrine in One Circuit*, 81 Wash. L. Rev. 217, 269 (2006) (emphasis added).

would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council*, 485 U.S. 568, 575 (1988) (collecting two centuries' worth of cases). Read in tandem with the absurd-results canon, e.g., *United States v. Kirby*, 74 U.S. 482, 486 (1868) ("All laws should receive a sensible construction."), these principles prevent courts from lapsing into the sort of hyper-literalist textualism that elevates silence and definitional omission over the Constitution itself. Congress may legislate against the backdrop of the Constitution, but it should never be presumed to have repealed it via inadvertence.

## III. THE DOCTRINE OF STANDING IS A TWENTIETH CENTURY JUDICIAL AMENDMENT TO THE CONSTITUTION.

Much as the original Framers built on the bedrock of the received common law, the framers of the Fourteenth Amendment built on the Constitution and developed law when drafting it. With respect to Section Three, they did not have to pass laws to effectuate it, because the writ of quo warranto had been available for centuries. They did not have to worry about who would enforce it, because in 1868, any citizen could engage in public-interest litigation. See Raoul Berger, *Standing to Sue in Public Actions: Is it a Constitutional Requirement?*, 78 Yale L.J. 816 (1969); Louis L. Jaffe, *Standing to Secure Judicial Review: Private Actions*, 75 Harv. L. Rev. 255

26

(1961); Robert J. Pushaw Jr., *Article III's Case/Controversy Distinction and the Dual Functions of Federal Courts,* 69 Notre Dame L. Rev. 447 (1994). The law drew no distinction between a generalized grievance and a specific one, nor did it need to.

But judges have so completely rewritten our law that, in the words of Judge Posner, "[i]f you look at the entire body of constitutional law, that body of law bears very little resemblance to the text of the Constitution in 1789, 1791, and 1868."[18]  In what Judge Bork acerbically called a "judicial *coup d'état*," Robert H. Bork, *Coercing Virtue: The Worldwide Rule of Judges* 13 (AEI Press, 2003), the revisions have been so extensive that the Bill of Rights can more accurately be called 'The Bill of Polite Suggestions.' Wide swaths of text have been interred by interpretation, from the Petition Clause of the First Amendment, see Julie M. Spanbauer, *The First Amendment Right to Petition Government for a Redress of Grievances: Cut from a Different Cloth*, 21 Hastings Const. L.Q. 15 (1993); Gregory A. Mark*, The Vestigial Constitution: The History and Significance of the Right to Petition*, 66 Fordham L. Rev. 2153 (1998), to the Supremacy Clause. Jordan J. Paust, *International Law as Law of the United States* (2d ed. 2003) (originally, validly enacted treaties were "the

---

[18]  Josh Blackman, Judge Posner on Judging, Birthright Citizenship, and Precedent, Nov. 6, 2015 (partial transcript of Judge Posner's talk at the 2015 Loyola Constitutional Law Colloquium), at http://joshblackman.com/blog/2015/11/06/judge-posner-on-judging-birthright-citizenship-and-precedent/

supreme Law of the Land"). Viewed *in pari materia,* these covert judicial emendations have had one aim: to emasculate the once-powerful American citizen.

## A. To the Framers, the People Were Citizens, Not Serfs.

The Constitution is not a suicide pact. Fearing the worst, the Framers provided the citizenry with an impressive toolbox of remedies, grounded in the common law, to be invoked when the system broke down—as it has here. Mandamus and prohibition were available where public officials acted outside the scope of their agency. Quo warranto remedied usurpations of office. Scire facias enforced the good behavior tenure of Article III judges. Habeas remedied unlawful imprisonment. And private criminal prosecution ensured that leaders would obey the law. As Sir James Fitzjames Stephen observed, they form the collective sword of liberty:

> [N]o stronger or more effectual guarantee can be provided for the due observance of the law of the land, by all persons under all circumstances, than is given by **the power, conceded to everyone by the English system**, of testing the legality of any conduct of which he disapproves, either on private or on public grounds, by a criminal prosecution[19].

Rules don't work if people have no fear of them. The specter of citizen-initiated action was intended to instill healthy fear in our agents in government.

---

[19] Note, *Private Prosecution: A Remedy for District Attorneys' Unwarranted Inaction*, 65 Yale L. J. 209, 209 (1955) (*quoting* 1 James Fitzjames Stephen, *History of the Criminal Law* 496 (1883), emphasis added).

These safeguards interposed between the people and "the magistrate who exercised the sovereign power" were constitutionally preserved by the Tenth Amendment's reservation of powers. Madison left no doubt as to his intention to preserve the citizen's ancient right to wield this arsenal of remedies at need, observing that

> ...those who opposed [the proposed Constitution] disliked it because it did not contain effectual provison [sic] against encroachments on particular rights, **and those safeguards which they have been long accustomed to have interposed between them and the magistrate who exercised the sovereign power**: nor ought we to consider them safe, while a great number of our fellow citizens think these securities necessary.

1 *Annals of Congress* 439 (1789) (statement of Rep. Madison) (emphasis added).

Madison's solution—which literally saved the Constitution[20]—became our modern-day Ninth and Tenth Amendments. All the rights and remedies available to the English subject were preserved in perpetuity unless expressly yielded, creating a "presumption of liberty." *See generally*, Randy Barnett, *Restoring the Lost Constitution: The Presumption of Liberty* (2004).

Existing law provided additional fortifications. It is a well-established principle of statutory construction that "[t]he common law ... ought not to be deemed to be repealed, unless the language of a statute be clear and explicit for this purpose." *Fairfax's Devisee v. Hunter's Lessee*, 11 U.S. 603, 623 (1813). "Statutes which

---

[20] David Larson, NC's 'Great Refusal' to sign US Constitution led to Bill of Rights, *Carolina J.,* Apr. 3, 2026 (noting that North Carolina refused to ratify the Constitution without a bill of rights, and that with New York and Virginia aligned, the risk of disunion would have been intolerably high).

invade the common law ... are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident [and] to abrogate a common-law principle, the statute must 'speak directly' to the question addressed by the common law." *United States v. Texas*, 507 U.S. 529, 534 (1993).

Historically, quo warranto was a writ of the sovereign. But in our constitutional system, sovereignty resides in the people. Professor (Justice) Story elaborates: "the *jus summi imperii*, the absolute right to govern ... [resides] in the people of the nation." 2 Story, *Commentaries* at § 207-08. Public officials exercise authority only as agents of law: "All the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it." *United States v. Lee*, 106 U.S. 196, 220 (1882). And as an essential corollary, the people must have some mechanism for doing the binding. As St. George Tucker adds, "representative democracy ceases to exist the moment that the public functionaries are by any means absolved from their responsibility to their constituents." 1 *Tucker's Blackstone* 297 (editor's app'x.). This was the legal foundation upon which the framers of Section Three built in crafting the Amendment and its remedies. But a century ago, the law underwent a seismic shift through the judicial invention of modern standing doctrine.

30

## B. *CASA*: The Revenge of Originalism

As Justice Thomas counsels, "[w]e should always start, when we read the Constitution, by reading the Declaration [of Independence], because it gives us the reasons why the structure of the Constitution was designed the way it was." Clarence Thomas, A Conversation with Justice Clarence Thomas, 36-10 *Imprimis* (Oct. 2007). The Framers designed the Constitution to prevent unchecked executive power—a principle rooted in their experience under King George III, as chronicled in the Declaration. Consistent with this aim, as discussed earlier, the Framers constitutionalized the prerogative writs, preserving the citizen's right to enforce the law when the Executive abuses his delegated authority. 1 *Annals of Congress* 450 (1789) (statement of Rep. Madison). Accordingly, nothing in Article III requires a litigant to possess an outsized personal stake in a matter.[21] In short, standing doctrine, as presently construed, is not a constitutional command but a judicially created rule—one that cannot nullify structural safeguards the Framers reserved to the People.

Apart from the lack of a constitutional pedigree—which should be fatal in and of itself, U.S. Const. art. VI, cl. 2—modern standing doctrine has been placed on

---

[21] "Most scholars reach the same conclusion from this history as Justice Harlan did in his dissent in *Flast v. Cohen*: there is nothing in the "judicial power," or "cases" and "controversies" language that requires the person bringing the action to suffer an injury in fact." Edward A. Hartnett, *The Standing of the United States: How Criminal Prosecutions Show That Standing Doctrine Is Looking for Answers in All the Wrong Places*, 97 Mich. L. Rev. 2239, 2242 (1997); *See United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 982 F. Supp. 1261, 1267 (S.D. Tex. 1997) ("The Court's modern conception of standing, as an Article III requirement, did not come into being until relatively recently.") (citation omitted).

31

precarious footing by the current Court.  In a frameworthy quote for the ages, Justice

Barrett brutally chastised Justice Jackson:

> We will not dwell on JUSTICE JACKSON's argument, which is at odds with more than two centuries' worth of precedent, not to mention **the Constitution itself**. … JUSTICE JACKSON would do well to heed her own admonition: "[E]veryone, from the President on down, is bound by law." Ibid. **That goes for judges too**.

*Trump v. CASA, Inc.,* No. 24A884, 606 U.S. 831 (Jun. 27, 2025) *slip. op.* at 23-24

(mem.) (capitalization in original) (emphasis added). The topic was the nationwide

injunction—a judicial invention of twentieth century vintage. It was driven by limits

on the power of a judge sitting in equity, established long before America was a

nation. But the rule itself—that agents of the law are bound by the limits of their

agency—remains.

## C. The Timing Paradox: Why Standing Falls Here

Whether it is clothed in the narrow reading of "interested person" used in *New-man, supra*, or the expansive expression of standing doctrine in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), there appears to be no universe in which it can

survive in relation to *Smith v. Trump*. The better view is that anyone can bring a

public interest lawsuit, see Louis L. Jaffe, *The Citizen as Litigant in Public Actions: The Non-Hohfeldian or Ideological Plaintiff*, 116 U. Pa. L. Rev. 1033 (1968), and if

the Constitution ever cried out an exception to standing, it is here.

Chief Justice Marshall explained the judicial duty in terms that leave no room for discretionary gatekeeping: "[T]his Court will not take jurisdiction if it should not: but it is equally true that it must take jurisdiction if it should." *Cohens,* 19 U.S. at 404. Modern standing doctrine stands that foundational principle on its head. Instead of asking whether a court possesses jurisdiction and the power to grant relief, it asks whether the plaintiff's injury is sufficiently individualized to warrant judicial attention.

In the unique context of *Smith v. Trump*, modern standing doctrine creates a hole in the law. An oathbreaking insurrectionist who has not been absolved by Congress cannot serve in public office, but Congress could absolve an insurrectionist President-elect at 11:59:59 A.M. on January 20, if it so chose. The Attorney General could also refuse to enforce Section Three in advance. Thus, when a legally unqualified President-elect takes the oath at 12:00:01 P.M.—before the first Executive Order is signed—no one could claim an injury sufficient to confer standing under *Lujan,* and no one could enforce the Constitution. This is a structural paradox the modern doctrine of standing cannot resolve. Section Three exists to ensure that no insurrectionist may attain office—even for a minute—and "[a] constitutional provision should not be construed so as to defeat its evident purpose, but rather so as to give it effective operation and suppress the mischief at which it was aimed." *Jarrolt v. Moberly*, 103 U.S. 580, 586 (1880). But more generically, the doctrine of standing introduces

33

intolerable uncertainty into the law. We can read the published "law" until we go blind, but rely on it at our peril.

Professor Tribe notes: "It is clear … that the Court has selectively employed standing and justiciability doctrines generally." L. Tribe, *American Constitutional Law* 110 (2d ed. 1988). As "the Federal courts established pursuant to Article III of the Constitution do not render advisory opinions," *United Public Workers of America v. Mitchell*, 330 U.S. 75, 89 (1947), citizens cannot know in advance whether the law will protect them. In short, the hapless citizen must run toward the football like Charlie Brown (vindication of rights guaranteed by our law), never knowing whether Judge Lucy will let him kick it.

The doctrine's incoherence has long been recognized. As Professor Pierce has demonstrated empirically, lower courts resolving standing questions have produced contradictory results: materially indistinguishable cases produce wildly divergent outcomes, justified by inconsistent invocations of separation-of-powers rhetoric.[22] Scholars have savaged the doctrine, describing it as "incoherent,"[23] "permeated with sophistry,"[24] "manipulable" and permeated with "doctrinal confusion,"[25] and akin to

---

[22] Richard J. Pierce, Jr., *Is Standing Law or Politics?*, 77 N.C. L. Rev. 1741 (1999) (political views of judges better predict outcomes in standing cases than analysis of the doctrine).

[23] William A. Fletcher, *The Structure of Standing*, 98 Yale L. J. 221, 221 (1988).

[24] 4 K. Davis, *Admin. L. Treatise* § 24:35, at 342 (2d ed. 1983).

[25] Cass R. Sunstein, *Standing and the Privatization of Public Law*, 88 Colum. L. Rev. 1432, 1458 (1988).

substantive due process.[26] Dissenting judges on both sides denounced it as a pre-scription for outcome-driven judicial mischief. *See Biden v. Nebraska*, 143 S.Ct. 2355, 2391 (2023) (Kagan, J., dissenting); *United States v. Texas*, 143 S.Ct. 1964, 1989 (2023) (Alito, J., dissenting). But the most powerful refutation is provided by the incomparable Antonin Scalia.

.

## D. The Scalia Test

As the Constitution would not precipitate an absurd result where any plausible alternative is available, *see e.g., Haggar Co. v. Helvering*, 308 U.S. 389, 394 (1940), we expect any judicial doctrines derived from it to make sense. As a final check, the competent judge must answer the question famously posited by Scalia: "Would the States conceivably have entered into the Union if the Constitution itself contained the Court's holding?" *Arizona v. United States*, No. 11-182, Jun. 25, 2012 (Scalia, J., bench statement at 6). The judge-made doctrine of standing fails this test.

### 1. *The Pennsylvania Delegation Would Never Have Agreed*.

"All rise!" To us, it might seem picayune. But William Penn—later to become the founder of Pennsylvania—had a quirk: He refused to remove his hat in deference to superior authority—the rough equivalent of standing when a judge enters a

---

[26] Sunstein, *What's Standing After* Lujan*? Of Citizen Suits, "Injuries," and Article III*, 91 Mich. L. Rev. 163, 167 (1992) ("[T]he injury-in-fact requirement should be counted as a prominent con-temporary version of early twentieth-century substantive due process.").

courtroom. And this infuriated an English judge, who forcibly had a hat placed on his head so he would either have to remove it or be held in contempt. He refused, leading to a famous trial. *The People's {Ancient and Just} Liberties Assrted in the Tryal of William Penn and William Mead* (Sept. 1670).

In a land where "all men are created equal," *The Declaration of Independence*, para. 2 (U.S. 1776), the right not to genuflect to superior authority is an indefeasible attribute of citizenship.[27]  But it would seem, on its face, to be so trivial a matter that under modern standing doctrine, a court could easily deem it to be insignificant and thus, unworthy of legal protection.

While on paper, the Constitution protects all of our rights, both great and small, the only "rights" you have are the ones a judge will enforce at need.  If they are "too generalized," or not—in a judge's empirically unpredictable view[28]—"deeply rooted in this Nation's history and tradition," *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997), the courthouse doors are shut.[29]

---

[27] *Liberté, égalité, fraternité!* While Penn acted out of religious conviction, rejection of the notion of a superior authority was an integral part of Enlightenment thought, traceable to the Levellers in Britain.

[28] As the dissenters famously lamented in *Obergefell v. Hodges*, 576 U.S. 644 (2015), protection of certain classes of right ultimately comes down to a judicial vote. It is hard to argue, for instance, that the right to enter into interracial marriages is "deeply rooted in this Nation's history and tradition," *Loving v. Virginia,* 388 U.S. 1 (1967), but the right to terminate a pregnancy prior to quickening that existed at common law, *Roe v. Wade,* 410 U.S. 113, 133-34 (1973), is not.

[29] In its modern iteration, the "Footnote Four" (*United States v. Carolene Products Co.,* 304 U.S. 144, 152 & fn. 4 (1938)) approach to rights jurisprudence relegates the Ninth Amendment to the dust-bin of history—invoking the ineffable concept of substantive due process to specially protect

The problem modern standing doctrine precipitates is both structural and easy to understand. The doctrine of *stare decisis* creates reliance interests in the public, enabling citizens to plan their affairs with confidence. *Moragne v. States Marine Lines*, 398 U.S. 375, 403 (1970). But the uncertainty modern standing doctrine injects into the law impairs everyone's liberty, for when "one must guess what conduct or utterances may lose him his position, one necessarily will 'steer far wider of the unlawful zone,'" *Speiser v. Randall*, 357 U.S. 513, 526 (1958), and "the value of a sword of Damocles is that it hangs—not that it drops." *Arnett v. Kennedy*, 416 U.S. 134, 231 (1974) (Marshall, J., dissenting). And as federal courts cannot issue advisory opinions, e.g., *Golden v. Zwickler*, 394 U.S. 103, 109 (1969), the hapless citizen cannot possibly know in advance whether the "right" that he reasonably believes he has will be protected by law or not, necessarily discouraging its exercise.

By stark contrast, the Framers' Constitution entrusts the people with deciding what rights are to be protected from government invasion. To suggest that the Pennsylvania delegation—led by the incomparable Ben Franklin—would endorse any

---

only rights which judges deem as being "deeply rooted in this Nation's history and tradition," *e.g., Moore v. East Cleveland*, 431 U.S. 494, 503 (plurality opinion), or somehow "implicit in the concept of ordered liberty." *Palko v. Connecticut*, 302 U.S. 319, 325 (1937). Courts require a "careful description" of the asserted "fundamental" liberty interest, *Reno v. Flores*, 507 U.S. 292, 302 (1993)—an engraved invitation to untrammeled judicial discretion. In turn, it has the noxious effect of elevating some rights to the exalted status of 'fundamental' while disparaging and denying others, thereby doing violence to the plain meaning of the Ninth Amendment. Barnett, *Lost Constitution* at 254. It creates no principled rule of decision, as the outcome of any given dispute is more a function of the judge's personal predilections than anything else.

constitution that would not protect a young William Penn shatters credulity. Their Constitution opened the courthouse doors to all justiciable claims. All that was required was that the judicial power be capable of acting on the dispute, *Osborn,* 22 U.S. at 819, and of crafting a remedy. To hold otherwise would void the Ninth and Tenth Amendments, reducing *Marbury v. Madison* to a solemn mockery.

2. *Standing is a Source of Unending Judicial Mischief*

Whether a plaintiff ultimately possesses a valid cause of action is distinct from whether Article III permits the exercise of judicial power, and *Frothingham, supra*, is the prooftext.

Public-right litigation does not transform into advisory litigation merely because the plaintiff's interest is widely shared. Advisory opinions involve abstract legal advice divorced from an actual controversy and request for coercive judicial relief. By contrast, prerogative writs, mandamus proceedings, quo warranto actions, and relator suits historically alleged concrete unlawful conduct by public officials and sought judicial remedies capable of redressing it.

*Frothingham* could have been disposed of cleanly on the merits by holding that in enacting the Sheppard-Towner Maternity Act of 1921, Congress acted within its enumerated powers under the General Welfare Clause, U.S. Const. Art. I, § 8, cl. 1, when it authorized appropriations for grants to states to promote maternal and infant health. Though the dispute might seem almost frivolous from our vantage point, it

38

was still a live issue until the New Deal.[30] Hamilton's view ultimately prevailed in *United States v. Butler*, 297 U.S. 1, 66-7 (1936), but it should have been resolved in *Frothingham. Cohens, supra.* At essence, the Taft Court was looking for a vehicle for advancing its new vision of standing, and *Frothingham* was handy.

The *Frothingham* Court expressed concern that if public-right litigation is widely allowed without an attendant showing of standing, it would open the courts to a flood of new litigation. This may or may not be true, **but the Constitution does not care**. There is no provision declaring that that the Constitution is only applicable when applying it is easy.  If volume becomes a problem, then more judgeships would be in order.  But that is a policy question, outside the scope of Article III.

3. *Scalia vs. Scalia: The Lujan Paradox*

> *It is of overwhelming importance, however, who it is that rules me. Today's decree says that my Ruler, and the Ruler of 320 million Americans coast-to-coast, is a majority of the nine lawyers on the Supreme Court.*
> ~Justice Antonin Scalia[31]

---

[30] The Framers' generation debated the scope of the General Welfare Clause vigorously. "Brutus" warned that its "most natural and grammatical" reading would give Congress power "to almost every thing about which any legislative power can be employed," turning the new government into a consolidated national authority with no real limits. David S. Schwartz, *Mr. Madison's War on the General Welfare Clause*, 56 U.C. Davis L. Rev. 887, 900 (2022). While Madison shared his concern, Hamilton read the clause as conferring a distinct power to tax and spend for objects of national (general) concern, not confined strictly to the subsequent enumerated powers—so long as the spending was not purely local or for private benefit. See The Federalist No. 23; Alexander Hamilton, *Report on Manufactures*, Dec. 7, 1792, 1 Annals of Congress 1011-12; see also 1 Story, *Commentaries* at §§ 906-22.

[31] *Obergefell v. Hodges*, 576 U.S. 644, 718 (2015) (Scalia, J., dissenting).

Modern standing doctrine rests on the seductive common-sense presumption that if something doesn't matter to you, you won't fight that hard to keep it. Prior to his authorship of *Lujan, supra,* Justice Scalia reduced standing doctrine to a pedestrian inquiry: "What's it to you?" Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983).

As Scalia perceptively noted, *Obergefell* was not about the culture wars. Rather, it was about the overwhelming importance of "who it is that rules me"—which is why this appeal is before this Court. The Framers solved the problem of unconsented rule with bullets, *Declaration of Independence* (U.S. 1776), and left us a constitution **so that _we_ wouldn't _have_ to**. The Constitution exists to protect our unalienable rights—and courts exist to ensure that it does. *See* Thomas Jefferson, *Notes on the State of Virginia*, Query XIII (1785) (constitutions are designed to obviate the need for resort to rebellion).

It was the ultimate in "generalized grievances." It seems passing strange that a document born of generalized grievances would ever dismiss them as insubstantial. The Constitution serves as a hard limit on the freedom of action of our authorized agents in government, and the preamble to the Bill of Rights reiterated those limits.

Thus, when a public official acts outside the lawful scope of that agency, a cause of action is created.[32] 1 Stephen, *History* at 496.

Standing is "a doctrine born largely of judicial creativity." *Sierra v. City of Hallandale Beach, Fla.*, 996 F. 3d 1110, 1128 (11th Cir. 2021) (Newsom, J., concurring). But given the overwhelming importance of "who it is that rules me," it is difficult to imagine a more essential exception to the rule.  Speaking for our Continental Congress, John Dickenson tersely asked:

> If it was possible for men, who exercise their reason to believe, that the divine Author of our existence intended a part of the human race to hold an absolute property in, and an unbounded power over others, marked out by his infinite goodness and wisdom, as the objects of a legal domination never rightfully resistible, however severe and oppressive, the inhabitants of these colonies

---

[32] Scalia's path to modern standing doctrine is a fascinating one. "The text is the law, and it is the text that must be observed." Antonin Scalia, *A Matter of Interpretation: Federal Courts and the Law* 22 (1997). Problem is, "[d]espite the clarity with which the Court articulates the elements of standing, the Constitution contains no Standing Clause." Richard H. Fallon, Jr. et al., *Hart & Wechsler's The Federal Courts and the Federal System* 101 (7th ed. 2015). Nor can it be fairly extracted from the plain text of Article III, as Chief Justice Marshall made clear in *Osborn*. In a debate with Justice Breyer, Scalia expounded on his jurisprudential approach: "[W]hen I interpret the American Constitution is I try to understand what it meant, what was understood by the society to mean when it was adopted." Antonin Scalia, Constitutional Relevance of Foreign Court Decisions (C-SPAN television broadcast Jan. 13, 2005), unofficial transcript available at http://www.freerepublic.com/focus/news/1352357/posts. He added that he uses "foreign law more than anybody on the Court. But it's all old English law." Id.

This makes Scalia's *Lujan* decision and standing-related law review article perplexing, as he makes no discernible effort to extract the doctrine from the Framers' writings and pertinent case law. Uncharacteristically, he failed to engage the thorough historical scholarship of Berger and Jaffe. The closest he comes to an encounter with the Framers' views was an excerpt from *Marbury v. Madison*: "The province of the court is, solely, to decide on the rights of individuals, not to inquire how the executive, or executive officers, perform duties in which they have a discretion." Scalia, *Doctrine of Standing* at 883.  But where the citizen's rights begin, discretion ends. It logically follows that when executive officers improperly invade citizens' rights, they acted outside the legitimate scope of that discretion, and a judicial remedy is warranted.

might at least require from the parliament of Great-Britain some evidence, that this dreadful authority over them, has been granted to that body.

*Declaration of the Causes and Necessity of Taking Up Arms* (U.S. July 6, 1775).

The courts cannot *not* be open.  The alternative is too terrifying to contemplate.

### E.  Roberts vs. Roberts

When applying for the job of Chief Justice, John Roberts declared that the job of a judge is to call balls and strikes. But in cases involving Donald Trump, his strike zone has become almost infinitely elastic.

In *Dobbs*, Roberts declared: "If it is not necessary to decide more to dispose of a case, then it is necessary not to decide more." *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 348 (2022) (Roberts, C. J., concurring in judgment). But in *Trump v. Anderson*, he jettisoned any pretense of adherence to that principle, overruling *Marbury v. Madison* along the way. As demonstrated above, Section Three was self-executing, coming complete with an enforcement mechanism. But the fatal conceptual flaw with concluding that Congress must pass a law to give life to Section Three is that it can repeal it by repealing the statute.

Standing doctrine has never been on stable constitutional ground. "*Frothingham*, decided in 1923, was in the heyday of substantive due process, when courts were sitting in judgment on the wisdom or reasonableness of legislation. ... [the Court] was indeed transforming itself into the Council of Revision which was rejected by

42

the Constitutional Convention." *Flast v. Cohen*, 392 U.S. 83, 107 (1968) (Douglas, J., dissenting). If *CASA, supra*, is any guide, modern standing doctrine is swirling the constitutional drain. But that is beside the point.

This is the rare case where constitutional imperatives trump that doctrine. Even if standing doctrine could be forcibly extracted from Article III, it cannot be read so broadly as to reduce Section Three to a dead letter. "It cannot be presumed that any clause in the constitution is intended to be without effect; and, therefore, such a construction is inadmissible, unless the words require it." *Marbury*, 5 U.S. at 174.

## F. For Sake of Completeness: Collateral Estoppel

Judges will naturally ask what weight should be given to the trial court's finding that Donald Trump engaged in insurrection. The answer lies in the threshold question of whether Appellant's petition was legally sufficient for a judge to grant leave to proceed. As the other operative facts are judicially noticeable, a showing that the court's finding can be given preclusive effect should meet that threshold.

The doctrine of collateral estoppel prohibits relitigation of an issue of fact or law that has been decided in earlier litigation. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n.5 (1979). More precisely, issue preclusion generally bars relitigation when: (1) the issue "being raised must have been contested by the parties and submitted for judicial determination in the prior case"; (2) it "must have been actually and necessarily determined by a court of competent jurisdiction in that prior case,"

43

and (3) it "must not work a basic unfairness to the party bound by the first determination." *Yamaha Corp. of America v. United States,* 961 F. 2d 245, 254 (D.C. Cir. 1992). The purpose is judicial economy.

All three elements are easily met here. "First, the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case." *Yamaha, supra.* "The issue must have been 'actually decided' after a 'full and fair opportunity' for litigation." *Robi v. Five Platters, Inc.,* 838 F.2d 318,322 (9th Cir. 1988). "[T]he district court conducted a five-day trial. The court found by clear and convincing evidence that President Trump engaged in insurrection as those terms are used in Section Three. *Anderson v. Griswold*, No. 23CV32577, ¶¶ 241, 298 (Dist. Ct., City & Cnty. of Denver, Nov. 17, 2023)." *Anderson,* 543 P.3d at 296. In other courts, a preponderance was sufficient. *E.g., N.M. ex rel. White v. Griffin*, No. D-101-CV-2022-00473 (N.M. Dist. Ct. Santa Fe Cnty. 2022). The Colorado Supreme Court independently reviewed the record and affirmed the trial court's findings. *Anderson,* 543 P.3d at 297. "The pendency of an appeal, we note, does not automatically diminish the preclusive effects of a prior adjudication." *Martin v. Malhoyt*, 830 F. 2d 237, 264 (D.C. Cir. 1987). This Court can take judicial notice of the trial court's ruling on that threshold issue, and assess its preclusive effect.

Second, the Denver District Court was a court of competent jurisdiction in this matter. A "court of competent jurisdiction" is a court that has both subject matter jurisdiction and personal jurisdiction over the party against which collateral estoppel is sought, as well as any other jurisdictional requirements necessary to adjudicate the dispute. *Pennoyer v. Neff*, 95 U.S. 714, 722–23 (1878); Restatement (Second) of Judgments § 1 (1982). Colorado district courts are "trial courts of record with general jurisdiction … [with] original jurisdiction in all civil, probate, and criminal cases," with irrelevant exceptions. Colo. Const. art. VI, § 9(1). Trump intervened and tried to remove the case to federal court, *Anderson,* 543 P.3d at 298, and his voluntary appearance constitutes consent to the court's jurisdiction. *Adam v. Saenger*, 303 U.S. 59, 67-8 (1938). And it has been settled law that state courts have concurrent jurisdiction over federal claims since Colorado became a state. *Claflin v. Houseman*, 93 U.S. 130 (1876).  Ergo, that Court was competent to hear the issue.

Finally, estoppel does not "work a basic unfairness" to Trump. In *Parklane,* the Court speaks of situations where it would be unfair to apply the doctrine, but none of them seem to apply. If a billionaire is sued for petty cash, he might have "little incentive to defend vigorously, particularly if future suits are not foreseeable." *Parklane,* 439 U.S. at 330. Similarly, a plaintiff might lie in wait, letting others establish the law controlling in the case before taking advantage of his adversary. *Id.* In either instance, invoking estoppel offensively would be unjust. And ever mindful that

45

fairness is paramount in a court of equity, Plaintiff would not ask if either applied. But they don't. Trump litigated *Anderson* through every available avenue, including the Supreme Court.

Could the question whether Mr. Trump engaged in insurrection be revisited? Of course. Collateral estoppel is an equitable doctrine. But because Appellant need only establish insurrection by a preponderance of the evidence, see *Griffin, supra*, the relevant question is whether judicial economy would be served by relitigating an issue already examined exhaustively by Congress, a Colorado trial court, a federal grand jury, and the Special Counsel. Appellant respectfully submits that it would not.

## IV. A MODEST PROPOSAL

An ambitious Panel could follow Justice Barrett, Judge Newsom, and the academy in using this case as a vehicle for revisiting the constitutionally grotesque twentieth century judge-made doctrine of standing. But *this* Panel need not do so.

"What's it to you?" Justice Scalia answered his own question. "It is of overwhelming importance, however, who it is that rules me." The unexamined premise of the generalized-grievance doctrine is that injuries shared by many are somehow less fit for judicial consideration than those suffered by a select few. But as Justice Scalia—the author of *Lujan*—acknowledged, there are "generalized grievances" of

46

such "overwhelming importance" that people would fight and die to secure them. "Who rules me?" sits atop that list.

And at the risk of stating the obvious, July 4, 1776.

Appellant alleges ongoing subjection to executive authority exercised by a constitutionally ineligible officeholder. That injury is directly traceable to Appellee's continued occupancy of the Presidency and redressable through the traditional remedy of quo warranto. Section Three sets forth a rule of law: If A and B, but not C, then D. This is a pure legal question. *Osborn, supra*. Political consequences do not magically transform pure legal questions into political ones. *Baker v. Carr*, supra.

The Attorney General and local U.S. Attorney are agents of Appellee, serving at his pleasure. They won't enforce Section Three. And this would have been the situation under Obama, Clinton, or Nixon. But that begs the question: If a citizen can't enforce it, and even a presidential candidate can't enforce it, *Sibley*, supra, who can enforce Section Three?

"It cannot be presumed that any clause in the constitution is intended to be without effect; and, therefore, such a construction is inadmissible, unless the words require it." *Marbury*, 5 U.S. at 174. This Court need not reconsider *Lujan* generally. It need only recognize that applying the generalized-grievance doctrine here would render Section Three unenforceable—an absurd result that the Constitution cannot countenance.

47

**CONCLUSION**



Our predicament is grave. Stanford historian Jack Rakove summarizes bluntly: "The Constitution has failed, and we no longer know which institution will rescue it." Jack N. Rakove, It's Not Just a Constitutional Crisis in the Trump Era. It's Constitutional Failure, *Washington Monthly*, Jun. 27, 2025. The Framers saw this coming from 230 years away. Alexander Hamilton, *Objections and Answers Respecting the Administration* (Aug. 18, 1792). They guarded against it, expecting the courts and citizenry to serve as a last line of defense. But they certainly did not expect the Supreme Court to enable it. See, e.g., *Trump v. United States*, 603 U.S. 593 (2024); *Trump v. Anderson, supra.*

Our Constitution is a piece of parchment. It can't defend itself. The bell tolls for you. Appellant respectfully urges this Court to reverse the dismissal below, and to direct the court below to issue a writ of quo warranto without delay.

48

Respectfully submitted this 10th day of June, 2026.



K.L. Smith
3649 Evergreen Pkwy. #504
Evergreen, CO. 80437-0504
Manncoulter.fox@gmail.com
(720) 404-5383


**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,983 words, excluding the parts of the brief exempted by Rule 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

/s/ K. L. Smith
K. L. Smith

49

## CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2026, I caused to be served the foregoing OPENING BRIEF OF APPELLANT K. L. SMITH via First-Class Mail and e-mail on Appellee at the following address:

Bisola Oni, Asst. U.S. Attorney
601 D Street, N.W.
Washington, DC 20530
bisola.oni@usdoj.gov

/s/ K. L. Smith
K. L. Smith
